46

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3
   UNITED STATES OF AMERICA,          )
4                                     )
                     Plaintiff,       )
5                                     )  No. 09 CR 846
             vs.                      )  Chicago, Illinois
6                                     )  October 13, 2010
   JOHN A. FORD,                      )  10:00 a.m.
7                                     )
                     Defendant.       )
8

9                        VOLUME 2

10           TRANSCRIPT OF PROCEEDINGS - TRIAL

11        BEFORE THE HONORABLE ROBERT W. GETTLEMAN

12                     AND A JURY

13  APPEARANCES:

14  For the Plaintiff:      HON. PATRICK FITZGERALD
                            United States Attorney
15                          219 South Dearborn Street
                            Chicago, Illinois 60604
16                          BY:  MS. CAROL A. BELL
                                 MR. RICK YOUNG
17

18  For the Defendant:      MICHAEL J. PETRO AND ASSOCIATES
                            53 West Jackson Boulevard
19                          Suite 324
                            Chicago, Illinois 60604
20                          BY:  MR. MICHAEL J. PETRO
                                 MS. QUINN A. MICHAELIS
21

22

23  Official Reporter:      JENNIFER S. COSTALES, CRR, RMR
                            219 South Dearborn Street
24                          Room 1706
                            Chicago, Illinois 60604
25                          (312) 427-5351

Thomas - direct

1    (Proceedings in open court.  Jury in.)

2        THE COURT:  Good morning, ladies and gentlemen.  Please

3    be seated.

4        I'm sorry for the delay.  I guess it was nobody's fault,

5    in this room anyway.  We try to start early and work hard, and

6    sometimes fate intervenes.  So thank you all for being here.

7    We'll resume Mr. Thomas's testimony.

8        MS. BELL:  Thank you, Your Honor.

9        DANNIE THOMAS, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

10                   DIRECT EXAMINATION (Resumed)

11   BY MS. BELL:

12   Q.  Good morning, Mr. Thomas.

13   A.  Good morning.

14   Q.  Mr. Thomas, on November 20th, 2007, did the U.S. Bank have

15   surveillance cameras?

16   A.  Yes.

17   Q.  Please describe to the jury how the bank surveillance system

18   worked at that time.

19   A.  There were, I would say, like seven or eight cameras.  They

20   work on a time-elapsed video.  Next to the vault room is where we

21   have, it's in a locked and secured metal cabinet is the VCR that

22   contains the tape.

23   Q.  At what angle are those cameras mounted in the bank?

24   A.  Each one is basically right off of where the ceiling is

25   facing downwards.  You know, so they're mounted high up like

                        Thomas - direct

1 | against the wall and the ceiling basically.

2 |          MS. BELL:  May I approach the witness, Your Honor?

3 |          THE COURT:  You may.

4 | BY MS. BELL:

5 | Q.  Mr. Thomas, I'm showing you what has been marked as

6 | Government's Exhibit 1.  Do you recognize it?

7 | A.  Yes.

8 | Q.  Is that a disk containing the U.S. Bank's video surveillance

9 | footage from the night of the robbery?

10 | A.  Yes.

11 | Q.  And how are you able to recognize that disk as containing the

12 | video surveillance footage from that night?

13 | A.  The number and my initials are located on it.

14 | Q.  So you've reviewed what's on that disk?

15 | A.  Correct, yes.

16 | Q.  Does the footage on the disk fairly and accurately depict

17 | what occurred during the bank robbery on November 20th, 2007?

18 | A.  Yes.

19 |          MS. BELL:  I offer Government's Exhibit 1 in evidence.

20 |          THE COURT:  Any objection?

21 |          MR. PETRO:  No, sir.  Thank you.

22 |          THE COURT:  Thank you.

23 |      (Government's Exhibit 1 was received in evidence.)

24 |          MS. BELL:  May I approach the witness again, Your Honor?

25 |          THE COURT:  Please.

Thomas - direct                                              49

1  BY MS. BELL:

2  Q.  Mr. Thomas, then showing you what has been marked as

3  Government's Exhibit 2, do you recognize that disk as well?

4  A.  Yes.

5  Q.  Are your initials on that disk?

6  A.  Yes, these are my initials.

7  Q.  Do you recognize Government's Exhibit 2 as being a series of

8  still images made from the bank's video footage from the night of

9  the robbery?

10 A.  Yes.

11 Q.  And do those images fairly and accurately depict what

12 occurred during the robbery on November 20th, 2007?

13 A.  Yes.

14 Q.  Are those images based on your review in chronological order?

15 A.  Yes.

16        MS. BELL:  At this time I move to admit Government's

17 Exhibit 2.

18        MR. PETRO:  No objection, sir.

19        THE COURT:  Thank you.  They may be admitted.

20    (Government's Exhibit 2 was received in evidence.)

21        MS. BELL:  May I publish Government's Exhibit 2 to the

22 jury, Your Honor?

23        THE COURT:  Sure.

24 BY MS. BELL:

25 Q.  Mr. Thomas, at this time I'd like to go through some of those

Thomas - direct

1  images.  Bear with me while I --
2          THE COURT:  Are you going to put them on the screen?
3          MS. BELL:  Yes, Your Honor.
4          THE COURT:  I'm going to try to see if I can lower the
5  lights a little bit to make it easier.
6          MS. BELL:  Thank you, Your Honor.
7  BY MS. BELL:
8  Q.  Mr. Thomas, directing your attention to Government Exhibit
9  2-1, could you briefly describe to the jury what is happening in
10  the top right corner of that image?
11  A.  In the top right corner, that's after I heard Merlyn scream.
12  You know, that's me coming out of my office, you know, running
13  towards the back exit.  And next to me is Svetlana.
14  Q.  Mr. Thomas, directing your attention to Government Exhibit
15  2-2, please describe to the jury what this image captures?
16  A.  This here is when I came around the corner.  And this is
17  where, you can't see Merlyn, but I'm blocking the view of her.
18  She's crouched in a fetal position, you know, on the floor, kind
19  of against the wall.
20          This is where the back exit is.  And that's the robber,
21  when I came, basically, telling me "This is a robbery," you know,
22  "Stand back or get back, big boy, fat boy."
23  Q.  And where is the bank's back door on this image, in which
24  corner?
25  A.  It would be on the left-hand side all the way to the top.

Thomas - direct

1  There is like an entrance up there.

2  Q.  Looking now at Government Exhibit 2-3, who is standing behind

3  you, Mr. Thomas?

4  A.  That is Svetlana Sisso that's directly behind me.  And this

5  is a camera angled up in the corner from like above the back

6  entrance, you know, directed into the lobby area, you know.

7       And Merlyn would be out of view, kind of like underneath

8  where the camera is, you wouldn't be able to see her, you know,

9  crouched beneath the camera.

10  Q.  Is that the robber in front of you?

11  A.  Correct.  And the robber is there with the hat.

12  Q.  Approximately how far were you from the robber at this time?

13  A.  This is probably about maybe 3 feet.

14  Q.  Now, after you discovered the robber hovering over Merlyn

15  Agravante at the back door, was he ever out of your view?

16  A.  No.

17  Q.  Mr. Thomas, I'm going to show you Government Exhibit 2-4 and

18  2-5?

19       MR. PETRO:  Judge, if I may?  If it's possible, if he's

20  referring to documents on the screen, may I relocate?

21       THE COURT:  Sure.

22       MR. PETRO:  Thank you.

23  BY MS. BELL:

24  Q.  Mr. Thomas, could you identify for the jury who all can be

25  seen in this image, 2-5?

Thomas - direct

1  A.  Where I'm standing there, just off on the left-hand side is

2  Svetlana.  Directly in front of me is the robber.  And on the

3  bottom of the screen is Merlyn.

4  Q.  And when you're talking about the bottom of the screen, are

5  you referring to the woman with the dark hair and the white

6  sweater?

7  A.  Correct, yes.  She's the one that was exiting, leaving for

8  the day.

9  Q.  Where -- sorry.  Where is the bank's back door in this image?

10 A.  It would be down in the right-hand corner, right bottom

11 screen of the corner, out of view.

12 Q.  Mr. Thomas, I'm going to show you another series of images

13 from the bank robbery that night.  Let's look at those with the

14 jury.  After that I'm going to ask you a few follow-up questions,

15 okay.

16       This is Government Exhibit 2-6.  I'm showing you

17 Government Exhibit 2-7, Exhibit 2-8, 2-9, Government Exhibit

18 2-10, 2-11, 2-12, 2-13, 2-14, 2-15, 2-16, and lastly, Government

19 Exhibit 2-17.

20       Mr. Thomas, if you could, please summarize for the jury

21 what we saw in this series of images from the bank robbery?

22 A.  In this series, that would be after he engaged or we engaged

23 at the back door, that would be him kind of directing me, you

24 know, take him to the vault.  And we're walking through the

25 lobby.  I'm kind of leading him from the back door through the

Thomas - direct

1  middle of the lobby into where the vault area is, you know, where

2  he was basically directed where he wanted to go, into the vault

3  area.  So that's just us walking through the lobby.

4  Q.  Were you speaking to the robber during that time?

5  A.  Yes, basically with my hands up just trying to, as we're

6  walking, you know, keep an eye on him and turning my head, trying

7  to look at him, you know, to keep his direction and his attention

8  on me, you know, instead of my employees, trying to keep the

9  employees calm.  But more or less, you know, trying to engage him

10  to keep his attention on me, you know, so he doesn't focus

11  basically, you know, to the rest of my staff.

12  Q.  Same thing, I'm going to show you a few more images,

13  specifically Government Exhibit 2-18 through 2-23.  And after we

14  look at those images, I'll ask you to summarize for the jury what

15  we're seeing.

16        Mr. Thomas, could you summarize what was occurring there

17  during the robbery to the best of your memory?

18  A.  On here, this is where -- this is just outside on the right

19  hand side of the screen here, lower right hand is where the vault

20  room is, inside there.

21        And in here, this is where the customer has access to

22  come in here where you can see where the safe box is and the two

23  closets on the left-hand side, where they review that.

24        But here, this is where we engaged, basically he wanted

25  to get into the vault and explaining to him that we don't have

Thomas - direct

1  access to get in there.  It needs two people.  The other person

2  is not there.  Again, Svetlana is trying to confirm with what I

3  was saying and she's trying to say the same thing, you know, that

4  we don't have access to kind of get in there.

5        Basically he's like looking in there, viewing in there.

6  And then he asked that -- well, let's get into or give me what's

7  inside the safe deposit boxes, which are the customer boxes.  You

8  know, again, just trying to explain we don't have access to those

9  either.  Those are customers.  We don't have the keys at all.  So

10 really nothing in there that I could give him, you know.

11       And here, explaining just the only thing available, you

12 know, the teller drawer that was open, for, you know, the

13 drive-through.

14 Q.  And approximately how close are you to the robber at this

15 time?

16 A.  Here about maybe, you know, 2 feet.

17 Q.  Were you making eye contact with him during this time?

18 A.  The whole time, yeah, just trying to make eye contact and

19 talking to him directly, yes.

20 Q.  All right.  Let's talk about a few more images.  We're going

21 to look now at Government Exhibit 2-24 through 2-36 and then

22 follow up with some questions.

23       Mr. Thomas, if you would as before, please summarize for

24 the jury what action was occurring during the bank robbery as

25 captured in these still images?

Thomas - direct

1  A.  On here, this is where, you know, after kind of telling him

2  that the teller drawer was the only thing available, we kind of

3  all went into the teller area, which is where Sam was located.

4  That's her teller drawer that she was standing by, which she's up

5  looks like in blue up on top of the screen there.

6          Svetlana, I think he handed the bags to Svetlana.

7  That's where he got the money out of the teller drawer, which she

8  kind of stood just out of view off to the side, which would be my

9  right-hand side on here, just out of view of the drive-through

10 window.

11          And Svetlana is the one that I guess got the cash.  You

12 know, he directed her to get the cash out of the drawer.  Or Sam

13 put it into the bag, and he retrieved the cash from her.

14          And this is where we're exiting out of the teller area.

15 Q.  And in this image that you're referring to, 2-36, what is the

16 robber holding?

17 A.  Those are like two pillowcases, light-colored pillowcases.

18 Q.  And what's inside the pillowcases?

19 A.  That would be the money from the teller drawer.

20 Q.  Mr. Thomas, I'll show you a few more images now if you could

21 please take a look at them now, specifically Government Exhibit

22 2-37 through 2-41.

23          Mr. Thomas, could you again summarize for the jury

24 what's occurring at this point in the bank robbery as captured by

25 these still images?

Thomas - direct

1  A.  On here, this is where after he's gotten the money from the

2  teller drawer, and we're trying to exit, but, you know, one more

3  time he's trying to demand to get access into the vault, "Give me

4  the money in the vault.  I know you can get in there."  And this

5  is where I'm kind of explaining to him that we don't have access.

6  "I'm not going to lie to you.  I'm not going to jeopardize my

7  life, you know, to basically, you know, lie to you to give you or

8  not give you the money or anything to get in there."

9        So he's just one more time trying to have access into

10  the vault, which kind of explaining "You got what you -- the most

11  you could get, you know.  You could go.  It's okay.  Get out of

12  here" kind of thing.

13  Q.  And what do we see in this image 2-41 in the lower right-hand

14  corner?

15  A.  The lower right-hand corner is the vault door.  We're

16  standing in front of where you can see the safe deposit boxes

17  again.  That's the door to get into the vault area.  And I'm

18  standing there.  To the left of me is Svetlana and the bank

19  robber, you know, standing in front of me.

20  Q.  How close are you to the robber at this point?

21  A.  Here about maybe 3 feet, 3 or 4 feet.

22  Q.  Were you making eye contact with him again?

23  A.  Yes.

24  Q.  Were you focusing your attention on the robber during the

25  robbery?

Thomas - direct

1  A.  Pretty much the whole time, yes.

2  Q.  Let's look at the remaining images from this disk, which is

3  Government's Exhibit 2-42 through 2-51 and talk about them.

4        Mr. Thomas, could you tell the jury, what is that?  What

5  do those images capture from the bank robbery?

6  A.  This is the process of him exiting out of the bank where I

7  guess at the point of where he realized, I guess, no access to

8  get into the vault down there, and me telling him, "You got what

9  you -- you can't get anymore.  It's okay to leave."

10       So he started towards the back exit, you know, which is

11  where he entered in there.  So he started walking towards the

12  lobby again, you know, towards the back exit door in front of me,

13  and basically I'm following behind him.

14       And as he exits through the door, this is me here

15  following behind him.  You know, he opens up the door.  You can

16  hear the click of the door, you know, as he kind of goes out of

17  the door.  And basically on the outside just, because the lights

18  weren't -- it was pitch black pretty much, you know, and around

19  the garbage carousel just kind of disappearing into the back.

20  Q.  Mr. Thomas, I'm going to show you what has previously been

21  admitted as Government Exhibit 5-9.  If you could please describe

22  what area of the bank this shows?

23  A.  This here is basically the direction that he took.  This is

24  the parking lot along the west side of the building.  So the back

25  door is just off to the left here.  That's the garbage disposal

1  area.  So he basically kind of came around this bricked area

2  there and went where the grass area is, just towards the back

3  fence in the back area.

4  Q.  Mr. Thomas, you appear to be gesturing toward the screen.

5  When you were talking about the brick area, are you looking at

6  what can be seen along the left-hand side of the image in the

7  middle?

8  A.  Correct, yes, on the left-hand side here, the red brick.

9  Q.  Then can you indicate where the back fence line is in this

10 image?

11 A.  It would be in the center of the screen towards the

12 right-hand side, a wooded fence.  Beyond that, it's like

13 residential area, but there is also, they kind of split the

14 fences, so there is a walkway kind of through there.

15 Q.  Okay.

16       MS. BELL:  That will be it for the images for a while,

17 Your Honor.

18       THE COURT:  Okay.

19       MS. BELL:  Thank you for dimming the lights.

20 BY MS. BELL:

21 Q.  Mr. Thomas, after the robber left the bank, what did you do?

22 A.  From after locking the door, after he exited, you know, our

23 security procedures are, you know, we secured the door.  So I

24 locked back the door so he can't reenter and basically directed

25 the employees, you know, hey, we've just been robbed, you know,

Thomas - direct

1  to call 911.  One of the employees activated the security alarm.

2  Q.  Did 911 and the Palatine police department respond to the

3  robbery that night?

4  A.  Yes.

5  Q.  Did you give them details about the robbery as well as a

6  description of the bank robber?

7  A.  Yes.

8  Q.  What do you recall about the robber's face and physical

9  features?

10  A.  Mostly through the whole process, you know, engaging with the

11  robber, you know, I just tried to maintain eye contact and mostly

12  focusing on his face, his, you know, facial features, which what

13  was visible was like the eye sockets around the eyes, you know,

14  the neck around, you know, around there, because he had the

15  painter's mask that covered his mouth, you know, and his nose,

16  but definitely focusing on his eyes and skin tone, you know,

17  color.  He had kind of like height-wise, you know, we use

18  reference points.

19          MR. PETRO:  I'm going to object.  There is no question

20  pending at this point.

21          THE COURT:  Overruled.

22          MR. PETRO:  I'm sorry, I should stand.  Judge, I'm going

23  to object.  There is no question pending at this point.

24          THE COURT:  I heard you.  It's overruled.  Thank you.

25  BY MS. BELL:

Thomas - direct

1  Q.  Mr. Thomas, you were asked to describe the robber's physical

2  features.  As part of that, could you also describe, did you get

3  a sense for the robber's weight and height and, if so, could you

4  describe those?

5  A.  Yeah.  I'm basically gauging to my own height on there, you

6  know, roughly about five-ten.  There is also different reference

7  points that we look, you know, like how high the cubicles are,

8  the glass cubicles, you know, and when they walk past, where the

9  head kind of comes through.  So you get a gauge of how high they

10  are, estimating, you know, the weight size, you know, that's on

11  there.

12         I'd say, you know, about 180 pounds, 160 to 180, you

13  know, roughly around there, close to my height, you know, around

14  five-ten or so, you know.  The main thing, you know, looking at

15  his eyes, he had like a slight hunch sort of thing, features like

16  that.  That's, you know, pretty much, you know, the whole ordeal,

17  just focusing kind of like on his face, you know, on there.

18  Q.  You mentioned that the robber was wearing what you called a

19  painter's mask?

20  A.  Correct.

21  Q.  How much of the robber's face was covered by that mask?

22  A.  Just basically around over his nose, the bridge of his nose

23  and, you know, his face or bridge of his nose and his mouth.

24         MR. PETRO:  Judge, could the record reflect that the

25  witness indicated that the nose area and the mouth area of his

Thomas - direct

1  face, he directed with his hand that it was covered by the mask.

2      THE COURT:  The jury can see what he's doing, counsel.

3  BY MS. BELL:

4  Q.  Mr. Thomas, what do you recall about what the mask itself

5  looked like?

6  A.  Just a standard, you know, painter's mask, white, respiratory

7  you would use, you know, like if you are painting or sanding or,

8  you know, just kind of covers, you know, over the nose and the

9  mouth and generally, you know, with a little metal band, you

10  know, that you would snugly fit to try to, you know, secure it on

11  your nose.

12  Q.  So you're indicating the metal band that would fit kind of by

13  the nose?

14  A.  Yes.

15      MS. BELL:  With the Court's permission at this time, I'd

16  like to show the witness what has been marked as Government

17  Exhibit 9.

18  BY THE WITNESS:

19  A.  Yes, that would be it.

20  BY MS. Bell:

21  Q.  Mr. Thomas, when you say "Yes, that would be it," what do you

22  mean?

23  A.  That is the mask basically of what I saw the robber wearing,

24  you know, on that day.

25      MS. BELL:  May I approach the witness again, Your Honor?

Thomas - direct

1                THE COURT:  You may.

2    BY MS. BELL:

3    Q.  Mr. Thomas, I'm showing you what has been marked as

4    Government's Exhibit 22.  Do you recognize that exhibit?

5    A.  Yes.

6    Q.  Is that a disk containing your call with 911 on the night of

7    the robbery?

8    A.  Yes.

9    Q.  How are you able to recognize that disk as the disk

10   containing your call with 911?

11   A.  Listening to it and my initials are on there.

12              MS. MICHAELIS:  I'm sorry, Ms. Bell, can you tell me

13   what number that was?

14              MS. BELL:  22.

15   BY MS. BELL:

16   Q.  Does that recording truly and accurately reflect the

17   conversation you had with 911 on November 20th, 2007 from your

18   review?

19   A.  Yes.

20              MS. BELL:  I offer Government Exhibit 22 in evidence.

21              THE COURT:  Any objection?

22              MR. PETRO:  I don't know what it is, Judge.

23              MS. BELL:  The 911 call.

24              MR. PETRO:  I would object.

25              THE COURT:  On what ground?

Thomas - direct                                    63

1           MR. PETRO:  It hasn't been played, Judge.  I don't know

2    what's on there.

3           THE COURT:  Overruled.  Go ahead.

4       (Government Exhibit 22 was received in evidence.)

5           MS. BELL:  At this time, Your Honor, I'd like to play

6    Government Exhibit 22 for the jury.

7           THE COURT:  Go ahead.

8       (Said audio recording was heard in open court.)

9    BY MS. BELL:

10   Q.  Mr. Thomas, directing your attention to later in the month of

11   November 2007, did you contact the police?

12   A.  Yes.

13   Q.  Please tell us why you contacted the police.

14   A.  Basically we were told if there is anything out of the

15   ordinary or if we have any suspicion or just any gut feelings, to

16   be better safe than sorry.  There was a customer that came in to

17   cash a U.S. Bank customer's check, but he was a non-customer that

18   kind of fit the description somewhat.  You know, he had like the

19   slight hunch, you know, about the same body size, you know,

20   weight, that, you know, afterwards, you know, he tried cashing a

21   check, and just something wasn't right.  So I went to kind of

22   talk to the customer, and he wouldn't directly look me in the

23   eye, you know.

24          So at that point, afterwards, we were told if there is

25   anything kind of out of the ordinary or just to be safe, you

Thomas - direct

1  know, to contact the police.  So we just, you know, that's where

2  I contacted them to just kind of let them know, hey, this is kind

3  of, you know, it just doesn't seem right, you know.  You know, we

4  just -- and everybody is kind of nervous and scared a little bit.

5  So it's just a security precaution.

6  Q.  Did you talk to anyone else at the bank before deciding to

7  call the police?

8  A.  I may have recalled --

9          MR. PETRO:  Judge, I'm going to object to foundation.

10  She said sometime in November.  If we could get a foundation as

11  to when all these conversations are occurring.

12          THE COURT:  All right.  Sustained.

13  BY MS. BELL:

14  Q.  Mr. Thomas, to the best of your recollection, do you recall

15  when you saw this person in the U.S. Bank after the robbery?

16  A.  It would be within a day or two.  It was relatively right

17  after.  And, again, you know, just to kind of confirm, I recall

18  calling our operations person just to -- "what do you think I

19  should do?"  And I remember kind of just telling me, you know,

20  "Go ahead.  It doesn't hurt.  You know, it's better safe than

21  sorry.  You know, the most they'll do is maybe contact the person

22  if they could."

23  Q.  And did the police respond to your call?

24  A.  Yes.

25  Q.  Mr. Thomas, was that person you saw that day the robber of

Thomas - direct

1  your bank?

2  A.  No.

3  Q.  If he wasn't the robber, why did you contact the police?

4  A.  It was, like I said, the employees were all kind of really

5  scared, nervous, not sure if this guy would come back.  He was

6  acting a little suspicious as to, you know, the guy wouldn't

7  look, directly look me in the eye.  He kept trying to look away

8  from me when I tried to engage conversation with him.

9       He fit, you know, the body size, you know, height and

10  weight sort of thing.  His eyes, I didn't get a good look at him,

11  because he just wouldn't look at me, which even gave me more

12  suspicion to call the police.

13  Q.  Directing your attention to March 24th, 2009, did you meet

14  with the detective from the Palatine Police Department?

15  A.  Yes.

16  Q.  Were you asked to review photographs for the purpose of

17  determining if any of them depicted the bank robber?

18  A.  Yes.

19  Q.  During that meeting, did you review and sign a form before

20  you viewed those photographs?

21  A.  Yes.

22       MS. BELL:  May I approach, Your Honor?

23  BY MS. BELL:

24  Q.  Mr. Thomas, I'm showing you what has been marked as

25  Government Exhibit 3.  Do you recognize that exhibit?

Thomas - direct

1  A.  Yes.

2  Q.  What is it?

3  A.  This is the form basically where I acknowledge that we're

4  going to review, you know, photos, and in no way kind of, you

5  know, does it tell me what they are or anything like that or who

6  it is, just reviewing photos and my acknowledgement, my signature

7  on there.

8          MS. BELL:  Your Honor, I offer Government Exhibit 3 in

9  evidence.

10          THE COURT:  Any objection?

11          MR. PETRO:  No objection, sir.  Thank you.

12          THE COURT:  Thank you.  All right.

13      (Government Exhibit 3 was received in evidence.)

14          MS. BELL:  May I publish it to the juror, Your Honor?

15  BY MS. BELL:

16  Q.  Mr. Thomas, does Government Exhibit 3 accurately reflect your

17  understanding at the time you viewed the photographs?

18  A.  Yes.

19  Q.  Did you identify a photograph that day as being a photograph

20  of the robber?

21  A.  Yes.

22          MS. BELL:  If I may approach the witness again, Your

23  Honor?

24  BY MS. BELL:

25  Q.  Mr. Thomas, I'm showing you what has been marked as

Thomas - direct

1   Government Exhibit 4-B.  Do you recognize that exhibit?

2   A.  Yes.  I recognize this as being the bank robber.

3   Q.  And how are you able to recognize that photograph as the one

4   you identified as the bank robber on March 24th?

5   A.  From here, you know, I relatively picked it quick.  Just

6   initially like I said, throughout the whole ordeal focusing on

7   his eyes, and here he has just very intense eyes, you know,

8   around the eye sockets and stuff like that, facial features and

9   the skin tone, just immediately I was able to pick it right away.

10  Q.  And, Mr. Thomas, after you identified that photograph, did

11  you also sign and date it?

12  A.  Yes.  This is my signature on the upper corner.

13  Q.  You're indicating the upper right corner that's been marked?

14  A.  Upper right corner, yes.

15  Q.  Is that photograph in substantially the same condition as

16  when you saw it back on March 24th, 2009?

17  A.  Yes.

18          MS. BELL:  Your Honor, I offer Government Exhibit 4-B in

19  evidence.

20          MR. PETRO:  No objection.  Thank you, sir.

21          THE COURT:  Thank you.

22      (Government Exhibit 4 was received in evidence.)

23          MS. BELL:  May I publish that photograph to the jury,

24  Your Honor?

25          THE COURT:  Sure, yes.

68

Thomas - cross

1          MS. BELL:  I'm just going to do it by the hard copy if
2  that's okay.
3          THE COURT:  Okay.
4     (Said photograph was shown to the jury.)
5  BY MS. BELL:
6  Q.  Mr. Thomas, how certain are you that this is a photograph of
7  the robber?
8  A.  A hundred percent.
9          MS. BELL:  No further questions, Your Honor.
10         THE COURT:  Your witness.
11         MR. PETRO:  May I Judge?  Thank you.
12                      CROSS-EXAMINATION
13  BY MR. PETRO:
14  Q.  Good morning, Mr. Thomas.  How are you today, sir?
15  A.  Very good.  Good morning.
16  Q.  Good.  My name is Mike Petro.  We've met before, isn't that
17  correct?
18  A.  Yes.
19  Q.  In fact, you've previously testified in this very case, isn't
20  that correct?
21  A.  Yes.
22  Q.  And you've testified about exactly this same subject, isn't
23  that correct?
24  A.  Yes.
25  Q.  And isn't it true at the first hearing where we went over all

Thomas - cross

1  the circumstances surrounding the identification of this person,

2  the person that you identified in photo number 4-B, isn't it

3  true, sir, that during that long three-hour hearing you never

4  mentioned anything about identifying someone coming to the bank

5  as the bank robber the day after it occurred?

6  A.  Correct.

7  Q.  Did you forget?

8  A.  Basically, yeah, I did not remember, yes.

9  Q.  Well, why didn't you remember?

10  A.  Because it wasn't the robber.

11  Q.  Well, you called the police?

12  A.  Yes.

13  Q.  And the police came out, isn't that correct?

14  A.  Yes.

15  Q.  And the person that came out and spoke to you that day was a

16  Detective Martino, isn't that correct?

17  A.  I don't recall.

18  Q.  And at the time that you identified that person, you didn't

19  mention anything about the intensity of the eyes, did you?

20  A.  Of the -- no, I did not.

21  Q.  In fact, you said that the thing that looked most familiar

22  about the person that came in the day after the robbery was the

23  shape of his eyes, is that correct?

24  A.  No, it's not.

25  Q.  You never told specifically Detective Martino or Officer

Thomas - cross

1  Martino from the Palatine Police Department that the shape of the

2  substance -- subject's eyes and the sound of his voice was nearly

3  identical to those of the offender.

4        "Nearly identical to those of the offender."  Did you

5  use those words when you talked to the Police Officer Martino?

6  A.  I don't recall the exact words.  But I know that the person

7  that came in the following day wouldn't engage me directly.  And

8  I tried to look at his eyes.  And that's what made me suspicious

9  to call the police, because he wouldn't engage me directly.

10 Q.  Well, did he --

11 A.  So getting a glimpse of his eyes, from what I saw, from a

12 glimpse, yes, it did resemble.  But he kept looking away from me,

13 so I wasn't able to intensely look at his eyes.

14 Q.  Just a simple "yes" or "no" question.  Did you say that the

15 person that came into the bank the next day, his eyes were nearly

16 identical to those of the offender?

17 A.  I don't recall.

18 Q.  But you've had an opportunity to review the police reports

19 before today's date, is that correct?

20 A.  Yes.

21 Q.  And you've read this exact report, isn't that correct,

22 Officer Martino's report --

23 A.  Yes.

24 Q.  -- from that day, is that correct?

25 A.  Yes.

Thomas - cross

1  Q.  And in that particular report, it uses the word, "the shape

2  of the eyes and the voice of the person that came into the bank

3  the day after was nearly identical."  That's what it says in this

4  report, isn't it?

5  A.  In the report, it says that, yes.

6  Q.  And Officer Martino made that up?  Is that what you are

7  telling the people on the jury, that Officer Martino made that up

8  when he put it on that report?

9  A.  I don't recall the initial conversation.

10  Q.  Well, if it says "nearly identical," who used those words?

11  Are those your words, or are those Officer Martino's words?

12  A.  Those are the words on the report.

13        THE COURT:  Do you want to make an objection?

14        MS. BELL:  Yes, Your Honor.  The government objects.

15  This is improper impeachment of the witness.

16        THE COURT:  Well, he said he didn't remember.  So I

17  think he was using it to refresh.

18        But if you are going to do it to refresh, I think you

19  should let him look at the report, if that's the purpose.  This

20  is Officer Martino's statement, not his.

21        MR. PETRO:  Well, I'm just trying to clarify if it says

22  "nearly identical," Judge.

23        THE COURT:  I think you've exhausted this.

24        MR. PETRO:  Thank you.

25  BY MR. PETRO:

Thomas - cross

1  Q.  But when you identified that person, you remember his name,

2  don't you?

3  A.  I didn't remember the officer's name, no.

4  Q.  Well, do you remember the person who you identified?  Do you

5  remember that person?

6  A.  No.

7  Q.  And the thing that you said specifically was that the voice

8  was an important identifier to you, is that correct?

9  A.  I don't recall on there either, but according to the report,

10  it sounded like him.

11  Q.  Well --

12      (Discussion off the record.)

13          MR. PETRO:  Can you work this machine, Quinn?

14          I'm sorry, Judge.

15  BY MR. PETRO:

16  Q.  What part of the voice of the offender can you determine from

17  this photo?

18  A.  Does it have audio?

19  Q.  I don't know.  You tell me.  This is the photo you

20  identified, isn't it?

21  A.  Yeah.  But you're telling me I identified the voice.

22  Q.  Well, are you able to identify the voice of the offender from

23  this photo?

24  A.  No.  It's a photo.

25  Q.  And that was a very, very important thing when you invented

73

Thomas - cross

1  -- you identified the person after the day of the robbery, isn't

2  that correct?  The voice was important?

3  A.  From what I can recollect, because for the police report, I

4  didn't, I didn't even recall kind of talking to the officer or

5  calling, because after the police officer kind of just took the

6  information and said "We'll look into it," I didn't get any

7  confirmation after that what happened, you know.  The first time

8  I saw the report was, I believe yesterday was the first time

9  after that day that I gave it.  Actually I've never seen a

10 report.  The first time was just yesterday.

11        So the incident itself the day after, like I said, I

12 don't recall really.  It's very vague.  Until yesterday it kind

13 of, oh, I remember talking to the officer, you know, in the

14 incident itself, but everything in between, very vague.  I don't

15 remember really much of it, just it's kind of there, you know,

16 but I don't -- any description of the gentleman.  I know it

17 wasn't him, so it had no value for me to remember anything.

18 Q.  So you called the police and identified a person as the bank

19 robber, and you told Martino, "But it wasn't him"?  Is that what

20 you told Martino?

21 A.  No.

22        MS. BELL:  Objection, Your Honor.  Mr. Petro is

23 misstating the evidence.

24        THE COURT:  I think he's answered the question.

25 BY MR. PETRO:

Thomas - cross

1  Q.  So John Ford is not the first person that you've wrongfully

2  accused in this case, is it, sir?

3          MS. BELL:  Objection, Your Honor.

4          THE COURT:  Sustained.

5  BY MR. PETRO:

6  Q.  The other thing that you stated about the person that came --

7  wait.  I want to go back to the voice.

8          When the police came to the bank that night, did you

9  tell the detective, Officer Martino or Detective Bice from the

10 Palatine Police Department that the voice of the person that came

11 in and took the money, that that voice was familiar to you?

12 A.  I don't recall talking about the voice.  I mean, there was

13 many officers that were there, and I don't remember which

14 officers were there.  But I don't recall speaking about the voice

15 at all on the day of the robbery.

16 Q.  Well, did you ever state to anyone that was at the bank

17 immediately after the robbery that the voice of the person that

18 took the money, that came in and took the money, that that voice

19 was familiar to you, that you had heard that voice before?

20 A.  I don't recall that, no.

21 Q.  Well, is your memory good about what happened that particular

22 evening?

23 A.  Relatively, yes.

24 Q.  Relative to what?

25 A.  Of remembering the incident.

75

Thomas - cross

1  Q.  So it's relative to the day after your memory is good, is

2  that correct?

3  A.  To, I would say, a traumatic experience is more etched in my

4  brain than a curiosity or something that was questionable, just

5  to have my staff feel better, you know, to just having a feeling

6  of someone.

7         You know, yes, the incident that happened on the day of

8  the robbery is going to be pretty much etched in my brain.

9  Anything else other than that, unless, you know, another robbery

10  occurred, you know, I'm not going to recall it.  There was no

11  importance of it.

12  Q.  There was no importance to wrongfully accusing a customer?

13  A.  I didn't wrongfully accuse anyone.

14         MS. BELL:  Objection, Your Honor.

15  BY MR. PETRO:

16  Q.  At least in your testimony, wrongfully accusing a customer of

17  this robbery?

18  A.  I didn't wrongfully accuse anybody.

19  Q.  Well, you called the police on him, didn't you?

20  A.  That doesn't mean I'm accusing him.

21  Q.  You said he was nearly identical to the robber, isn't that

22  correct?

23  A.  Basically it's notifying the police on a lead.  You know, I

24  had -- it's just me securing my staff trying to follow

25  procedures.  If you get any gut feeling on anything, you know,

76

Thomas - cross

1 and confirming, calling, should I or shouldn't I?  I mean, I

2 didn't think, hey, that's him a hundred percent.  I remember

3 calling our operations department, you know, and speaking to

4 them.  "Do you think I should?"

5          And she's like, "Yeah, go ahead.  What would it hurt?"

6          You know, not like "This is the guy."  No, absolutely

7 not.

8 Q.  Well, one of the things that you said the day after the

9 robbery when you wrongfully identified this person --

10          MS. BELL:  Objection, Your Honor.

11 BY MR. PETRO:

12 Q.  One of the things that you said --

13          MS. BELL:  Mr. Petro is misstating the evidence.

14          THE COURT:  I think you are.  I think you're putting

15 words in his mouth.  Just ask the question.

16 BY MR. PETRO:

17 Q.  Well, one of the things that you said was that there was

18 something about the neck area of the person that took the money,

19 something about the neck area that was important in calling the

20 police on this person the day after the robbery.  What was that

21 exactly?

22 A.  From looking at the report, I would say the tone of the skin

23 maybe, the freckles, the paleness of the skin might have been

24 similar.

25 Q.  That's the person the day afterwards?

1  A.  Again, I don't recall the day afterwards.  You know, it's

2  very vague.  I can't -- I'm comparing, trying to compare the

3  person that happened on the date, because that's very etched in

4  my brain, and vaguely trying to match up the person next, you

5  know, the following day, not the reverse.

6  Q.  Now, the photo you identified, Photo 4-B, is that correct?

7  A.  Yes, I suppose.

8           MR. PETRO:  Let me see 4-B again.  Do you have it there?

9  BY MR. PETRO:

10  Q.  With respect to this photo, is it fair to say at least from

11  your testimony that you can't see any part below the nose, is

12  that correct?

13  A.  Of the bridge of the nose and the mouth, no.  But with the

14  mask, you could see the side of his face and down his neck, his

15  eyes, part of his forehead.

16  Q.  But you couldn't see his ears, could you?

17  A.  I don't recognize the ears, no.

18  Q.  And you couldn't see the forehead, is that correct?

19  A.  Part of the forehead you could, yes.

20  Q.  But you couldn't see the color of the hair, is that correct?

21  A.  His eyebrows, not the hair.

22  Q.  Well, wasn't there a hat that the person that took the money

23  was wearing on that day?

24  A.  He was wearing a hat, yes.

25  Q.  And with respect to the photo that you, in fact, identified,

Thomas - cross

1  would it be fair to say, sir, that this would fairly and

2  accurately describe what portion of the person that you could

3  identify from the person that took the money, is that correct?

4  A.  That portion alone, because you've blocked out the side of

5  his face, his neck and like chin area, I was able to see that,

6  too.

7  Q.  But that wasn't an important part of your identification, was

8  it, sir?

9  A.  It was, because it's part of the skin tone and the freckles

10 and, you know --

11 Q.  Well, you testified previously in this case, and you

12 testified that you couldn't be 100 percent sure that the person

13 that took the money was Caucasian, is that correct?

14 A.  I didn't -- I don't believe I said that.

15 Q.  And you also said that you couldn't be 100 percent sure what

16 the height of the person was, is that correct?

17 A.  An estimate, not an exact.

18     (Discussion off the record.)

19 BY MR. PETRO:

20 Q.  Sir, I'm showing you another picture.  What is that other

21 picture of, sir?  Do you know?

22 A.  Somebody's eyes.

23 Q.  Do you know whose eyes?

24 A.  I would say no, not really.

25         THE COURT:  Do you want to mark this as an exhibit so

Thomas - cross

1  that the record can reflect what it is?

2          MR. PETRO:  Sure, Judge.  I'll mark it as Defendant's

3  Exhibit No. 1 for identification.

4          MS. BELL:  And the other exhibit as well, Your Honor,

5  that Mr. Petro published that.

6          MR. PETRO:  I'll mark that as Defendant's Exhibit No. 2

7  for identification, Judge.

8  BY MR. PETRO:

9  Q.  Do you know if that picture with the yellow stickies on it,

10 do you know if that's a picture of my client, John Ford?

11 A.  It looks like it.  I mean, the eye sockets are very similar,

12 the eyebrows are very similar.  The bridge of the nose is very

13 similar.

14 Q.  And that fairly and accurately represents approximately what

15 you could see.  I know you could see a little bit of face and

16 things along those lines, is that correct?

17          MS. BELL:  Objection, Your Honor.  He's misstating the

18 evidence again as to what the defendant -- what the witness

19 testified.

20          THE COURT:  It's cross-examination.  It's a question.

21 Put it as a question.

22 BY MR. PETRO:

23 Q.  It's nearly identical, isn't it, sir?

24 A.  It's close.

25          MS. BELL:  Your Honor, objection as well as to Mr. Petro

80

Thomas - cross

1  is now publishing a photograph that's not in evidence before the

2  Court to the jury.

3  BY MR. PETRO:

4  Q.  Would it surprise you to learn, Mr. Thomas --

5          THE COURT:  Counsel, counsel.

6          MR. PETRO:  I'm sorry.

7          THE COURT:  Please take it off of there.  Do you want to

8  offer this as an exhibit?

9          MR. PETRO:  I will offer this as an exhibit.

10          THE COURT:  In the government's case?

11          MR. PETRO:  Defendant's No. 1.  I'll put it in my case

12  when we're done.

13          THE COURT:  Well, then take it off of the machine,

14  please.

15          MS. BELL:  There has been no foundation laid for that

16  photograph, Your Honor.  The government objects to his using it.

17          THE COURT:  Well, then lay a foundation for it.

18  BY MR. PETRO:

19  Q.  Would it surprise you, sir, if that other photo was the

20  person that you identified as the robber the day after the

21  robbery?

22          THE COURT:  And which exhibit are you talking about,

23  which of the two that you just --

24          MR. PETRO:  Defendant's Exhibit No. 1, Judge.

25          THE COURT:  No. 1, okay.

Thomas - cross

1         MR. PETRO:  This one right here.

2         MS. BELL:  Mr. Petro --

3         THE COURT:  Mr. Petro, I asked you to take it off there.

4         MR. PETRO:  I'm sorry.

5         THE COURT:  It's not to be published.

6    BY MR. PETRO:

7    Q.  Is that, in fact, the person that you identified that came

8    into the bank the day after the robbery?

9    A.  He resembles it.  That's probably why I called the police,

10   because he did resemble the robber, similar features.

11   Q.  Now, with respect to the person, you're not sure exactly of

12   what the sex of the person was that took the money, are you?

13   A.  Almost a hundred percent, yes, that he was --

14   Q.  Not quite a hundred percent though, right?

15   A.  I'd say a hundred percent.

16   Q.  Well, you testified previously in this case, didn't you?

17   A.  From the last time we were here, yes.

18   Q.  And on that particular day when you were under oath, you said

19   you weren't a hundred percent sure of the sex of the person,

20   isn't that correct?

21   A.  If that's what it says on there on that day.

22   Q.  Well, what is your testimony today, sir?  Do you know whether

23   you were a hundred percent sure of the sex of the person that

24   took the money?

25   A.  To me he appeared to be male.

82

Thomas - cross

1  Q.  But you're not 100 percent sure, is that correct?

2  A.  He could get a sex change.  I mean, different things happen.

3  I mean --

4  Q.  Well, if a person had a sex change since November 20th of

5  2007, and that person is now male, that means the person that

6  came into the bank is female, isn't it?

7  A.  No.  I mean, it could have been a male and today is a female.

8  I don't know.

9  Q.  Is it your testimony today in court that the mask did not

10 cover the chin area of the bank robber?

11 A.  It covered his face on here.  I didn't focus on the chin

12 area.

13 Q.  But it covered his lips, is that correct?

14 A.  Lips, yes.

15 Q.  And it covered his chin, is that correct?

16 A.  The chin I'm not sure about.  I don't recall that.  I know it

17 covered his nose and his mouth.

18 Q.  Now, on the 911 call, I was listening closely to the 911

19 call, is that the first time you've heard that call, sir?

20 A.  No.

21 Q.  How many times have you heard that call?

22 A.  I do not know.

23 Q.  Now, when you first described the person, you identified the

24 person that took the money, the hat that he was wearing as a

25 black hat, is that correct?

Thomas - cross

1 A. Well, I said that he was wearing black. I didn't say black

2 hat.

3 Q. Well, it says specifically, "He was wearing like, um, black

4 like, um, black floppy hat kind of thing." Did you describe the

5 hat as black at the time of the 911 call?

6 A. I didn't say, I didn't say "black hat." I said "black," he

7 was wearing black, a hat, and a surgical mask.

8 Q. Well, was the hat black, sir?

9 A. On the video, no, it wasn't.

10 Q. You've had an opportunity to look at those videos a lot of

11 different times, is that correct?

12 A. Yes.

13 Q. Isn't it true that you're testifying more from the video and

14 the still images at this time than you are from your memory?

15 A. No.

16 Q. Throughout this whole process, Mr. Thomas, from November 20th

17 until today's date, you've never been able to identify the color

18 of the eyes of the person that took the money, is that correct?

19 A. Exact color, no. Light colored is what I recall.

20 Q. Did you ever tell anyone that it was light colored?

21 A. I was never asked. I mean, I don't recall ever being asked.

22 I don't recall saying it either. I'm not sure.

23 Q. You're not sure?

24 A. Of being asked, no, I'm not sure. I don't think anybody

25 asked me the color of his eyes.

Thomas - cross

1  Q.  And you're not sure of the color of the eye, are you?

2  A.  Light colored, I know they were light colored.

3         MR. PETRO:  If I may have one second please, Judge?

4  BY MR. PETRO:

5  Q.  The back door of the U.S. Bank, that particular door, did it

6  lock automatically?

7  A.  No.

8  Q.  So if someone left the U.S. Bank from the rear exit, would

9  that door automatically lock when that person left?

10 A.  No.

11 Q.  There is no safety feature that would keep the door locked so

12 that a person exiting, no one else could get into that particular

13 location?

14 A.  No.

15 Q.  And did that door open in, or did it come in towards you to

16 the inside of the bank, or did that open outward?

17 A.  It opened outward.

18 Q.  And that would be opening outward and to the left or outward

19 and to the right?

20 A.  From what I recall, it's to the left.

21 Q.  And the garbage disposal area, there is a brick wall to the

22 left when you exit, is that correct?

23 A.  No.  It's directly in front of you.

24 Q.  Is there also a brick wall or a wall of trees directly to

25 your left, sir?

Thomas - cross

1  A.  To the left, it's a wooden fence.

2  Q.  A wooden fence?

3  A.  Yes.

4  Q.  But the door opens into a wooden fence, is that correct?

5  A.  Correct, yes.

6  Q.  And where were you standing at the time that the person that

7  took the money, where were you standing in relationship to that

8  person when that person went out the door?

9  A.  When he exited out the door, I was probably maybe within six

10  feet of him.

11  Q.  And what could you see at that point in time?

12  A.  From there, basically the back of him walking out.  From the

13  angle of the door, you see him walking around the garbage area on

14  there.  But you could also see the Home Depot section, you know,

15  on an angle, you know.  From where you are standing, the parking

16  lot, because there is an alley that is parallel to our parking

17  lot, you know, from the Home Depot customers come.  So you can

18  kind of directly see the Home Depot, you know.

19          But where he went, he went around the garbage disposal

20  area and kind of disappeared back in that area.

21  Q.  Well, I was talking about what could you see specifically

22  when the person exited the bank?  How did the person exit the

23  bank specifically?

24  A.  He pushed the door open.  You hear the click of the lock.

25  Q.  Could you see the click of the lock?

Thomas - cross

1  A.  No.  You could hear it.  You can't see it, because he's
2  blocking the view of it.  But you could definitely hear, it
3  clicks very loud, so you hear the click of the lock, because it's
4  a manual lock.  So you hear the click of the lock.  He basically
5  went through the back.
6  Q.  Well, did he push the door open in a particular manner that
7  you can remember?
8  A.  In a particular manner, no.
9  Q.  Well, how were his hands placed on the door when he exited
10  the bank?
11  A.  I don't recall that.
12  Q.  You could see that, you just don't recall it, is that
13  correct?
14  A.  No.  I see him exiting.  I see the back, I see his back
15  basically.
16  Q.  But you don't recall how he placed his hands on that
17  particular area of the door?
18  A.  No.
19  Q.  You don't know if he used the right hand to undo the lock or
20  the left hand, is that correct?
21  A.  Correct, yes, sir.  I have no idea.
22  Q.  And you don't know if he used his right or his left hand to
23  push open the door after the lock was undone, is that correct?
24  A.  Correct.  I have no idea.
25  Q.  Did you see, did he put his hand on the door to your

Thomas - cross

1  knowledge?

2  A.  I do not know.

3         MR. PETRO:  Judge, may I have permission to publish a

4  photo?

5         MS. BELL:  Your Honor, if Mr. Petro would show it to the

6  government first.

7         THE COURT:  I would say so.

8         MR. PETRO:  I want to put in -- didn't I have these

9  marked somehow, 2-005, 2-005.

10     (Discussion off the record.)

11 BY MR. PETRO:

12 Q.  How tall are you, sir?

13 A.  Five-ten.

14 Q.  Did you represent yourself as being five foot ten and a half

15 at the last hearing?

16 A.  I suppose I could have.

17 Q.  Well, have you shrunk?

18 A.  You shrink with age.

19 Q.  Well, do you know if you are shorter today than you were a

20 couple months ago when you testified?

21 A.  I always say five-ten, five-ten and a half whenever I

22 estimate my height.

23        MR. PETRO:  Can I get this thing to turn on somehow with

24 the defense laptop.

25        THE COURT:  And this is a government's exhibit?

88

Thomas - cross

1          MR. PETRO:  This is Government's Exhibit, Judge, 2-005

2    for identification.  It's already in evidence.  The government

3    placed this in evidence.  This is a still.

4    BY MR. PETRO:

5    Q.  In that photo, sir, you see a number of people in that photo,

6    is that correct?

7    A.  Yes.

8    Q.  The person that's closest to us, the person in the white

9    coat, who is that person?

10   A.  That is Merlyn.

11   Q.  That's Merlyn Agravante?

12   A.  Yes.

13   Q.  And then with respect to the second person, that's the person

14   that took the money, is that correct?

15   A.  That's the bank robber, yes.

16   Q.  And then the third person, the bald headed guy, that would be

17   you, is that correct?

18   A.  Yes.

19   Q.  And then the person to the left, that would be who?

20   A.  Svetlana Sisso.

21   Q.  Now, there also appears to be way in the back there, there

22   appears to be another person at the teller window back there in

23   blue.  Would that be fair to say, is that Ms. Pathare?

24   A.  Yes, Sam.

25   Q.  Now, with respect to this particular picture, sir, isn't it

Thomas - cross

1  fair to say that the person that took the money is substantially

2  shorter than you?

3  A.   No.

4  Q.   How tall is Svetlana Sisso?

5  A.   She's somewhere around maybe five-five I think.

6  Q.   Well, the person that took the money is closer in height to

7  Ms. Sisso than to you, wouldn't that be fair to say from that

8  particular picture, sir?

9  A.   No.  I mean, because it's on, the camera is on an angle.  The

10  perception is going to be different.

11  Q.   All right.  Well, we'll go to the next photo, and we'll see

12  if it looks any different from a different perception?

13         MS. BELL:  Your Honor, if Mr. Petro could show it to the

14  government first.

15         MR. PETRO:  2-007.

16         MS. BELL:  Thank you.

17  BY MR. PETRO:

18  Q.   It's a little bit different angle there.  This is

19  Government's Exhibit 2-007.  You looked at that particular photo,

20  didn't you?

21  A.   Yes.

22  Q.   The person in the back in the white coat, that's Ms. Sisso,

23  is that correct?

24  A.   That's Merlyn.

25  Q.   That's Merlyn Agravante, is that correct?

Thomas - cross

1  A.  Yes, correct.

2  Q.  And Merlyn Agravante is approximately five foot five inches

3  tall, is that correct?

4  A.  She's -- no.  She's about maybe four-eleven I think.

5  Q.  4-foot 11-inches tall?

6  A.  Yes.

7  Q.  And then the person on the left there, that would be the

8  person that took the money, is that correct?

9  A.  Yes.

10  Q.  And the person on the right there, that would be you, the

11  bald headed guy, right?

12  A.  Yes.

13  Q.  Well, isn't it fair say from that photo, sir, that you're

14  substantially taller than the person in that photo?

15  A.  Actually we look close to the same height.

16  Q.  Well, we have actually another view of that particular image.

17        MR. PETRO:  Can you get this thing to work, Quinn?

18        THE COURT:  What's the exhibit number?

19        MR. PETRO:  This will be Defendant's Exhibit No. 3,

20  Judge.

21  BY MR. PETRO:

22  Q.  That's the exact same photo, isn't that correct?

23  A.  It appears to be.

24  Q.  In that photo it looks like you're taller, much taller than

25  the person on the left, isn't that correct?

Thomas - cross

1  A.  To me, I mean, to my left on there, meaning Merlyn or the

2  bank robber?  There is two people.

3  Q.  The person that took the money, yes, correct.

4  A.  Here we look close to the same height.

5          MR. PETRO:  How do you make it smaller?  I need one more

6  I think, Quinn.  Which one else did we want to look at, 2-23.  Do

7  you have 2-23?

8      (Discussion off the record.)

9          MR. PETRO:  Judge, I'm asking leave to show what's in

10  evidence 2-23.

11          THE COURT:  Okay.

12          MR. PETRO:  Is it possible to lower the lights just a

13  little bit, Judge?

14          THE COURT:  Sure.

15  BY MR. PETRO:

16  Q.  Do you remember looking at that photo, isn't that correct,

17  sir?

18  A.  Yes.

19  Q.  That's Merlyn in the back in the white jacket?

20  A.  Yes.

21  Q.  The person that took the money on the left, is that correct?

22  A.  Far left, yes.

23  Q.  And then the person, the bald headed guy on the right, that

24  would be you, is that correct?

25  A.  Yes.

92

Thomas - cross

1  Q.  And that person, you are substantially taller than the person

2  on the left, isn't that correct, the person that took the money?

3  A.  Again, to me it looks, you know, close to the same height,

4  slightly taller, but, you know --

5  Q.  Well, how much taller is slightly in your mind, sir?

6  A.  Minimal, I mean, an inch maybe, two.  I don't know.

7  Q.  Well, is it 1 inch, is it 2 inches?

8  A.  It could be either or.  It depends on what your perception

9  is.

10  Q.  Could it be 3 inches?

11  A.  I mean, what is your perception of substantially taller?  I

12  mean, how many inches is that?

13          MS. BELL:  Your Honor, if I may just for the record, the

14  defense is showing the witness Government's Exhibit 2-12, not

15  2-23.

16  BY MR. PETRO:

17  Q.  It's pitch black outside, is that correct?

18  A.  It was dark, yes.

19  Q.  And when you look outside, is it fair to say when you look

20  out that door -- I assume the door going out is glass, is that

21  correct?

22  A.  Correct, yes.

23  Q.  And you're inside, so it is lit inside, is that correct?

24  A.  Correct, yes.

25  Q.  It's pitch black outside, is that correct?

Thomas - cross

1   A.  It was very dark outside.

2   Q.  And the person that leaves the bank, the person that took the

3   money that leaves the bank, you have no idea what direction that

4   person left, is that correct?

5   A.  In the back, he went around the garbage disposal carousel

6   area.

7   Q.  Well, you weren't able to see that from your position in the

8   bank, is that correct?

9   A.  I did see that, yes.

10  Q.  Well, you were focused at that point in time about locking

11  the door so that the person wouldn't come back in, isn't that

12  correct?

13  A.  No.  I locked the door after he was gone.  Then I no longer

14  saw the suspect.

15  Q.  Well, once the suspect gets around the wall, you have no idea

16  where the suspect went, is that correct?

17  A.  Correct.  He's out of my view though.

18  Q.  It's dark out too though, isn't that correct?

19  A.  Yes.

20  Q.  After the person that took the money left the bank, 911

21  called, is that correct?

22  A.  One of the staff hit the security alarm.  And the 911 call

23  that we listened to, yes, that was after the suspect left.

24  Q.  And with respect to after the 911 call, I believe you

25  mentioned during your direct testimony that you called an

1  operations manager, is that what you described?

2  A.  We notified them, yes.

3  Q.  Well, did an operations manager ever actually physically come

4  out to the U.S. Bank on the night of November 20th, 2007?

5  A.  Yes.

6  Q.  What time did that person arrive at that particular location,

7  sir?

8  A.  I'm not sure.  I mean, we had a district manager, operations

9  manager, you know, and all the police, so time-wise I have no

10 idea.

11 Q.  Well, was it 5 minutes, 10 minutes, 20 minutes, an hour?

12 A.  I have no clue.  I don't recall how quickly.

13 Q.  Do you remember what time you left the bank on that

14 particular evening?

15 A.  Not really, no, because we were there probably for a while.

16 Q.  Well, for a while, was it one hour?  Was it two hours?  Was

17 it three hours?

18 A.  I couldn't tell you.  I don't recall.

19 Q.  And the purpose for notifying that operations manager, what

20 was the purpose for notifying that particular person?

21 A.  That's our robbery procedure.  And they have to perform the

22 audit on the teller drawer.

23 Q.  All right.  And then they also distribute packets to the

24 people that were there for their own internal records where they

25 fill out physical description forms, isn't that correct?

95

Thomas - cross

1  A.  We, we have the packet there, they don't.  It's in the

2  branch.  It's located on premise.

3  Q.  Well, the other people, and I just want to get through this

4  real quick, but there is three people that were at the bank

5  besides you that day that worked at the bank, isn't that correct?

6  A.  Correct, yes.

7  Q.  Svetlana Sisso, is that correct?

8  A.  Yes.

9  Q.  Merlyn Agravante, is that correct?

10  A.  Correct.

11  Q.  And Samrajnee Pathare, is that correct?

12  A.  Correct.

13  Q.  And you as the manager of that particular location, you see

14  them every day, isn't that correct?

15  A.  Unless it's their day off, but yes.

16  Q.  And you still see them every day as the manager of the U.S.

17  Bank, isn't that correct?

18  A.  Today, no.

19  Q.  Well, do you still work at the U.S. Bank?

20  A.  No, I do not.

21  Q.  How long have you not been at the U.S. Bank?

22  A.  Roughly, about two years.

23  Q.  And with respect to your preparation for trial here today,

24  you've had an opportunity to reacquaint yourself with Ms. Sisso,

25  is that correct?

Thomas - cross

1  A.  I've spoken to her on occasion, yes.

2  Q.  She still works at the U.S. Bank as far as you know, isn't

3  that correct?

4  A.  Yes.

5  Q.  And you've had an opportunity to reacquaint yourself with

6  Merlyn Agravante, is that correct?

7  A.  Yes.

8  Q.  And she still works at the U.S. Bank, isn't that correct?

9  A.  Yes.

10  Q.  And you've also had an opportunity to speak to Samrajnee

11  Pathare, isn't that correct?

12  A.  No.

13  Q.  You haven't spoken to Samrajnee Pathare?

14  A.  No.

15  Q.  Do you know if Ms. Pathare is still working at the U.S. Bank?

16  A.  She does not work there, no.

17  Q.  Well, when you prepared your testimony for today's court

18  date, did you at any point in time prepare your testimony as a

19  group with Ms. Sisso and Ms. Agravante?

20  A.  No.

21  Q.  Have you seen Ms. Sisso and Ms. Agravante here today?

22  A.  I did not see them today, no.

23  Q.  You were in the witness room outside prepared to testify,

24  isn't that correct?

25  A.  Today, yes.

Thomas - cross

1  Q.  Were you in a room with Ms. Sisso or Ms. Agravante before you

2  testified today and discussing your testimony?

3  A.  No.

4  Q.  I want to go back to these physical description forms and

5  packets that are required to be filled out.  Is that the rules of

6  U.S. Bank?

7  A.  Yes, that is procedure.

8  Q.  You're required to have each person fill out a physical

9  description form where they put down the general characteristics

10  of the person that came in and took the money, is that correct?

11  A.  They would, yes.

12  Q.  Now, with respect to those forms, since you're actually a

13  witness, wouldn't the procedure of the U.S. Bank be for you to

14  fill out a physical description form also?

15  A.  It should be, yes.

16  Q.  Did you fill out a physical description form on November

17  20th, 2007?

18  A.  I don't recall.

19  Q.  Even though it was the procedures of the bank to do that?

20  A.  It should have been, yes.

21  Q.  Did you have the other people that worked at the bank fill

22  out those forms to your knowledge?

23  A.  I don't recall.  I mean, we should have.  I mean, that was

24  procedures.  But I don't recall if I did.  It could have been the

25  operations manager, too, that had them do that.

Thomas - cross

1  Q.  What was the weather like the night of November 20th, 2007,

2  if you can recall?

3  A.  Rainy, windy.

4  Q.  How hard was it raining?  Do you know?

5  A.  At that particular time, no.

6  Q.  Well, did you follow the person that took the money, did you

7  follow them out the bank then?

8  A.  I did not exit the bank.

9  Q.  You never exited the bank?

10 A.  Except for when I met the police, you know, after the 911

11 call.

12 Q.  Well, when you went outside to meet with the police, were you

13 aware or did you become aware of the weather that existed at or

14 around the time that the person left the bank?

15 A.  Yes.

16 Q.  What was the weather, sir?

17 A.  Drizzly, raining.

18 Q.  Was it raining hard?

19 A.  Drizzling, a mist.

20 Q.  Had it been raining all day to your knowledge?

21 A.  That, I don't recall.

22 Q.  And when you left the bank, after this was all over, after

23 you met with the district manager, your operations manager, the

24 people from the Palatine Police Department, was it still drizzly

25 rainy out at that time, sir?

Thomas - cross

1  A.  I don't recall.

2  Q.  But it was pitch black still, is that correct?

3  A.  It was nighttime, yes.

4  Q.  And apparently there were lights that were somehow designed

5  to light up the back area of the bank, is that correct?

6  A.  Yeah, but the bulbs were not properly working.

7  Q.  So they weren't working on the night of November 20th of

8  2007, is that correct?

9  A.  Correct.

10        MR. PETRO:  If I may just have one second please, Judge?

11  BY MR. PETRO:

12  Q.  Now, I noticed in the 911 call that you described the mask

13  that the person was wearing as a surgical mask, is that correct,

14  sir?

15  A.  I said painter's mask and surgical mask.

16  Q.  Well, did you say in the 911 call, did you specifically say a

17  medical mask, is that correct?

18  A.  Well, surgical mask, maybe medical mask.

19  Q.  But you never described it as a dust mask with a metal band,

20  is that correct?

21  A.  I did not mention metal band, no.

22  Q.  Well, that's because a surgical mask or a medical mask, what

23  you described to the 911 caller, wouldn't have that type of a

24  metal band, is that correct?

25  A.  I have no idea.

Thomas - cross

1  Q.  Well, the exhibit that you were shown here, the mask you were

2  shown, Government Exhibit No. 9 I believe it was called, in court

3  is that the first time that you've seen that particular exhibit?

4  A.  No.

5  Q.  How many times have you seen that exhibit before you came to

6  court here today, sir?

7  A.  Once.

8  Q.  And that is not what you would describe as a medical mask or

9  surgical mask, is that correct?

10  A.  I have seen them worn in hospitals, yes, that mask.

11  Q.  In fact, it's a fairly common mask.  You can see those masks

12  just about everywhere, a white mask with a metal band.  Those are

13  common, ubiquitous, is that correct?

14  A.  They are common, yes.

15  Q.  There is nothing exactly specific about that particular mask

16  that would allow you to identify that mask as the mask worn by

17  the person who took the money on November 20th, 2007, is there?

18  A.  It's a common mask.

19  Q.  A very common mask?

20  A.  Yes.

21  Q.  The kind of mask that you can buy at your local Home Depot,

22  isn't that correct?

23  A.  I'm sure you could, yes.

24  Q.  And there is a Home Depot that is right next door to the U.S.

25  Bank right there in Palatine, is that correct?

1  A.  Yes.

2       MR. PETRO:  May I have just one second please, Judge?

3    (Discussion off the record.)

4  BY MR. PETRO:

5  Q.  Now, on the night that this occurred, you were interviewed by

6  people from the Palatine Police Department, is that correct,

7  regarding the description of the person that took the money, is

8  that correct?

9  A.  Yes.

10 Q.  When you were asked the age of that particular person, you

11 didn't know or you could not estimate what that age was, is that

12 correct?

13 A.  I can't recall being asked the age.

14 Q.  With respect to the hair, you were unable to determine what

15 color the person's hair was, is that correct?

16 A.  I don't know if I was asked the color of his hair, you know.

17 But he was wearing a hat.

18 Q.  And with respect to the type of footwear, you described the

19 type of footwear that the person that came in to the bank and

20 took the money as black boots, is that correct?

21 A.  I did.  The dispatcher said "boots" and I kind of said yes.

22 Q.  Black boots though, is that correct?

23 A.  When the dispatcher said that, yes, I said that.

24 Q.  Black boots?

25 A.  Boots, black boots I suppose, yes.

Thomas - cross

1  Q.  The boots --

2  A.  But also in the police report, too, the following day I said

3  gym shoes.

4  Q.  Well, that was after you had reviewed the security stills,

5  isn't that correct?

6  A.  Well, yes.

7  Q.  Well, that's what I want to get at.  After the bank robbery

8  occurred, Detective Bice came out --

9  A.  Well, I don't recall --

10  Q.  -- to that particular location, the U.S. Bank location and

11  took all of the video that existed in the bank, isn't that

12  correct?

13  A.  That, I have no idea.  Our operations manager would have

14  taken the videocameras, you know.  And I didn't see any images on

15  there or any of these until the first time that I met with the

16  attorneys.  So I haven't reviewed these.  And the police report

17  was the following day, when I said he wore gym shoes.

18  Q.  But you were aware on the night of the robbery, you were

19  aware that someone from the Palatine Police Department had taken

20  the videos from the bank and reviewed them, isn't that correct?

21  A.  No, not the day, not the night of, you know.  You know, I

22  knew that our procedure was that they would probably take them.

23  But I have no idea when they were taken.

24  Q.  Well, to be clear, since your memory seems to be clearer

25  about the description you gave the day after when you identified

Thomas - cross

1  the other person, the day after you identified the person as

2  having gym shoes, is that correct?

3  A.  It seems that I recalled, you know, his gym shoes, yes.

4  Q.  And you said that those were similar or identical to the

5  shoes that the person that took the money was wearing, is that

6  correct?

7  A.  They seemed similar, yes.

8       (Discussion off the record.)

9  BY MR. PETRO:

10 Q.  Sir, in Government Exhibit No. 2, there were 51 photos that

11 were shown.  Do you remember those 51 photos, the stills from the

12 night of the robbery?  Do you remember seeing those?

13 A.  Reviewing --

14 Q.  We can do them all again if you want, but here is --

15 A.  I remember reviewing them, yes.

16 Q.  -- photo number 1.  And then we went through 51 photos.  You

17 remember those 51 photos, is that correct?

18 A.  Correct, yes.

19 Q.  You never once were able to observe the actual eye area of

20 the person that took the money, because that person had a hat on,

21 is that correct?

22 A.  From the photos, your perception could mean a lot of things.

23 But the day of, yes, I do, because that's what I focused on.  So

24 it was absolutely a hundred percent I engaged him in the eyes,

25 you know, talking with him trying to --

Thomas - cross

1   Q.   Focusing on those eyes from that period of time --

2           MS. BELL:  Your Honor --

3   BY MR. PETRO:

4   Q.   -- you can't tell us today what the color --

5           THE COURT:  Counsel, there is an objection.

6           MS. BELL:  Your Honor, if counsel could please let the

7   witness finish his answers.

8           And also may the record reflect that counsel has shown

9   the witness Government Exhibits 2-1 through 2-8.

10          THE COURT:  Do you want to finish your answer?

11  BY THE WITNESS:

12  A.   Yeah.  Basically, the day of I was able to clearly see the

13  eye sockets around his eyes, the neck area.  I mean, it wasn't

14  only just the color of his eyes.  I was never asked the color.  I

15  knew they were light colored.  You know, but it was also the

16  shape of the eyes, the intensity of the eyes, because they were

17  generally wide open, you know, the whole time.

18          You know, I'm trying to focus on that to keep his

19  attention to me and not to redirect it towards my staff, you

20  know, to try to keep everybody calm.  So at the time, yeah,

21  throughout the whole ordeal, you know, I tried to definitely

22  engage, you know, eye to eye.

23  BY MR. PETRO:

24  Q.   But despite that focus and that attention, you were never

25  able to identify the eye color of the person that came in and

1  took the money, is that correct?

2  A.  Well, it was never asked.

3      (Discussion off the record.)

4  BY MR. PETRO:

5  Q.  Sir, when you talked to the people at the Palatine Police

6  Department the night that this occurred, they specifically asked

7  you whether the person that came in and took the money was

8  wearing gloves, is that correct?

9  A.  I don't recall.

10 Q.  Well, specifically, do you recall being asked by the Palatine

11 Police Department whether or not the person that took the money

12 was wearing gloves?

13 A.  Again, I don't recall exactly what he asked me.

14 Q.  Do you remember from your review of the reports or from your

15 memory itself that you told the Palatine police officer that you

16 were unsure if the offender was wearing gloves during the

17 incident?

18 A.  Not too sure from listening to the video, you know, on there

19 that I was unsure or I said that he had gloves.

20 Q.  But you didn't focus on the person that came in and took the

21 money's hands, is that correct?

22 A.  Correct.  I was more focused on the facial features, you

23 know, instead of his hands.

24 Q.  And with respect to the hearing that we had previously, you

25 testified repeatedly that you didn't know whether or not the

1  person that came in to the bank and took the money was wearing

2  gloves, is that correct?

3  A.  I wasn't sure, correct.

4  Q.  And you're not sure today, is that correct?

5  A.  Correct.

6         MR. PETRO:  One second, please, Judge.

7     (Discussion off the record.)

8  BY MR. PETRO:

9  Q.  With respect to the mask, the one that was in the bag here

10 today, when is the last time that you had seen this particular

11 mask?

12 A.  I believe it was yesterday.

13 Q.  You saw it yesterday?  That was the first time since November

14 20th of 2007 that you viewed this particular item?

15 A.  From what I recall, yes.

16 Q.  You don't know if you saw it before then?

17 A.  I don't recall seeing it.

18 Q.  Well, when you saw the mask yesterday, where did you see that

19 particular mask?

20 A.  It was presented by the attorney.

21 Q.  And they showed it to you, and you were able to look at it up

22 close, isn't that correct?

23 A.  A quick glance at it, yes.

24 Q.  And with respect to that particular, the person that came in

25 and took the money, do you know, sir, whether that person was

Thomas - cross

1 wearing makeup to disguise the color of his skin on the night of

2 the robbery?

3 A.  It didn't appear to be.

4 Q.  Do you know?

5 A.  It didn't appear to be.

6     (Discussion off the record.)

7 BY MR. PETRO:

8 Q.  Now, the day after the robbery occurred, when you called the

9 police and identified someone else as being nearly identical to

10 the person that robbed the bank --

11     MS. BELL:  Objection, Your Honor.  Mr. Petro is

12 misstating the evidence.

13     THE COURT:  I think we all know what he's talking about.

14 But you've already gone over this subject pretty thoroughly, so

15 please --

16     MR. PETRO:  Shortly, Judge.

17     THE COURT:  -- don't repeat yourself.

18 BY MR. PETRO:

19 Q.  The person that came in and cashed that check, you don't

20 remember that person's name?

21 A.  No.

22 Q.  But the person that cashed the check did not have an account

23 at the U.S. Bank, isn't that correct?

24 A.  Correct.

25 Q.  And the person that came in and cashed that check, because

Thomas - cross

1    they didn't have an account, you required them to put their thumb

2    print on that particular check, is that correct?

3    A.   That's procedure, yes.

4    Q.   Do you recall specifically whether you did that with respect

5    to the person and the check on that day?

6    A.   That would be the responsibility of the teller.

7    Q.   Well, have you ever looked at that check after the fact,

8    after November 21st of 2007, did you ever have an opportunity to

9    look at the check that was presented by the person that came in

10   and cashed that check?

11   A.   I saw it for the first time yesterday.

12   Q.   Is there a thumb print on that check, sir?

13   A.   There appears to be, yes.

14   Q.   And that thumb print would be consistent from your experience

15   as the bank manager at U.S. Bank for five years, that would be

16   consistent with your experience of what is required by a teller

17   when someone that doesn't have an account at the U.S. Bank comes

18   in and cashes a check, is that correct?

19   A.   Correct, yes.

20   Q.   So the check had the name of the person that came in and

21   cashed the check on it, is that correct?

22   A.   It would be, I suppose.

23   Q.   That would be the payee, isn't that correct?

24   A.   Yeah.  It could also be payable to cash.  But I don't recall

25   what was on there though, who it was payable to.

Thomas - cross

1  Q.  Well, in that particular situation, the thumb print is used

2  in the event that you have to go and find that person for

3  whatever reason?

4  A.  Correct.

5  Q.  If the check bounces or doesn't clear, is that correct?

6  A.  Correct.

7  Q.  At the time that you identified Government Exhibit Photo No.

8  4-B, you remember 4-B, isn't that correct?

9  A.  If I see it, yeah, I'd recall it.

10 Q.  When you came in and you signed the form, you remember the

11 form that you signed when you came in to the Palatine Police

12 Department in March of 2009?  Do you remember that?

13 A.  Yes.

14 Q.  You had discussions specifically with Detective Bice about

15 what other evidence that you had, what other evidence that the

16 Palatine Police Department had regarding the person that you were

17 about to identify, isn't that correct?

18 A.  After viewing the photos, I was curious and asked him.

19 Q.  You specifically asked him whether they had identified a

20 potential suspect, isn't that correct?

21 A.  Yes, after viewing the photos, yes.

22 Q.  Well, what happened beforehand?  Do you recall?

23 A.  Beforehand what?

24 Q.  Did you have conversation?  Did you just come in, and the guy

25 said, "Is your name Thomas"? and took you back to a room.  And

Thomas - cross

1  then you looked at the photo and identified it, is that correct?

2  A.  Basically.

3  Q.  But you didn't discuss the facts or circumstances surrounding

4  the case?

5  A.  No, no.

6  Q.  Did Detective Bice, did that person ever remind you or

7  refresh your recollection that you had identified someone else as

8  being a suspect the day after the robbery?

9  A.  No, not that I recall, no.

10  Q.  Did you ever view a physical lineup where more than one

11  person stood in a room, and you stood behind a one-way mirror of

12  some sort, did you ever view a lineup with a number of different

13  people in it physically where they were all physically present at

14  the Palatine Police Department?

15  A.  No.

16        MR. PETRO:  Just one second please, Judge.

17     (Discussion off the record.)

18  BY MR. PETRO:

19  Q.  I noticed when the 911 phone call was played, it got to one

20  particular area of the phone call where it appears as if you are

21  talking to other people that are at the bank regarding the

22  description of the person that came in and took the money.  Would

23  that be fair and accurate to say, sir, that there were other

24  people around you during the 911 call that were providing you

25  with information regarding the person that took the money?

Thomas - cross

111

1 A.  I don't hear anybody, you know, while I'm on there.  I could

2 hear them in back after I make my statements.  So basically I

3 confirmed with the mask, the other employees, after I kind of

4 gave a description of what he was wearing, you know, to try to

5 confirm it.  I didn't have any -- I don't recall anybody telling

6 me what to say.

7 Q.  Well, one of the things that the 911 caller asked you

8 specifically was that the person that came in, were they wearing

9 glasses.  And it sounds like you say "Yeah, yeah."  Would that be

10 fair and accurate to say that at the time that you made the 911

11 call, that you described the person that came in to the bank as

12 having glasses on?

13 A.  No, I don't recall that at all.

14 Q.  And to be specific, in the 911 call, you stated that the

15 person that left the bank was going towards the Home Depot, is

16 that correct?

17 A.  No.  I said he did not go towards the Home Depot.

18 Q.  But there is a Home Depot right there, isn't that correct,

19 sir?

20 A.  Correct.  I said from the angle, you could see the Home

21 Depot.

22          MR. PETRO:  I have no other questions, Judge.

23          THE COURT:  Any redirect?

24          MS. BELL:  Yes, Your Honor.

25                    REDIRECT EXAMINATION

Thomas - redirect                                    112

1  BY MS. BELL:

2  Q.  Mr. Thomas, you testified that you had previously reviewed

3  Government Exhibit 5 and 6, being the bank robbery video and the

4  still images from that video surveillance system before your

5  testimony here today, is that correct?

6  A.  Yes.

7  Q.  Mr. Thomas, did you ever see that video or those still images

8  before you identified the robber on March 24th, 2009?

9  A.  No.

10       MS. BELL:  No further questions, Your Honor.

11       THE COURT:  Any recross based on that?

12       MR. PETRO:  Nothing further, sir.

13       THE COURT:  All right.  You're excused, sir.

14     (Witness excused.)

15       THE COURT:  It's about 5 after 12:00.  I usually go a

16  little later than this.  But since this is a good point to break,

17  why don't we break for lunch now and return at 5 after 1:00.

18     (Recess at 12:05 p.m. until 1:05 p.m.)

19

20

21

22

23

24

25

113

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                        Plaintiff,    )
 5                                    )  No. 09 CR 846
                vs.                   )  Chicago, Illinois
 6                                    )  October 13, 2010
     JOHN A. FORD,                    )  1:30 p.m.
 7                                    )
                        Defendant.    )
 8

 9                          VOLUME 2

10            TRANSCRIPT OF PROCEEDINGS - TRIAL

11        BEFORE THE HONORABLE ROBERT W. GETTLEMAN

12                       AND A JURY

13  APPEARANCES:

14  For the Plaintiff:      HON. PATRICK FITZGERALD
                            United States Attorney
15                          219 South Dearborn Street
                            Chicago, Illinois 60604
16                          BY:  MS. CAROL A. BELL
                                 MR. RICK YOUNG
17

18  For the Defendant:      MICHAEL J. PETRO AND ASSOCIATES
                            53 West Jackson Boulevard
19                          Suite 324
                            Chicago, Illinois 60604
20                          BY:  MR. MICHAEL J. PETRO
                                 MS. QUINN A. MICHAELIS
21

22

23  Official Reporter:      JENNIFER S. COSTALES, CRR, RMR
                            219 South Dearborn Street
24                          Room 1706
                            Chicago, Illinois 60604
25                          (312) 427-5351
```

Bice - direct

114

1       (Proceedings in open court.  Jury in.)

2            THE COURT:  Good afternoon, folks.  Please be seated.

3            Would you call your next witness, please.

4            MR. YOUNG:  Your Honor, the government calls Robert

5    Bice.

6            THE COURT:  Raise your right hand, please.

7       (Witness duly sworn.)

8            THE COURT:  Have a seat.

9            ROBERT BICE, GOVERNMENT'S WITNESS, SWORN

10                       DIRECT EXAMINATION

11   BY MR. YOUNG:

12   Q.  Sir, can you please state your name and spell your last name

13   for the record?

14   A.  Robert Bice, "B as in "boy" i-c-e.

15   Q.  Are you employed?

16   A.  Yes.

17   Q.  By whom are you employed?

18   A.  The Palatine Police Department.

19   Q.  Can you tell us what position you hold for the Palatine

20   Police Department?

21   A.  I'm a detective.

22   Q.  Can you tell us how long you've worked for the Palatine

23   Police Department?

24   A.  About 14 years.

25   Q.  And during your 14 years with the Palatine Police Department,

Bice - direct

1  have you held any positions other than that of detective?

2  A.  I was also a patrolman prior to becoming a detective.

3  Q.  Can you briefly tell us what your duties as a detective

4  entail?

5  A.  We're assigned to various criminal offense reports.  We

6  conduct follow-up investigation on them.

7  Q.  I'd like to direct your attention now to the evening of

8  November 20th of 2007 at approximately 5:25.  Were you dispatched

9  to the scene of a bank robbery at that time?

10  A.  Yes.

11  Q.  Can you tell us what bank that was?

12  A.  It was a U.S. Bank.

13  Q.  Do you recall where that bank is located?

14  A.  It's 1586 North Rand in Palatine.

15  Q.  Can you tell us at what time approximately you arrived on

16  scene?

17  A.  About 5:30 p.m.

18  Q.  Were you a detective on November -- at that time?

19  A.  Yes.

20  Q.  Could you tell us what you generally did after arriving at

21  the scene of the bank robbery that you were dispatched to?

22  A.  I spoke with the responding officers, and I also interviewed

23  some victims.

24  Q.  Did you or any other officers conduct any search of the

25  premises?

Bice - direct

1  A.  Yes.

2  Q.  Can you tell us about that?

3  A.  We searched the fence line that was at the rear of the bank

4  property.

5  Q.  How many other officers, or when you say "we," how many

6  people participated in the search of the fence line?

7  A.  There were four of us.

8  Q.  Do you recall who it was?

9  A.  Myself, Detective DelGadillo, Detective Ericson, and Officer

10  Martino.

11  Q.  And approximately how much time passed between the time of

12  your arrival and the time you conducted this search of the fence

13  line in back of the bank?

14  A.  Approximately an hour.

15  Q.  Can you tell us how much time the search took?

16  A.  10 to 15 minutes.

17  Q.  What were the conditions like that night?

18  A.  Pretty heavy rainstorm.

19  Q.  Can you tell us how you and the other officers went about

20  conducting this search of the fence line and the premises outside

21  of the bank?

22  A.  We just got into a line and walked the fence line one behind

23  the other.

24  Q.  What, if anything, did you find as you were searching this

25  fence line behind the bank?

Bice - direct

1  A.  We found a white dust mask.

2  Q.  Did you find anything else other than this white dust mask?

3  A.  No.

4  Q.  What, if anything, was noteworthy about this white dust mask

5  that you found?

6  A.  It matched the description given to us by the victims of a

7  mask worn by the offender.

8  Q.  Can you tell us approximately how far the white dust mask was

9  from the back entrance of the bank when you found it?

10 A.  Approximately 150 feet.

11 Q.  Can you tell us a little bit more about the fence line or the

12 area of the fence line in which you found the white dust mask?

13 A.  It's a wooden fence.  It's about 5 to 6 feet high.

14 Q.  Is it a single fence line that runs behind the bank?

15 A.  For a certain length of the property line, it's a single

16 fence.  And then it becomes actually two fences, one in front of

17 the other, so kind of creating a path.

18 Q.  Does that path between the two fences lead anywhere?

19 A.  Yes.  It leads to an apartment complex that's located behind

20 the bank property.

21 Q.  When you found the mask, was it next to the fence, the single

22 fence line, or was it next to the dual fence line that you

23 described with a path in between?

24 A.  It was on the path in between the two fences.

25 Q.  Officer Bice, I'd like to direct your attention to Government

Bice - direct                                    118

1  Exhibit 5-9.

2          MR. YOUNG:  Your Honor, may I publish this exhibit?  It

3  was previously entered into evidence.

4          THE COURT:  Sure.

5  BY MR. YOUNG:

6  Q.  Are you familiar with this photograph?

7  A.  Yes.

8  Q.  Can you tell us what this photograph depicts?

9  A.  That's the rear section of the property at the U.S. Bank.

10 Q.  This photo was taken during the daylight?

11 A.  Yes.

12 Q.  Directing your attention to the parking lot in the

13 foreground, is that the parking lot to U.S. Bank?

14 A.  Yes.

15 Q.  And directing your attention to the brick structure that

16 appears on the left side of the photograph, is that part of the

17 bank?

18 A.  Yes.

19 Q.  Let me show you what has been marked as Government Exhibit

20 5-12.  Are you familiar with this photograph?

21 A.  Yes.

22 Q.  Can you tell us what it is?

23 A.  It's the rear of the U.S. Bank.

24 Q.  Directing your attention now specifically to the brick

25 structure that appears on the right-hand side of the photograph,

Bice - direct

1  is that the same brick photograph -- the same brick structure,

2  I'm sorry, that we just saw depicted in Government Exhibit 5-9?

3  A.   Yes.

4  Q.   Directing your attention now back to Government Exhibit 5-9,

5  and specifically to the middle portion of the photograph, is that

6  the fence line that you searched on the evening of November 20th,

7  2007?

8  A.   Yes.

9  Q.   You made a reference to a portion of the fence line where

10  another fence line began, creating a path between the two fences.

11  Can you direct us to the area on this photograph at which that

12  double fence line begins?

13  A.   It's just behind, there is a cluster of bushes there about

14  three-fourths of the way from right to left, just behind this.

15  Q.   If I focus in on this area, was that the area to which you

16  were referring?

17  A.   Yes.

18  Q.   And this is the path to which you were referring between the

19  two fences?

20  A.   Correct.

21  Q.   Do you recall how far down that path you found the mask?

22  A.   Approximately 20, 25 feet.

23  Q.   Let me now just direct your attention to Government Exhibit

24  5-11.  Are you familiar with this photograph?

25  A.   Yes.

                        Bice - direct

1  Q.  And can you tell us what it is?

2  A.  It's a photo of the two fences where they run together.

3  Q.  I'd like to now direct your attention to Government Exhibit

4  8.  Are you familiar with the photograph that appears on your

5  screen, Detective Bice?

6  A.  Yes.

7  Q.  Can you tell us what it is?

8  A.  It's an aerial photograph of the bank property.

9  Q.  And by "the bank property," are you referring to the U.S.

10 Bank located at 1586 Rand Road in Palatine?

11 A.  Yes.

12 Q.  And does this aerial photograph truly and accurately depict

13 the bank and the grounds surrounding the bank as they existed

14 around the time of the robbery on November 20th, 2007?

15 A.  Yes.

16 Q.  I assume the trees may not have been in bloom at that time?

17 A.  Correct.

18         MR. YOUNG:  Your Honor, the government would move to

19 admit Government Exhibit 8 and publish it to the jury.

20         THE COURT:  Any objection?

21         MR. PETRO:  No, sir.  Thank you.

22         THE COURT:  Okay.  Thank you.  It will be admitted.

23     (Government Exhibit 8 was received in evidence.)

24 BY MR. YOUNG:

25 Q.  Detective Bice, Government Exhibit 8 appears to depict three

Bice - direct

1  separate buildings.  Can you tell us the one on the left, the one

2  in the middle, the one on the right-hand side of the photograph,

3  can you tell us which of those three buildings is the U.S. Bank?

4  A.  The one in the middle is the U.S. Bank.

5  Q.  Is this the building to which you are referring (indicating)?

6  A.  Correct.

7  Q.  And directing your attention to the side of the building at

8  the top of the picture, is that the front of the building or the

9  back of the building?

10  A.  The front.

11  Q.  And directing your attention to the side of the building that

12  appears at the bottom of the photograph, would that then be the

13  back of the building?

14  A.  Yes.

15  Q.  Can you tell us approximately where on this photograph the

16  fence line that we've seen and that you've described would

17  appear?

18  A.  It's towards the bottom of the picture, just below the

19  U-shaped circle drive of the U.S. Bank property.

20  Q.  Are you referring to this line that I'm marking here, officer

21  Bice?

22  A.  Correct.

23  Q.  And along the fence line marked by the long red line I've now

24  drawn towards the bottom of Government Exhibit 8, can you tell us

25  approximately where it would be that you found the white dust

122

Bice - direct

1  mask on November 20th, 2007?

2  A.  In where you see a bigger cluster of trees, there about in

3  the middle of the picture.

4  Q.  It would be approximately this area (indicating)?

5  A.  Correct.

6  Q.  You indicated that the path that was in between these two

7  dual fences or these two fences, I should say, led to an

8  apartment complex, is that apartment complex depicted at all on

9  this exhibit?

10  A.  Yes.

11  Q.  And where would that be?

12  A.  You can see just a little bit of a building in the lower

13  right-hand corner.

14  Q.  Are you referring to this area (indicating) approximately

15  right here?

16  A.  Yes.

17  Q.  Can you tell us what you did with the white mask after you

18  found it on that evening?

19  A.  I collected the mask wearing latex gloves and placed it

20  inside a paper bag.

21  Q.  And after you placed it into this paper bag, what did you do

22  with that bag?

23  A.  I sealed the bag and later that day placed it into property

24  at the station.

25  Q.  At some point in time, did you send that mask to a crime

Bice - direct

1   laboratory?

2   A.   Yes.

3   Q.   When was that approximately?

4   A.   January of '08.

5   Q.   And what crime laboratory was the mask sent to?

6   A.   The Illinois State Police.

7   Q.   Why was the mask sent to the Illinois State Police Crime

8   Laboratory?

9   A.   I requested them to conduct DNA analysis on the mask.

10  Q.   At some point after, was the mask received back to Palatine

11  from the Illinois State Crime Laboratory?

12  A.   Yes.

13  Q.   Do you know when that was approximately?

14  A.   May of 2009.

15  Q.   Prior to the mask being received back at Palatine, was

16  results of a DNA analysis provided to the Palatine Police

17  Department?

18  A.   Yes.

19          MR. YOUNG:  Your Honor, may I approach the witness?

20  BY MR. YOUNG:

21  Q.   Detective Bice, I am showing you what has been marked as

22  Government Exhibit 9.  Do you recognize this exhibit?

23  A.   Yes.

24  Q.   Can you tell us what this exhibit is?

25  A.   That is the white dust mask that we recovered at the scene of

Bice - direct

124

1  the robbery.

2  Q.  How do you know that this particular white dust mask is the

3  dust mask that you recovered at the scene of the robbery?

4  A.  That is the dust mask which was placed in this bag and

5  sealed, and a chain of custody has been maintained on it ever

6  since.

7  Q.  Is it in substantially the same condition as it was on the

8  evening you recovered it on November 20, 2007?

9  A.  Yes, outside of some markings made by the lab personnel, it

10  is.

11         MR. YOUNG:  Your Honor, the government would move to

12  admit Government Exhibit 9.

13         MR. PETRO:  Subject to cross-examination, please, Judge.

14         THE COURT:  Well, I'll admit it for purposes -- you can

15  make a motion if you think it's appropriate later on, but it will

16  be admitted for now.

17     (Government Exhibit 9 was received in evidence.)

18         MR. YOUNG:  May I publish the mask to the jury, Your

19  Honor?

20         THE COURT:  You may.

21     (Said exhibit was viewed in open court.)

22  BY MR. YOUNG:

23  Q.  Detective Bice, I'd now like to direct your attention to the

24  time period of approximately March of 2009.  Did you assemble a

25  photographic lineup around that time?

Bice - direct

1  A.  Yes.

2  Q.  Can you tell us why you assembled that photographic lineup?

3  A.  Yes.  The lab report that came back from the analysis of the

4  mask had stated that a DNA profile recovered from the mask

5  matched that of a John Ford.

6  Q.  Can you tell us how many photographs were included in that

7  photographic lineup you prepared?

8  A.  There were six.

9  Q.  Was one of the photographs the photograph of the defendant

10  John Ford?

11  A.  Yes.

12  Q.  Can you tell us why you included John Ford's photograph in

13  that lineup?

14  A.  Because of the laboratory report indicating his DNA profile

15  matched the profile found in the mask.

16  Q.  Can you tell us how you went about selecting the other five

17  photographs that appeared in that photographic lineup?

18  A.  I selected them from a database of Palatine Police arrest

19  mugshots.

20  Q.  I'd like to direct your attention now specifically to the

21  date of March 24th, 2009, at approximately 10:20 a.m.  Did you

22  present that lineup to a particular person at that date and on

23  that time?

24  A.  Yes.

25  Q.  Can you tell us who it was that you presented that lineup to?

Bice - direct

126

1  A.  Daniel Thomas.

2  Q.  Can you tell us where it was that you presented this

3  photographic lineup to Mr. Thomas?

4  A.  At the Palatine Police Department.

5  Q.  Was it in any particular room at the police department?

6  A.  It was in an interview room in our investigation section.

7  Q.  Can you tell us who else was present at the time that you

8  presented this lineup to Mr. Thomas other than yourself and

9  Mr. Thomas?

10  A.  There was no one else present in the room.

11  Q.  Before you presented this lineup to Mr. Thomas, did you speak

12  with him about the lineup?

13  A.  Yes.

14  Q.  Can you tell us what you said to him regarding the lineup?

15  A.  I had him read an advisory form that's a standard form that

16  we have anyone viewing a photo lineup read to make sure they

17  understand.

18          MR. YOUNG:  Your Honor, may I publish what has been

19  previously entered into evidence as Government Exhibit 3.

20          THE COURT:  You may.

21  BY MR. YOUNG:

22  Q.  Detective Bice, you referenced showing Mr. Thomas a notice

23  form prior to showing him the lineup.  Is this the notice form

24  that you showed to Mr. Thomas on March 24th of 2009?

25  A.  Yes.

Bice - direct

1  Q.  Is this a standard form?

2  A.  Yes, it is.

3  Q.  Did you ask Mr. Thomas to read the form?

4  A.  Yes.

5  Q.  Did he appear to do so?

6  A.  Yes.

7  Q.  Did you ask him to do anything else after he read the form?

8  A.  I asked him to sign it.

9  Q.  Did he do so?

10  A.  Yes.

11  Q.  Did anyone else other than Mr. Thomas sign the form as a

12  witness?

13  A.  No.  Well, myself.

14  Q.  If I can direct your attention to the middle portion of the

15  document, is that the signature of Dannie Thomas?

16  A.  Yes.

17  Q.  And below that, over the heading "Detective Officer," is that

18  your signature?

19  A.  Yes, it is.

20  Q.  Detective Bice, can you read the portion of Government

21  Exhibit 3 that I have magnified?

22  A.  "I understand that the suspect may or may not be in the

23  lineup photo spread.  I understand that I am not required to make

24  an identification.  I do not assume that the person administering

25  the lineup photo spread knows which person is the suspect."

Bice - direct

1  Q.  After Mr. Thomas took the time to read the document and

2  signed it, did you have any discussion with him about the

3  document?

4  A.  Yes.

5  Q.  Can you describe that for us?

6  A.  I told him that basically what the form means is that I only

7  wanted him to pick someone if he was sure, I didn't want him to

8  guess, and it was okay if he didn't pick anybody at all.

9  Q.  Did you have any other discussions with Mr. Thomas before

10 showing him the lineup form?

11 A.  No.

12 Q.  I assume there was some type of phone call to ask Mr. Thomas

13 to come in to the Palatine Police Department on March 24th, 2009,

14 is that correct?

15 A.  Correct.

16 Q.  During that call, did you have any discussions with him

17 beyond asking him to come in?

18         MR. PETRO:  Judge, I object to foundation on that,

19 please.  If I could get a foundation?

20         MR. YOUNG:  I'll lay a better foundation, Your Honor.

21 BY MR. YOUNG:

22 Q.  With respect to that phone call, did anyone else participate

23 in that conversation other than yourself and Mr. Thomas?

24 A.  No.

25 Q.  Do you recall approximately when that telephone call

129

Bice - direct

1  occurred?

2  A.  I do not.

3  Q.  Would it have been within a week or two of March 24th, or do

4  you think it would have been a longer period of time?

5          MR. PETRO:  Objection, Judge, leading.

6          THE COURT:  Overruled.

7  BY THE WITNESS:

8  A.  I believe it would have been within a couple days.

9  BY MR. YOUNG:

10 Q.  And do you recall what was discussed during that telephone

11 conversation?

12 A.  I just asked Mr. Thomas if he could come into the station and

13 view some pictures related to the case.

14         MR. YOUNG:  May I approach, Your Honor?

15 BY MR. YOUNG:

16 Q.  Detective Bice, I'm handing you what has been marked as

17 Government Exhibit 4-A through 4-F.  You're familiar with those

18 exhibits?

19 A.  Yes.

20 Q.  Can you tell us what they are?

21 A.  These are the six pictures used in the photo lineup.

22 Q.  And each of the photographs in the corner has a numerical

23 marking, Government Exhibit 4-A is marked 1, Government Exhibit

24 4-B is marked 2 and so on.  Are those markings that you placed on

25 the photograph?

Bice - direct

1  A.  Yes.

2  Q.  And they're numbered 1, so they're numbered 1 through 6?

3  A.  Correct.

4  Q.  Can you tell us how it was that you presented that, those

5  photos to Mr. Thomas on March 24th, 2009?

6  A.  He was seated at a table in our interview room.  And I laid

7  them out in order going right or -- left to right 1, 2, 3 and

8  then the bottom row 4, 5, and 6.

9  Q.  Are those the actual photographs that you showed to

10  Mr. Thomas in March 2009?

11  A.  Yes, they are.

12  Q.  Are they substantially in the same condition they were at the

13  time you showed them to Mr. Thomas?

14  A.  Yes.

15       MR. YOUNG:  Your Honor, the government would move to

16  admit Government Exhibit's 4-A through 4-F with the exception of

17  4-B, that was previously admitted.

18       MR. PETRO:  No objection, sir.  Thank you.

19       THE COURT:  All right.  They'll be admitted.

20     (Government Exhibits 4-A, 4-C, 4-D, 4-E, and 4-F were

21      received in evidence.)

22  BY MR. YOUNG:

23  Q.  Can you tell us what happened after you laid these

24  photographs out for Mr. Thomas?

25  A.  I left the room for a few minutes.

Bice - cross                                            131

1  Q.  What happened next?

2  A.  I came back in the room, and Mr. Thomas identified John Ford,

3  picture number 2, as the robber and the bank robber.

4  Q.  Can you tell us what that photograph number 2 is marked?

5  A.  Government Exhibit 4-B.

6          MR. YOUNG:  Your Honor, the government would move to

7  publish Government Exhibit 4-B.

8          THE COURT:  You may.

9          MR. YOUNG:  May I have a moment, Your Honor?

10     (Discussion off the record.)

11          MR. YOUNG:  Your Honor, I tender the witness.

12          THE COURT:  Is there some holdup here, counsel?

13          MR. PETRO:  I'm sorry, Judge.  I was just looking at

14  something.

15          THE COURT:  Are you ready to proceed?

16          MR. PETRO:  Yes, sir, I am.  Thank you.

17          THE COURT:  Okay.

18                      CROSS-EXAMINATION

19  BY MR. PETRO:

20  Q.  Sir, you testified about some photos.  I believe the photos

21  were Exhibits 5-9, 5-12, and 5-11, is that correct?

22  A.  Yes.

23  Q.  Do you need to refresh your recollection with respect to

24  those photos?

25  A.  Yes.

Bice - cross

1          MR. YOUNG:  Can you help me out here, Mr. Young?

2   BY MR. PETRO:

3   Q.  Is it fair to say, sir, that at the time that you -- is it

4   fair to say that at the time that you viewed this fence line, it

5   was dark out, is that correct?

6   A.  Correct.

7   Q.  Pitch black?

8   A.  There are some street lights in the area.  Fairly dark.

9   Q.  Well, were there street lights in the area where you

10  recovered the mask?

11  A.  No.

12  Q.  So it was raining fairly hard, is that correct?

13  A.  Correct.

14  Q.  And this search of this particular area occurred while it was

15  still raining, is that correct?

16  A.  Correct.

17  Q.  And when you arrived at the bank, you arrived at the bank at

18  approximately what time?

19  A.  Within 10 minutes of the 911 call approximately.

20  Q.  So about 5:40 in the evening, would that be fair to say?

21  A.  About then, yes.

22  Q.  And with respect to the search, what was the first thing that

23  you did when you arrived at that particular location, the bank,

24  U.S. Bank?

25  A.  The first thing?

Bice - cross

1  Q.  Uh-huh.

2  A.  I interviewed a witness to the case.

3  Q.  What was her name?

4  A.  Julie Boge.

5  Q.  Julie Boge.  And where was Julie Boge located?

6  A.  She was in the parking lot.

7  Q.  Why did you interview Julie Boge?

8  A.  She has been in the drive-through at the time of the robbery

9  and had called 911.

10  Q.  In fact, your purpose for interviewing Ms. Boge was to arrest

11  her at that point, is that correct?

12  A.  No.

13       MR. YOUNG:  Objection, relevance.

14       THE COURT:  Counsel?

15       MR. PETRO:  Well, it's relevant.  I wanted to know what

16  his state of mind was at the time that he was conducting his

17  investigation.

18       THE COURT:  I'll let you go into this.  It's overruled.

19  But not too far.

20  BY THE WITNESS:

21  A.  Could you repeat the question?

22  BY MR. PETRO:

23  Q.  With respect to Ms. Boge, the person that was in the

24  drive-through that you interviewed, the first person you

25  interviewed when you arrived at the U.S. Bank location, your

Bice - cross

1  purpose for talking to her was, in fact, to place her under

2  arrest, is that correct?

3  A.  No.

4  Q.  Did you originally think that she was a suspect of this

5  particular offense?

6  A.  No.

7  Q.  Ms. Boge was in the drive-through.  Why did you go to that

8  particular location?

9  A.  The drive-through?

10  Q.  Yeah.

11  A.  I did not go to the drive-through.

12  Q.  Well, where was Ms. Boge when you arrived?

13  A.  In the front parking lot of the bank.

14  Q.  That would be in this area up here (indicating), sir?

15       MR. PETRO:  Sorry.  Where is the undo button?

16    (Discussion off the record.)

17  BY MR. PETRO:

18  Q.  When you say the front portion, that would be the portion

19  that would be closest to Rand Road, is that correct?

20  A.  Yes.

21  Q.  And with respect to this building to the left of the U.S.

22  Bank, the left as I'm looking at it and I'm sure you're looking

23  at it too, that's the Home Depot, is that correct?

24  A.  Could you use the mouse maybe to point out what you are

25  talking about, to make sure we're on the same page?

135

Bice - cross

1  Q.  This area right here (indicating), is this building right
2  here, is this the Home Depot?
3  A.  No, it's not.
4  Q.  Well, is there a Home Depot at or approximately near there
5  somewhere?
6  A.  Yes.
7  Q.  Where is the Home Depot in relationship to this red line that
8  I've placed on here?
9  A.  It would be outside of the photograph, outside of the lower
10 left corner as I look at this picture.
11 Q.  So if you went parallel past where the U-shaped drive is, the
12 Home Depot would be to the left of that, is that correct?
13 A.  It would be that way (indicating).
14 Q.  Now, with respect to 5-9, that wasn't taken the night of the
15 robbery, is that correct?
16 A.  Correct.
17 Q.  In fact, the robbery occurred sometime in November of '07, is
18 that correct?
19 A.  Correct.
20 Q.  And this picture was taken recently, is that also fair to
21 say?
22 A.  Yes.
23 Q.  How recently was that particular picture taken?
24 A.  I don't know the exact date.
25 Q.  Did you take the photo?

Bice - cross

1  A.  No, I didn't.

2  Q.  I noticed in some of the photos, this would be 5-007, it

3  looks like there is a substantial amount of debris on the ground,

4  is that fair to say?

5  A.  I see some leaves on the ground.

6  Q.  Well, you also see some white debris, is that correct?  Maybe

7  the next photo would be a little bit -- do you see some debris

8  and things along this lines over here, is that correct?  Do you

9  see some like debris right here, some debris right here?  Would

10  that match your experience when you were searching on November

11  20th of 2007?

12  A.  I don't understand your question.

13  Q.  Well, there was other things that were on the ground at that

14  particular day, time, and location when you're out in the

15  four-man line, is that correct?

16  A.  I don't recall any other items on the ground.

17  Q.  Well, how were you going through this line?  Did you have

18  flashlights or something?

19  A.  Yes.

20  Q.  And how many people live at that apartment complex at that

21  particular location?

22  A.  I don't know.

23  Q.  Would it be safe to say that there is thousands of people

24  that live in that particular location?

25  A.  I don't know.

Bice - cross

1  Q.  It's a multiple unit apartment complex at that particular

2  location, is that correct?

3  A.  Yes.

4  Q.  And the purpose for having these holes in the particular

5  fence is so that the hundreds and hundreds and hundreds of people

6  that live in the apartment complex can walk over to Home Depot or

7  the other stores in that particular location.  Would that be fair

8  to say?

9  A.  I don't know what the purpose of it is.

10  Q.  Well, how long have you been a police officer at the Palatine

11  Police Department?

12  A.  About 14 years.

13  Q.  Is it your testimony that you've never been to that apartment

14  complex in 14 years as a Palatine Police Department officer?

15  A.  No, it's not.

16  Q.  You did patrol, is that correct?

17  A.  Correct.

18  Q.  Well, how many times have you been to that particular

19  apartment complex during the course of your 14-year career?

20  A.  I couldn't give you an exact number.

21  Q.  It's a lot though, isn't it?

22  A.  Sure.

23  Q.  Domestic violence complaints, correct?

24  A.  I'm sure, yeah.

25  Q.  Drunk and disorderlies, correct?

138

Bice - cross

1  A.  I don't recall exactly what type.

2  Q.  Fist fights?

3        But during the course of your career you've been to that

4  apartment complex dozens and dozens and dozens and dozens of

5  times, isn't that correct?

6  A.  I've been on calls in that complex, yes.

7  Q.  And it's been the scenes of various crimes over the years

8  probably, isn't that correct?

9  A.  I'm sure.

10  Q.  Well, how many people live at that location?

11  A.  I don't know.

12  Q.  Well, would it be more than 10?

13  A.  I would say so.

14  Q.  Would it be more than a hundred?

15  A.  Most likely.

16  Q.  More than 500?

17  A.  I don't know exactly how many people live there.

18  Q.  But it's a lot of people, isn't it?

19  A.  Yes.

20  Q.  And the purpose for having these holes in this fence -- I

21  mean, you've got some common sense about you, you're trained as a

22  police officer -- it's so the people can go from the apartment

23  complex to the establishments on Rand Road, isn't that correct?

24  A.  There is a path there.

25  Q.  And that path is designed for people to walk through, is that

Bice - cross

1  correct?

2  A.  I don't know what it was designed for.

3  Q.  Well, it's late, it's late at night by the time you go

4  searching for the mask, isn't it?

5  A.  It's about 6:00, 6:30, 6:40.

6  Q.  And when you find the mask, the mask is wet?

7  A.  Yes.

8  Q.  And for a wet mask, it's very, very difficult for a person to

9  identify and determine how long that mask has been at that

10  particular location, isn't that correct?

11  A.  No.

12  Q.  Well, you have no idea how long the mask had been at that

13  particular location, do you?

14  A.  No.

15  Q.  And there is a Home Depot right next door, is that correct?

16  A.  Adjacent to the property, yes.

17  Q.  And they sell that mask, probably dozens and dozens and

18  dozens of those particular masks at that Home Depot each and

19  every day, isn't that fair to say?

20  A.  I don't know what type of masks they sell there.

21  Q.  Well, that's a pretty ubiquitous mask as far as a dust mask,

22  isn't that correct, a white dust mask?  There is nothing specific

23  about that particular dust mask that you can point to today, can

24  you?

25  A.  No.

Bice - cross

1  Q.  So when you went out there, you're going to walk the fence

2  line.  What's the first thing that you do?

3  A.  Walk the fence line.

4  Q.  Well, do you have an umbrella with you?

5  A.  No.

6  Q.  Are you wearing gloves?

7  A.  Not at that time.

8  Q.  Well, is it cold out?  It's November.  Is it cold out?

9  A.  I don't remember the temperature.  I'm sure it was a little

10 chilly.

11 Q.  Did other people have gloves?

12 A.  I don't know.

13 Q.  Were you wearing a coat?

14 A.  Yes.

15 Q.  And then you say that you're walking this fence line, and you

16 find some type of mask, is that correct?

17 A.  I found a white dust mask.

18 Q.  And that dust mask, just to be absolutely 100 percent

19 certain, you had never walked that fence line before November

20 20th of 2007, have you?

21 A.  No.

22 Q.  You never looked for any evidence in that particular location

23 before, is that correct?

24 A.  Correct.

25 Q.  And right next to that particular location there is couches

Bice - cross

1 where kids hang out and party and drink beer, smoke pot and

2 cigarettes and things along those lines, isn't that correct also?

3 A.  I'm not aware of any of those activities.

4 Q.  Well, you walked the fence line.  You saw that particular

5 area around that location, didn't you?

6 A.  Yes.

7 Q.  There was couches and tables and things along those lines,

8 dirty beer cans, things along those lines, you saw that, didn't

9 you?

10 A.  I remember there being a couch.

11 Q.  There was a couch there, right there by that particular

12 entrance, is that correct?

13 A.  I believe it was on that apartment complex side.

14 Q.  Uh-huh.  People hung out there and kids hung out there, I

15 would assume?

16 A.  I don't know who hangs out there, if anyone hangs out there.

17 Q.  Well, to be 100 percent certain, before November 20th of

18 2007, you don't know whether that mask was there, is that

19 correct?

20 A.  No.

21 Q.  That mask could have been there on the 19th, is that correct?

22 A.  I don't know.

23 Q.  Well, you don't know, do you?

24 A.  That's what I said.

25 Q.  It could have been there for a year, couldn't it have?

142

                    Bice - cross

1  A.  I know it was there on November 20th.

2  Q.  But the mask, did you notice any particular markings on the

3  particular mask when you picked it up that particular evening?

4  A.  No.

5  Q.  Where did you get the gloves, sir?

6  A.  I had them on me.

7  Q.  Where were they?

8  A.  Coat pocket.

9  Q.  In your coat pocket.  Where did you get the gloves before you

10  put them in your coat pocket?

11  A.  From a box of them.

12  Q.  And then you put them in your coat pocket?

13  A.  Yes.

14  Q.  And what, you carried them in your coat pocket?  You touched

15  the outside of the gloves before you put them on, is that

16  correct?

17  A.  I put them on just like you would see anybody put them on.

18  Q.  Just like they put them on here in court here today, is that

19  correct?  You put them on, you pick them up, put them on and pull

20  them over, isn't that correct?

21  A.  Correct.

22  Q.  Wouldn't it be correct that you are putting your DNA on those

23  particular gloves at that time?

24  A.  I suppose it's possible.

25  Q.  It's possible?  It's probable, isn't it?  You put the gloves

Bice - cross

1  on.  You pull them on.  You have your hands all over them?

2  A.  How else would you put them on?

3  Q.  I've always wanted to do this, by the way.  I saw it on TV

4  once.  Go ahead.

5  A.  I also --

6  Q.  You're putting DNA on the gloves, aren't you?

7  A.  How else would you put them on?  How else would you put them

8  on?

9  Q.  Well, you're putting DNA on the gloves, right?

10  A.  It's possible there is transfer.

11  Q.  Well, did you touch anywhere else while you were walking the

12  fence line?

13  A.  No.

14  Q.  Did you touch any of your friends or fellow officers while

15  you were touching the fence line?

16  A.  I didn't place the gloves on until the mask was found.

17  Q.  Well, how long have you been a detective at that particular

18  time?

19  A.  About two years.

20  Q.  Did you receive training?

21  A.  Yes.

22  Q.  Well, did you do anything other to preserve that particular

23  mask at that date and time?

24  A.  Other than placing it, sealing it in a paper bag?

25  Q.  That's correct.

144

Bice - cross

1  A.  No.

2  Q.  I noticed before court that you were talking on a phone out

3  in the hall.  Would that be fair to say?  You have some type of

4  phone, is that correct?

5  A.  Do I own a cellphone?

6  Q.  Yes.

7  A.  Yes.

8  Q.  Does the cellphone have a camera on it?

9  A.  Yes.

10 Q.  Well, did you ever make any attempt to photograph the finding

11 of this key and crucial piece of evidence on November 20th, 2007?

12 A.  No.

13 Q.  So with respect to the finding of that particular piece of

14 evidence, we have to trust you, is that correct?

15 A.  Yes.

16 Q.  Why didn't you take a picture of it when you found it?  You

17 had a camera with you, didn't you?

18 A.  No, I did not.

19 Q.  Well, you had your cellphone with you, didn't you?

20 A.  I didn't have the cellphone I have now back then.

21 Q.  Well, there was four other, three other people with you, is

22 that correct?

23 A.  Three others.

24 Q.  They're detectives, they're trained, is that correct?

25 A.  Two of them are detectives, the other one is an officer, but

145

Bice - cross

1  yes.

2  Q.  Well, the reason you didn't do it is because you didn't think

3  it was a piece of evidence in this particular case, isn't that

4  correct?

5  A.  No.

6  Q.  Well, you took the evidence and you put it in a bag, didn't

7  you?

8  A.  Correct.

9  Q.  And then you took it back to the station, didn't you?

10  A.  Yes.

11  Q.  And then you left it at the station for two, three months

12  before you decided to do anything with it, is that correct?

13  A.  When I got back to the station, I entered it in the property

14  like we do with any evidence.

15  Q.  But you never made any attempt to have that analyzed in a

16  meaningful manner, isn't that correct?

17  A.  No.  I submitted it to the lab in January.

18  Q.  Which is about two months later, is that correct?

19  A.  I believe it's around --

20  Q.  It didn't get to the lab until around February, did it?

21  A.  I believe it's around maybe five or six weeks.

22  Q.  Well, why did you wait five or six weeks?  You'd know in your

23  training that evidence degrades over time, isn't that correct?

24  A.  No.

25  Q.  Was the mask wet?

Bice - cross

1  A.  At the time.

2  Q.  Did you dry it out?

3  A.  It dried in the bag.  That's the purpose of the paper bag, to

4  allow the evidence to dry.

5  Q.  Well, you know that as a forensic person that the evidence is

6  degrading each and every day, especially if it's wet, right?  You

7  know that from your training?

8  A.  The mask dried.  It didn't stay wet for days on end.

9  Q.  Well, the reason why you take it back and leave it sit for

10 six weeks is because you don't think it's important in this

11 particular case, is that right?

12 A.  No, it's not correct.

13 Q.  And the reason why you don't think it's important is because

14 the day after this offense occurred, Dannie Thomas called you and

15 identified another person, didn't he?

16 A.  No.

17 Q.  He called someone at the Palatine Police Department, didn't

18 he?

19 A.  Yes.

20 Q.  That would be Officer Martino?

21 A.  Correct.

22 Q.  And Officer Martino was part of the investigation crew at the

23 bank on that particular evening, isn't that correct?

24 A.  Yes.

25 Q.  You were also aware that there was other evidence recovered

147

Bice - cross

1  that particular evening, isn't that correct?

2        Are you the lead detective for the Palatine Police

3  Department on November 20th, 2007?  Are you in charge of the

4  crime scene?

5  A.  I was assigned this case, yes.

6  Q.  So you can tell everyone else what to do at that particular

7  area, is that correct?

8  A.  That's not really how it works, but --

9  Q.  Well, one of the things that was recovered at that particular

10  crime scene was a palm print.  Do you remember that?

11  A.  Yes.  There was a partial palm print collected off of --

12  Q.  Where was that collected?

13  A.  The rear door.

14  Q.  Going out?

15  A.  I believe so.

16  Q.  Inside of the door?  Outside of the door?

17  A.  Inside.

18  Q.  And there was also some fingerprint smudges, is that correct?

19  A.  I believe so.

20  Q.  And you directed Crime Scene Technician Seehome, I believe

21  that was his name, you directed him to preserve that evidence,

22  didn't you?

23  A.  Well, Crime Scene Technician Seehome does what he thinks is

24  appropriate in fulfilling his duties.

25  Q.  But did you direct him?

Bice - cross

1  A.  I did not direct him, no.

2  Q.  Well, you did not discourage him from securing that piece of

3  evidence, did you?

4  A.  No.

5  Q.  With respect to the palm print, did you make any attempt or

6  effort to take a photograph of that particular palm print?

7  A.  Did I?

8  Q.  Yes.

9  A.  No.

10 Q.  Did Crime Scene Technician Seehome, did he have a camera with

11 him?

12 A.  I believe he did.

13 Q.  Well, did you ever direct Crime Scene Technician Seehome to

14 come out to the area where the mask was recovered and take a

15 picture of it so the rest of us wouldn't have to trust your word

16 where you found it?

17          MR. YOUNG:  Objection, Your Honor, foundation and

18 argumentative.

19          THE COURT:  Sustained.

20 BY MR. PETRO:

21 Q.  Did you prepare a report regarding recovery of the mask?

22 A.  Yes.

23 Q.  Have you had an opportunity to review that report before you

24 came here today?

25 A.  Yes.

Bice - cross

1  Q.  If I showed it to you, would you recognize it?

2  A.  Yes.

3  Q.  I'm going to show you what has been labeled Defendant's

4  Exhibit No. -- could you take a look at what I'll label --

5          THE COURT:  What's the number?

6          MR. PETRO:  Defendant's Exhibit No. 4, Judge.

7  BY MR. PETRO:

8  Q.  Could you take a look at that, please, and tell me if you

9  recognize what that particular document is?

10  A.  This is a report that I wrote.

11  Q.  Is that the report regarding the recovery of the mask?

12  A.  Yes.

13  Q.  And with respect to that particular report, the only thing

14  that that report says about the recovery of that particular mask,

15  the most important piece of evidence in this particular

16  prosecution, a white mask was located along a fence approximately

17  150 feet south of the bank property, is that correct?

18  A.  Correct.

19  Q.  That's the sum total of your report regarding this important

20  piece of evidence, is that correct?

21  A.  Yes.

22  Q.  There is no evidence logs that would show where the mask went

23  after you placed it into the paper bag, is there?

24  A.  Yes, there are.

25  Q.  Isn't it true, sir, that you did not find the mask at that

Bice - cross

1   particular location until November 21st, the next day after the

2   bank robbery?

3   A.   No.   That's incorrect.

4   Q.   Did you make any attempts to investigate whether that type of

5   mask was sold commonly at the Home Depot just hundreds of yards

6   away from the location of where this mask was located?

7   A.   No.

8   Q.   Did you go over to the Home Depot and ask them if they had

9   records of anyone from November 20th or November 19th that had

10  purchased a white dust mask or something similar?

11  A.   No, I did not.

12  Q.   Did you make any attempts to ascertain the person that Dannie

13  Thomas identified on November 21st as the bank robber, did you

14  make any efforts to go out and talk to that person?

15          MR. YOUNG:   I'll object to the question, Your Honor, as

16  misstating the evidence and specifically regarding an

17  identification by Mr. Thomas on November 21st.

18          THE COURT:   Overruled.

19  BY THE WITNESS:

20  A.   Could you repeat the question?

21  BY MR. PETRO:

22  Q.   Did you make any attempts to trace, to check the lead as to a

23  potential suspect that was given to you by Dannie Thomas to the

24  Palatine Police Department on November 21st, 2007?

25  A.   I don't know if it was November 21st, but yes, I did conduct

151

Bice - cross

1  some follow-up on the lead.

2  Q.  Did you create police reports regarding the follow-up of that

3  lead?

4  A.  No.

5  Q.  So we have to trust you as to your investigation of that

6  particular aspect of the case, is that correct?

7          MR. YOUNG:  Objection, argumentative.

8          THE COURT:  Sustained.

9  BY MR. PETRO:

10  Q.  Now, you mentioned some type of form that was signed by

11  Dannie Thomas.  I believe it was Government Exhibit No. 3.  It

12  was signed by Dannie Thomas and yourself, isn't that correct?

13  A.  The Lineup Spread Advisory Form?

14  Q.  That's correct.

15  A.  Yes.

16  Q.  And with respect to the Lineup Spread Advisory Form, is that

17  the only person that you had showed that Lineup Spread Advisory

18  Form that was a witness in this particular case?

19          MR. YOUNG:  Objection, relevance.

20          THE COURT:  Overruled.

21  BY THE WITNESS:

22  A.  No.

23  BY MR. PETRO:

24  Q.  There were other people that observed the person that took

25  the money on November 20th, 2007, is that correct?

Bice - cross

1  A.  Yes.

2  Q.  There was Svetlana Sisso, is that correct?

3  A.  Correct.

4  Q.  Sam Pathare, is that correct?

5  A.  Correct.

6  Q.  And Merlyn, Merlyn Agravante, is that correct?

7  A.  Correct.

8  Q.  Dannie Thomas was the last person to view the photo lineup in

9  this particular case, isn't that correct?

10  A.  No.

11  Q.  Well, he wasn't the first person to view the lineup, isn't

12  that correct?

13  A.  Correct.

14  Q.  Who viewed it first?  Do you remember?

15  A.  Not without refreshing my recollection from my report.

16  Q.  Well, how many people before Dannie Thomas had you provided

17  the lineup to before Dannie Thomas?

18  A.  Two.

19  Q.  Two people that were at the bank, is that correct?

20  A.  Two of the victims, yes.

21  Q.  Did you ever show the photo to Ms. Boge, the photo lineup

22  spread to Ms. Boge?

23  A.  No.

24  Q.  So you don't know if she could identify or not identify the

25  person that was in the photo spread, is that correct?

Bice - cross

1  A.  Yes.

2  Q.  You have no idea?

3  A.  I didn't show her the lineup.

4  Q.  And then with respect to Svetlana Sisso, did you tell her

5  that you had a suspect in mind for this particular offense?

6      MR. YOUNG:  Objection, relevance.  I think we're also

7  going into hearsay, Your Honor.

8      MR. PETRO:  It's his statement I'm asking for, Judge.

9      THE COURT:  I don't think it's for the truth of the

10  matter.  Overruled.

11      But you're getting close.

12      MR. PETRO:  Very close, Judge.  I'm sorry.

13      But go ahead.

14  BY THE WITNESS:

15  A.  I'm sorry, did I tell her what?

16  BY MR. PETRO:

17  Q.  Well, one person viewed the lineup on one day.

18      MR. PETRO:  Do you have those forms, Ms. Michaelis?

19  BY MR. PETRO:

20  Q.  On March 11, 2009, Svetlana Sisso viewed the photo lineup, is

21  that correct?

22  A.  Is that what my report says?

23  Q.  I can give them to you.

24      Can I show them to him?  Bates stamps number 92, 93 and

25  94.

154

                        Bice - cross

1           Can you take a look at those, Detective.

2    A.  Okay.

3    Q.  You had showed that lineup to two additional people at the

4    bank, correct?  I don't mind if you read from them.  Go ahead.

5    You can tell me the exact order that you did.

6    A.  What is the question?  Can you repeat your question?

7    Q.  Well, who did you show the lineup to before March 24th, 2009?

8           MR. YOUNG:  Objection, Your Honor.  If they're used to

9    refresh recollection, he needs to lay a foundation --

10          THE COURT:  Well --

11          MR. YOUNG:  -- whether they refresh.

12          THE COURT:  Go ahead.  Exhaust his recollection.

13   BY MR. PETRO:

14   Q.  Is your memory exhausted about who you showed the photo

15   lineup to?

16   A.  No.

17   Q.  Well, who did you show it to?

18   A.  The four victims.

19   Q.  Who did you show it to first?

20   A.  Svetlana Sisso.

21   Q.  You showed it to her on March 11th, is that correct?

22   A.  I believe so.

23   Q.  She still works at the U.S. Bank, is that correct?

24   A.  Yes.

25   Q.  And then on March 23rd, you showed it to Merlyn Agravante, is

155

Bice - cross

1  that correct?

2  A.  Correct.

3  Q.  She still worked at the U.S. Bank on March 23rd of 2009, is

4  that correct?

5  A.  I don't recall if she's still working at the bank.

6  Q.  And then you showed it to Samrajnee Pathare, is that correct?

7  A.  Correct.

8  Q.  Did you show that to her before or after you showed a lineup

9  to Dannie Thomas?

10  A.  After.

11  Q.  But it was on March 24th of 2009, is that correct?

12  A.  Yes.

13  Q.  And with respect to Dannie Thomas viewing that lineup, he's

14  not really sure who he identified, is that correct?

15  A.  No.

16  Q.  Well, after he gets done viewing the lineup, he asks you a

17  number of questions trying to verify and validate if he picked

18  the right person, is that correct?

19  A.  No.

20          MR. YOUNG:  Objection, argumentative.

21          THE COURT:  Overruled.

22  BY MR. PETRO:

23  Q.  Well, he specifically asked you whether there was DNA in the

24  case, didn't he?

25  A.  No.

156

Bice - cross

1  Q.  Well, was there a conversation regarding DNA?

2  A.  I mentioned something about DNA, yes.

3  Q.  You mentioned something about DNA before you showed the

4  lineup to someone else, is that correct?

5  A.  Before I showed the lineup to --

6  Q.  Well, I'm assuming Thomas --

7        MR. YOUNG:  Objection, relevance.

8  BY MR. PETRO:

9  Q.  I'm assuming Thomas  --

10       THE COURT:  Hold on.  Are you putting another question?

11 BY MR. PETRO:

12 Q.  I'm assuming that Thomas and Pathare came to the Palatine

13 Police Department together, is that correct?

14 A.  No.

15 Q.  Well, Dannie Thomas viewed the lineup at what time?

16 A.  I believe it was around 10:00, 10:00 a.m., 10:10.

17 Q.  And then Ms. Pathare, she viewed it at 12:05, is that

18 correct?

19 A.  Correct.

20 Q.  And after you showed the lineup to Dannie Thomas, you

21 confirmed to him that you had some type of DNA evidence, is that

22 correct?  He's seeking out from you whether there is evidence to

23 support his identification, isn't that correct?

24 A.  No.

25       MR. YOUNG:  Objection, Your Honor, calls for

Bice - cross

1  speculation.

2          THE COURT:  Sustained.

3  BY MR. PETRO:

4  Q.  Well, explain this conversation that you had with respect to

5  DNA testing that occurred on March 24th, 2009 with Dannie Thomas?

6  A.  Would you like me to explain?

7  Q.  Well, tell me, why did it come up?  Who brought it up?

8  Dannie Thomas asked you, is that correct?

9  A.  It was like small talk.  He was just asking about the --

10 Q.  What was the small talk?  Tell us what it was.

11         THE COURT:  Let him finish his answer.

12         MR. PETRO:  Sorry.

13 BY THE WITNESS:

14 A.  It's common for people to come in and view a photo lineup to

15 ask a couple of questions about the case after we've completed,

16 completed the photo lineup.

17 BY MR. PETRO:

18 Q.  Well, what questions did he ask you after you completed the

19 photo lineup?

20 A.  He asked me if the person he picked is the person we were

21 investigating.

22 Q.  And did you tell him?

23 A.  Yes.

24 Q.  Even though you still had one person to show the lineup to,

25 you told him that?

Bice - cross

1     MR. YOUNG:  Objection, relevance.

2     MR. PETRO:  I'll strike it.

3   BY MR. PETRO:

4   Q.  What else did he ask you?

5   A.  I don't recall.

6   Q.  Something about DNA though, is that correct?

7   A.  No, he didn't bring up DNA.

8   Q.  Well, DNA did come into the conversation at some point, isn't

9   that correct?

10  A.  Yeah, I said to him, you know, that our investigation was

11  ongoing, and we were working on some DNA evidence.

12  Q.  Well, you already had the DNA though, isn't that what your

13  testimony is?

14  A.  It wasn't complete yet.

15  Q.  Well, it was complete though, because you're going out and

16  you're showing photos to people, and you're putting people in

17  photo lineups based on this DNA evidence, isn't that correct?

18     MR. YOUNG:  Objection, argumentative.

19     THE COURT:  Overruled.

20  BY THE WITNESS:

21  A.  It's a process.  It's a step-by-step process.

22  BY MR. PETRO:

23  Q.  Well, you already had a suspect in mind at that point though,

24  right?

25  A.  Mr. Ford.

159

Bice - cross

1  Q.  And that's because of DNA?

2  A.  The lab had matched his DNA profile with the DNA profile from

3  the mask.

4  Q.  And you told that to other two girls beforehand, Merlyn and

5  Sisso, isn't that correct?

6          MR. YOUNG:  Objection, relevance.

7          THE COURT:  Overruled.

8  BY THE WITNESS:

9  A.  No, I did not discuss that with them.

10  BY MR. PETRO:

11  Q.  You contaminated the lineup in this particular case, didn't

12  you?

13  A.  No.

14  Q.  Isn't it fair to say, sir, that you altered the photo of John

15  Ford when you placed it into the lineup?

16  A.  I cropped his photo.

17  Q.  You cropped and enlarged it, correct?

18  A.  I cropped it.

19  Q.  Well, you cropped it.  It was a horizontal photo, wasn't it?

20  A.  It was a wide photo, yes.

21  Q.  It was a wide photo with a small head, is that correct?

22  A.  I wouldn't call it small.

23  Q.  But then when you were done, the photo was much bigger,

24  wasn't it?

25  A.  I cropped all six photos.

Bice - cross

1  Q.  Well, I didn't ask you that.

2      I asked you:  When you cropped John Ford's photo, the

3  original photo that you had, you made it look bigger, didn't you?

4  A.  No.

5  Q.  Well, it was bigger though in actuality, wasn't it?

6  A.  Similar size to the rest of the lineup.

7  Q.  I didn't ask you that.

8      You didn't really crop it.  When you "crop," you take

9  something that's big and make it small, isn't that correct?

10  Isn't that your version or definition of "crop"?

11  A.  No.

12  Q.  Well, what does "crop" mean to you?

13  A.  If I had placed the original source photo in a lineup with

14  the other five, your client would have stood out from the other

15  five.  It's the purpose of the cropping.  It's to make all six

16  photos look uniform.

17  Q.  But when you cropped the photo, you subtracted from the

18  photo, is that what you are saying?  When you cropped the photo,

19  you subtracted from the photo, correct?  You took a big image and

20  made it look smaller?

21  A.  It's based on the size of his picture were eliminated to make

22  it look uniform with the other five photos.  It's standard

23  procedure.

24  Q.  But the end result of your cropping is you took a photo with

25  a very, very small head, and it became the largest head in the

161

Bice - cross

1   photo lineup, didn't it?

2   A.   No.

3   Q.   You also enhanced the photo to make John Ford look like he

4   had freckles, isn't that correct?

5   A.   No.

6   Q.   Well, I'm going to show you the photos one at a time.

7            THE COURT:   Do you want me to turn the light down a

8   little?

9            MR. PETRO:   Please, a little, Judge.

10  BY MR. PETRO:

11  Q.   This is photo 4-A.   That's one of the photos that you used,

12  is that correct?

13  A.   Yes.

14  Q.   And this is 4-B?

15  A.   Correct.

16  Q.   Are you telling me and are you telling these nice people on

17  the jury that John Ford's photo was cropped to make it look the

18  same size as 4-A?

19  A.   Yes.

20  Q.   Those two photos are the same size in your mind, is that

21  correct?

22  A.   Well, no.

23  Q.   Well, would you say that with respect to the head on the

24  right and the head on the left, are you saying that that's a fair

25  comparison?

162

Bice - cross

1  A.  It's not an exact science.

2  Q.  No, it's not an exact science.

3  A.  No.  The pictures --

4  Q.  But it's an exact science if you want someone to pick someone

5  out of a lineup, isn't it?

6  A.  No.

7  Q.  Isn't it true, sir, that the best way to do a photo lineup is

8  to do it sequentially one at a time, isn't that true?

9          MR. YOUNG:  Objection, Your Honor.

10         THE COURT:  You can ask him what his practice is.  He's

11 not an expert.  He's not testifying as an expert.

12 BY MR. PETRO:

13 Q.  Well, you've received training in how to conduct a photo

14 line, isn't that correct?

15 A.  Yes.

16 Q.  The sequential lineup is the best way, showing the photos one

17 at a time.  That's the right way to do it, isn't that correct?

18         MR. YOUNG:  Objection, Your Honor, argumentative,

19 foundation.

20         THE COURT:  Sustained.

21 BY MR. PETRO:

22 Q.  Also in your training, just to be 100 percent clear, isn't it

23 best for the person that shows the lineup to the witnesses, isn't

24 it the best idea that the person that does that doesn't know who

25 the suspect is?  It's called a blind test?

163

Bice - cross

1          MR. YOUNG:  Objection, foundation, argumentative.

2          THE COURT:  I think you're asking for an opinion rather

3    than his practice.  If you asked him what his practice was, I

4    think that would be a fairer question.

5    BY MR. PETRO:

6    Q.  Well, is it the practice of the Palatine Police Department to

7    use a blind photo identification process, where the person that's

8    showing the lineup photo to the particular witnesses for

9    identification doesn't know who the suspect is?

10   A.  That's not our practice.

11   Q.  You're not worried about contamination or observer bias?

12         MR. YOUNG:  Objection, argumentative.

13         THE COURT:  Overruled.

14   BY MR. PETRO:

15   Q.  You know what observer bias is, don't you, confirmation bias?

16   You've heard those terms in your training as a police officer 14

17   years, isn't that correct?

18   A.  No.

19   Q.  That's when a person who knows the answer subtly cues the

20   other people to give them suggestions as to who the right person

21   to pick is.  You've heard those terms, haven't you?

22   A.  Just from you today.

23   Q.  Let's go to this one right here, 4-C.  That's one of the

24   photos you used in the lineup process, is that correct?

25   A.  Yes.

Bice - cross

1  Q.  Are you telling me and these nice people on the jury that the

2  photo of John Ford was cropped to make it the same size as the

3  photo in 4-C?

4  A.  Yes.

5  Q.  And you're saying to the people in the jury that the head

6  size of John Ford on the left is the same as the head size in 4-C

7  on the guy on the right?

8  A.  No, I did not say that.

9  Q.  Does this guy, just out of curiosity, does this guy in 4-C,

10  does he have any of the characteristics of the person that was

11  identified as a suspect in the bank robbery on November 20th,

12  2007 at the U.S. Bank?

13  A.  Who are --

14          MR. YOUNG:  Objection, relevance and foundation.

15          THE COURT:  Overruled.

16  BY THE WITNESS:

17  A.  Who would you be referring to?

18  BY MR. PETRO:

19  Q.  Well, the eye color, for instance.  What color eyes were you

20  looking for or did you even have a suggestion as to what color

21  eyes you were looking for?

22  A.  Well, when you create a lineup, it's general appearance.

23  You're trying to get six people who have generally the same

24  appearance, not identical twins.

25  Q.  And then you're cropping like the photos to make the heads

Bice - cross

1  the same size so as not to suggest a particular answer, is that

2  correct?

3  A.  That's the idea.  Photos come from different sources.  You

4  can't make them exactly the same.

5      MR. PETRO:  If I may just have one second, please,

6  Judge?

7      (Discussion off the record.)

8      MR. PETRO:  If I may have just one more second, Judge.

9  I have one more item to display.

10     (Discussion off the record.)

11     MR. PETRO:  I'm sorry, Judge.

12 BY MR. PETRO:

13 Q.  I want to go over this piece of evidence if I could one last

14 time here.  Could you take a look at this, please, and tell me if

15 you recognize what that is?

16 A.  It's the paper bag that the mask was sealed inside.

17 Q.  And how did you determine to put the mask in that particular

18 location?

19 A.  Inside of this bag?

20 Q.  Uh-huh.

21 A.  Standard procedure.

22 Q.  Well, with respect to that particular bag, is there something

23 that would signify or suggest that on November 20th, 2007, that

24 you recovered this at a particular location?

25 A.  I don't understand what you are getting at.

166

Bice - cross

1  Q.  Well, is your name on there somewhere?

2  A.  Yeah.  My name is on --

3  Q.  Where is it?

4  A.  -- the tape that sealed it.

5  Q.  What does it say?

6  A.  It says "R. Bice, Badge 184."

7  Q.  But does it have a date on there?

8  A.  No.

9  Q.  There is nothing on the outside of that bag that would

10 suggest that that bag was recovered or used for a piece of

11 evidence that was recovered on November 20th, 2007, is there?

12 A.  That information is on our property sheet.

13 Q.  There is nothing on that bag that would suggest that, is

14 there?

15 A.  There is not a date on the seal, no.

16 Q.  Well, how many other people were there for the recovery of

17 that?

18 A.  Three.

19 Q.  Did they put their name and did they date that particular

20 piece of evidence to signify where it came from?

21 A.  No.

22         MR. PETRO:  I have no other questions.  Thank you,

23 Judge.

24         MR. YOUNG:  I have a few, Your Honor.

25                     REDIRECT EXAMINATION

Bice - redirect                                    167

1  BY MR. YOUNG:

2  Q.  Detective Bice, Mr. Petro asked you a series of questions

3  about the pathway that was between the two fences that you

4  searched on the evening of November 20th, 2007.  Did you see

5  anyone just hanging out on that pathway that evening as you

6  searched it?

7  A.  No.

8  Q.  Was there any indication of anyone walking back and forth

9  over that pathway when you searched it?

10 A.  No.

11 Q.  Is that a grass pathway?

12 A.  Yes.

13 Q.  He also asked you about why you didn't photograph the mask

14 when you found it on the ground on November 20th.  Can you tell

15 us why it is that you didn't take the time to photograph it at

16 that point?

17 A.  Due to the heavy storm we were experiencing, I wanted to

18 collect it and protect it as soon as possible.  I didn't want to

19 waste time by getting the camera over there to photograph it.

20 Q.  Let me also hand you what I'm going to mark as Government

21 Exhibit 24.

22         MR. YOUNG:  May I approach the witness, Your Honor?

23 BY MR. YOUNG:

24 Q.  Are you familiar with that document?

25 A.  Yes.

Bice - redirect

168

1  Q.  Can you tell us what it is?

2  A.  This is a property sheet.

3  Q.  Does it correspond to the, does that relate to the white dust

4  mask you found?

5  A.  Yes.

6  Q.  Does it confirm when you found the mask on November 20th,

7  2007?

8  A.  Yes.

9  Q.  And does the numbering on that property sheet correspond to

10  numbering found on the paper bag that you placed the mask into?

11  A.  Yes, it does.

12  Q.  You were asked several questions about the photo lineup that

13  you showed to Mr. Ford and how you selected the pictures.  What

14  features are you looking for when you select the lineup?

15  A.  Similar race, general appearance, skin tone, facial hair.

16  Q.  Did you follow your practice here?

17  A.  Yes.

18  Q.  There was also a discussion of or Mr. Petro asked you about a

19  discussion you had with Mr. Thomas about the DNA in this

20  particular case.  Did that discussion occur before or after

21  Mr. Thomas reviewed the photo lineup you showed him?

22  A.  It was after.

23       MR. YOUNG:  May I have a moment, Your Honor?

24    (Discussion off the record.)

25       MR. YOUNG:  I tender the witness, Your Honor.

169

Bice - recross

1          THE COURT:  Any recross?

2                      RECROSS-EXAMINATION

3  BY MR. PETRO:

4  Q.  You said you wanted to collect and protect.  That was your

5  testimony on redirect, is that correct?

6  A.  Yes.

7  Q.  Protect from what?

8  A.  Protect the mask from what?

9  Q.  Yes.

10  A.  Any number of things, blowing away, rain water.

11  Q.  What was the particular concern with respect to the rain

12  water?

13  A.  I didn't want it getting any further wet than it already was.

14  Q.  It was washing away evidence at all times, wasn't it?

15  A.  No.

16  Q.  Well, you couldn't see any DNA on that mask, could you?

17          MR. YOUNG:  Objection, Your Honor.

18          THE COURT:  I'll overrule it.

19          MR. PETRO:  I'll withdraw it.

20          THE COURT:  All right.

21          MR. YOUNG:  Nothing further.

22          THE COURT:  All right.  Thank you.  You're excused,

23  officer.

24      (Witness excused.)

25          THE COURT:  Call your next witness, please.

Torrisi - direct                                    170

1        MS. BELL:  The government calls Cynthia Torrisi.

2        THE COURT:  Raise your right hand, please.

3    (Witness duly sworn.)

4        THE COURT:  Have a seat.

5        CYNTHIA TORRISI, GOVERNMENT'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7    BY MS. BELL:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  Please state your name for the record.

11   A.  My name is Cynthia Jane Torrisi.  And my last name is spelled

12   T-o-r-r-i-s-i.

13   Q.  Where are you employed?

14   A.  I'm employed with the State of Illinois in the crime lab in

15   Rockford.

16   Q.  What's your position there in Rockford?

17   A.  A forensic scientist.

18   Q.  How long have you been so employed?

19   A.  This is my 31st year.

20   Q.  What are your primary duties?

21   A.  My primary duties are analysis of blood and body fluid stains

22   and then testimony in court as to my findings.

23   Q.  Please relate your educational background to the Judge and

24   jury.

25   A.  I have a Bachelor's Degree from SIU in Carbondale.  I have

1  additional course work in biochemistry and molecular biology

2  enabled for me to do my DNA training, and that's it.

3  Q.  Have you received any specialized training in the area of

4  forensic examination of biological evidence?

5  A.  Yes.  I've gone through the Illinois State Police's formal

6  training programs in both biology and DNA.  Those programs are

7  each approximately one year.  And they consist of reading,

8  lectures, and a lot of practical work.  There is written and

9  practical examinations, mock case work and then supervised case

10  work.

11  Q.  Ms. Torrisi, how many times have you testified as an expert

12  in court?

13  A.  Approximately a hundred.

14  Q.  Are you a member of any professional groups related to

15  forensic science?

16  A.  Yes.  I'm a member of the Midwestern Association of Forensic

17  Scientists.

18  Q.  Have you ever taught courses or trained other scientists in

19  your area of expertise?

20  A.  I've trained analysts in both biology and DNA analysis.

21  Q.  Could you explain to the jury what is forensic biology?

22  A.  Forensic biology is what I guess you would term the initial

23  stages of DNA analysis nowadays.  We look to detect and analyze

24  blood and body fluid stains as they pertain to a crime, either

25  linking a victim or a suspect to a crime scene or each other or a

1 weapon or something like that.

2         Nowadays it also includes a lot of collecting of

3 cellular material, not necessarily blood or body fluid stain, but

4 cells from people's bodies where they are at friction points.

5 Q.  And when you say "cells from people's bodies," can you give

6 us an example of what cellular material is?

7 A.  Well, your whole body is comprised of skin cells, and they're

8 constantly being sloughed off.  So your clothing, stuff that you

9 handle or wear, jewelry, anything, your steering wheel of your

10 car, cans, bottles, cigarettes, anything like that that people

11 handle or touch, part of themselves and skin cells will come off

12 onto those items.

13 Q.  What types of evidence do you most routinely analyze at your

14 current position?

15 A.  Any kind of evidence that pertains to a crime we analyze.

16 And that can be anything that might have a blood or body fluid

17 stain on it or have handlers or wearer's DNA.  It could be

18 clothing, swabbings, blood, weapons, like guns and knives and

19 clubs, cigarette butts, bottles, cans, masks, cans, gloves, hats,

20 anything.

21 Q.  What is the purpose of analyzing and collecting these blood,

22 bodily fluids, and cellular material from these different items

23 of evidence you mentioned?

24 A.  The purpose is to be able to obtain DNA from these stains and

25 then compare the DNA to standards in the case.

Torrisi - direct

1  Q.  And these items you mentioned, where do you usually receive

2  them from?

3  A.  Items of evidence?

4  Q.  Yes.

5  A.  We receive those in evidence receiving in our laboratory.

6  Q.  Does your lab have intake procedures for how they receive

7  such evidence?

8  A.  Yes.

9  Q.  Could you briefly describe what those are?

10 A.  Evidence is brought in by a custodial person most of the time

11 now or an agency, police agency.  Sometimes it's mailed by

12 registered mail.  Sometimes it comes in from another lab.  It

13 goes to our evidence receiving area where it is entered into our

14 laboratory information computer system.  And from there the

15 evidence tech brings it to our section vault, and it's put in the

16 vault.

17 Q.  On October 24th, 2008, did you analyze evidence in this case?

18 A.  Yes, I did.

19 Q.  What was that evidence?

20 A.  It was a white dust mask.

21 Q.  What was your goal of the analysis of that mask?

22 A.  To determine who wore that mask.

23 Q.  What were you seeking to recover from the mask?

24 A.  Cellular material from where the mask rubbed up against

25 whoever wore it, skin.

174

Torrisi - direct

1  Q.  What was the first step of your analysis of that mask?

2  A.  I prepared the area for the analysis and then I got the

3  exhibit out.  I looked at it and determined which part of the

4  item probably had the most contact with skin, selected that area,

5  and I swabbed it.

6  Q.  You mentioned you prepared the area.  Could you tell the jury

7  what techniques you use at the lab when examining and looking at

8  an item of evidence to ensure there is no contamination?

9  A.  Since DNA is extremely sensitive, we have to take a lot of

10  precautions to not contaminate our evidence with ourselves or

11  other items.  And so we use what's called clean technique.  And

12  this involves wearing a lab coat and gloves, bleaching those

13  gloves after they're put on.  I have a mask on.

14      And my area is then prepared.  I bleach my table.  Wipe

15  it off.  I get clean paper, put that down.  I have just the one

16  item out at a time.  I have a cup of bleach also and any tools

17  that I use in analysis first have to be wiped down with the

18  bleach.

19      And in this particular instance I did a swabbing.  So we

20  use sterile swabs.  And we put them when we are done with the

21  swabbing into a tube that has been irradiated with UV light,

22  which kills everything.  So the tube is essentially sterile.

23      So we put a sterile swab, pull it out of the packet, use

24  it to collect a sample, and then put it into a sterile tube and

25  snap the top on the tube.

Torrisi - direct

1          So that would pretty much entail my analysis.

2  Q.  After the tube is closed, where do you put the tube?  Where

3  do you store it?

4  A.  Once the tube is, the sample is dry, and the tube -- and the

5  case is finished, then that tube and any other samples will go

6  into a specialized area of the vault into a special rack

7  designated for a DNA analyst to take.

8          MS. BELL:  May I approach the witness, Your Honor?

9  BY MS. BELL:

10  Q.  Ms. Torrisi, I'm showing you Government's Exhibit 9.  Do you

11  have a pair of gloves with you?

12  A.  I think I do.

13  Q.  Ms. Torrisi, do you recognize that exhibit?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  This is the outer packaging of the dust mask.

17  Q.  And how are you able to recognize that?

18  A.  My marks are on it.

19  Q.  What's your typical markings?

20  A.  This is our laboratory information sticker, and my marks are

21  my initials and the date.

22  Q.  And if you opened up the outer packaging and looked inside,

23  do you recognize what's inside?

24  A.  Yes, I do.

25  Q.  What is that?

Torrisi - direct                                              176

1  A.  This is the dust mask that I examined.

2  Q.  How are you able to recognize it?

3  A.  My markings are here on the outside, and the area that I

4  swabbed is circled on the inside.

5  Q.  Using Government's Exhibit 9, could you please indicate which

6  area of the mask you swabbed for skin cells?

7  A.  The inner side of the mask, I swabbed the outer two

8  centimeters circumference where it would come in contact with the

9  face.

10  Q.  How is that area marked on the mask?

11  A.  I drew a circle with my marker around it.

12  Q.  Now, are you familiar with such mask?

13  A.  Yes.

14  Q.  How is that?

15  A.  Well, you see them all the time in drug stores and hardware

16  stores, and at one point in time we used these ourselves in the

17  lab.

18        MS. BELL:  One moment, Your Honor.

19        May I approach the witness, Your Honor?

20  BY MS. BELL:

21  Q.  Ms. Torrisi, I'm showing you what has been marked as

22  Government's Exhibit 10 along with the outer packaging.  Do you

23  recognize that exhibit?

24  A.  I've never seen the outer exhibit.  But this tube has my

25  marks on it.

Torrisi - direct                                    177

1  Q.  And what do you recognize that tube to be?

2  A.  This is the original tube in which I put the sample.

3  Q.  Could you explain again to the jury what you mean by

4  "sample"?

5  A.  The swabbing that I took from the dust mask was put into this

6  tube, which I marked with my initials, the sub-exhibit number,

7  case number, and the date.

8  Q.  After you completed your analysis, what did you -- where were

9  the mask and that swab with your sample stored?

10 A.  The mask went back into this packaging and back into our main

11 vault, not our section vault, for return to the agency.  And this

12 tube went into a rack into the vault in a special location

13 awaiting analysis by a DNA person.

14        MS. BELL:  One moment, Your Honor.

15     (Discussion off the record.)

16        MS. BELL:  No further questions, Your Honor.

17        MR. PETRO:  Judge, may I approach the witness to

18 retrieve that last item of evidence?  Would that be okay for the

19 Court?

20        THE COURT:  Sure.

21        MS. MICHAELIS:  If I may approach and grab that other

22 bag, too, Your Honor?

23        THE COURT:  Sure.

24                      CROSS-EXAMINATION

25 BY MS. MICHAELIS:

Torrisi - cross

1  Q.  Ms. Torrisi, good afternoon.

2  A.  Hi.

3  Q.  My name is Quinn Michaelis.

4       Now, the government was nice enough to provide me with a

5  copy of your CV, which I'd like to ask just a couple of questions

6  about.

7       Under "specialized training," you've included a workshop

8  that you took part in called Courtroom Demeanor.  Do you recall

9  that workshop?

10  A.  That was probably some time ago.

11  Q.  But you took a workshop called Courtroom Demeanor?

12  A.  Yes, I'm sure that I have at some point.

13  Q.  And can you explain what the purpose of that workshop was?

14  A.  The purpose of that workshop is to help people get used to

15  testifying in court, proper etiquette, just general things so you

16  become comfortable testifying in a courtroom.

17  Q.  And you said that you had testified in court before, correct?

18  A.  Yes, I have.

19  Q.  Over a hundred times?

20  A.  I think I'm right at a hundred times.

21  Q.  And were any of those times for the defense?

22  A.  Sometimes, yes.

23  Q.  Were you testifying for the defense when you worked for the

24  Illinois State Police?

25  A.  Yes, I have before.

Torrisi - cross

179

1  Q.  Under your professional experience, it also lists that you

2  were the quality control assurance coordinator for the Illinois

3  State Police, correct?

4  A.  Quality control assurance coordinator?

5  Q.  Yes, under your professional experience it says Illinois

6  State Police Forensic Quality Assurance Coordinator.

7  A.  Quality Assurance Coordinator, yes.

8  Q.  And that was 2005 to 2007?

9  A.  Yes, it was.

10 Q.  And was the reason that you discontinued acting as the

11 quality --

12 A.  Assurance coordinator.

13 Q.  -- assurance coordinator, because in 2007 you had quality

14 issues with your external proficiency exam?

15 A.  No.

16 Q.  Did you take an external proficiency exam in February of

17 2007?

18 A.  Yes.

19 Q.  And did you have quality issues with that proficiency exam?

20 A.  Not that I know of.

21 Q.  Not that you're aware of?

22        Were you ever talked to about quality issues that

23 were --

24 A.  I had a typographical error in my submitted --

25 Q.  You had a typographical error?

180

1   A.   Yes.

2   Q.   In what?

3   A.   In my submitted DNA part.

4   Q.   And when you were the quality assurance coordinator, was that

5   to check for typographical errors of reports?

6   A.   It was for the biology section, to randomly reanalyze cases

7   and to look over case file folders from other analysts, yes.

8   Q.   Do you recall taking proficiency exams then from the years

9   2008 and 2007?

10  A.   Yes, I did.

11  Q.   And what did those proficiency tests consist of?

12  A.   The externals or the internals?

13  Q.   The external?

14  A.   The external was from CTS.  One time a year we would get

15  blood samples, the other times we would get semen samples.

16  Q.   What is CTS?

17  A.   Collaborative Testing Services.

18  Q.   And were the tests, aside from the different types of samples

19  that you received, were the tests essentially the same test each

20  year?

21  A.   They were the same kind of test.  They weren't the same

22  profiles at all.

23  Q.   But you were essentially just asked to create a profile for

24  those samples?

25  A.   We were asked to do those samples as if we were doing a case,

1  generate results and submit them.

2  Q.  Now, when you begin your examination of a piece of evidence,

3  does one of the steps in that process include looking at the

4  reports that are submitted with a piece of evidence?

5  A.  Yes.

6  Q.  And were there reports submitted with the mask in this case?

7  A.  Yes, there were.

8  Q.  And were those police reports?

9  A.  I believe that they were.

10  Q.  And you reviewed all of those reports?

11  A.  Yes, I looked through them.

12  Q.  Do you recall how many reports you reviewed?

13  A.  No.  I have them in my notes.  There was a narrative of each

14  of the bank employees I think.  And I think that was about it.

15  Q.  And how does knowing the statements of those bank employees

16  help you examine the mask?

17  A.  Actually, their statements did not help me.  But the very end

18  of the reports, it said that, actually they all said that whoever

19  robbed the bank wore a white dust mask, and when some officer,

20  I'm not sure who, went and looked out the back area where the

21  person had run away and fled, they found a white dust mask.

22  Q.  So does reviewing the police reports help you determine

23  whether or not a DNA sample will be degraded?

24  A.  Will be what?

25  Q.  Degraded.

Torrisi - cross

182

1  A.  Sometimes.

2  Q.  Did it help you in this particular case?

3  A.  No.  In this particular case I didn't have any feeling that

4  it would be degraded or anything like that.

5  Q.  And can you tell by looking at the mask itself when exactly

6  the mask was recovered?

7  A.  No, I can't.

8  Q.  Is there a test that you can run that can tell you when the

9  DNA was deposited on the mask?

10  A.  No.

11  Q.  And the machines that you use in your lab cannot tell you how

12  old a DNA sample is when it gets to the lab, correct?

13  A.  Correct.

14  Q.  When a sample is degraded, are you able to run any test to

15  determine how long the sample has been exposed to whatever has

16  caused that degradation?

17  A.  No, because depending on the kind of degradation, it could

18  occur very quickly or very slowly over time.

19  Q.  And if a sample is not properly preserved, how much time can

20  pass before a sample begins to degrade?

21  A.  It's variable depending on what external stresses the sample

22  is exposed to.

23  Q.  Well, you said that it could happen very quickly or very

24  slowly depending.

25  A.  Correct.

Torrisi - cross

1  Q.  In the example where it would be quick degradation, how
2  quickly would that be?
3  A.  Under a really strong, a lot of amount of light or heat, I
4  imagine that would probably destroy DNA fairly quickly.
5  Q.  Approximately how long, if you could estimate?
6  A.  It varies.
7  Q.  A day?
8  A.  I don't know.
9  Q.  Could it be faster than a day?
10 A.  I don't think it could be faster than a day, but I don't
11 know.  It varies.  You never know until you look at the sample.
12 Q.  Could it in your experience be three months?
13 A.  It could be.
14 Q.  And once you receive a piece of evidence, one of the reasons
15 why you put these samples in a freezer or refrigerator is to
16 prevent a sample from degrading, correct?
17 A.  We usually have our samples all at room temperature.
18 Q.  Do you ever do anything to prevent a sample from degrading or
19 prevent a sample from degrading further?
20 A.  We ensure that it's dry and at room temperature.
21 Q.  So does moisture affect the degradation of a sample?
22 A.  It can if it's enclosed in plastic or a tube or something
23 like that.  Yes, it can.
24 Q.  What if it's -- strike that.
25          One of the reasons that DNA begins to degrade is

1  because, and I don't really understand the whole DNA process, so

2  correct me if I am wrong here, but the DNA starts off in these

3  cells, right, the cells from the human body, and it's packed

4  inside of the cell, is that correct?

5  A.  The DNA is contained in the nucleus of the cell.

6  Q.  But it's kind of packed in there?

7  A.  I guess you could say that, yes.

8  Q.  And so once the cells are discarded from the body, the cell

9  itself begins to break down, is that correct?

10  A.  I assume that it does over time, yes.

11  Q.  And do you know how quickly a human cell will break down over

12  time?

13  A.  Like I said, there is tremendous variability to that.

14  Q.  But it could be quickly or slowly depending on what the

15  environment is?

16  A.  The environment and the intensity of it, yes.

17  Q.  And once the cell begins to break down, then the DNA starts

18  to lose the container that is keeping it together, correct, the

19  cell?

20  A.  Yes, I guess you could say that.

21  Q.  And then the DNA can start to fragment, is that correct?

22  A.  Yes.

23  Q.  So that's what would cause -- or that would be degradation at

24  that point?

25  A.  That could be one kind of degradation, yes.

Torrisi - cross

1  Q.  What are the other types of degradation?

2  A.  Bacteria could be eating the DNA.

3  Q.  Are there other types?

4  A.  Just the general environmental insults, sunlight, humidity,

5  heat.

6  Q.  Did you say moisture or humidity?

7  A.  Moisture can be one, too.

8  Q.  Moisture.

9        And if I were to rub my skin cells on this pen, for

10  instance, how quickly would the DNA start to degrade on this pen

11  if I left it in the courtroom?

12  A.  I'd have no idea.  That wouldn't stop me from swabbing the

13  pen and testing it.

14  Q.  What about if I were to take this pen outside and put it on

15  the sidewalk.  Do you know how quickly the DNA would degrade at

16  that point?

17  A.  I would think more quickly than being in here.  But other

18  specifics, I don't know.

19  Q.  And if I put this pen in a pile of dirt, would it cause the

20  DNA to degrade faster than if I were to just leave it out on the

21  sidewalk?

22  A.  Sure.

23  Q.  Is soil one of the things that causes degradation of DNA?

24  A.  Yes, it is.

25  Q.  And you had said sunlight, correct?

186

1  A.  Yes.

2  Q.  What about animal feces, for instance?

3  A.  I have no idea.  But I would assume that that wouldn't be

4  good for it.

5  Q.  How about plant tissue?

6  A.  Plant tissue, again, like plants being rubbed on it?

7  Q.  Plant matter, yeah, being rubbed on the DNA.

8  A.  I don't know.  Could be.

9  Q.  Garbage, what about some sort of refuge, if a piece of DNA

10 was in garbage of some kind?

11 A.  I imagine things like that might dilute the DNA sample by

12 getting mixed in with it.  I don't know if they would essentially

13 hurt the profile at all.

14 Q.  But if something had bacteria on it, it might start to

15 degrade the DNA also, correct?

16 A.  That's correct.

17 Q.  And if a piece of evidence is recovered in an environment

18 that causes it to degrade, will the DNA continue to degrade if it

19 is not preserved in some way?

20 A.  Can you repeat that question?

21 Q.  Sure.  If a piece of evidence is recovered in an environment

22 that causes the DNA to degrade in any way, will the DNA continue

23 to degrade if it is not preserved in some way?

24 A.  If it's something like sunlight or humidity, and those

25 conditions are removed, then I would think that degradation would

1  slow down a lot.

2  Q.  And if a piece of DNA were exposed to bacteria and were just

3  allowed to dry or -- I'm sorry -- bacteria that was caused by a

4  wet piece of something, and that piece of something was allowed

5  to dry, would the bacteria still be present on that item?

6  A.  I assume that there would still be some bacteria.  I don't

7  know how active they would be once it was dried and in a more

8  cooled temperature.

9  Q.  But the bacteria could still be degrading the DNA?

10  A.  I assume that, yes, it could be.

11  Q.  And are there specific tests that you can run on a piece of

12  DNA that would tell you how -- I'm sorry -- what caused a piece

13  of DNA to degrade?

14  A.  I don't think so, unless you're asking me something that is

15  not direct enough that I understand what you mean.

16  Q.  Well, let me go back to the mask here.  When you first

17  received this mask, you did a visual examination of the mask,

18  correct?

19  A.  Yes.

20  Q.  And while you were examining the mask, you made notes about

21  the condition of the mask, correct?

22  A.  Yes.

23  Q.  And one of the notes that you wrote said that the mask looked

24  somewhat used, is that correct?

25  A.  That's correct.

Torrisi - cross

1  Q.  And what exactly does that mean?

2  A.  That means it didn't look pristine or untouched.  It looked

3  like it had been worn.

4  Q.  Worn by a lot of people?

5  A.  I have no idea.

6  Q.  Worn frequently?

7  A.  It looked worn.

8  Q.  And you also indicated that the mask was dirty, correct?

9  A.  Yes.

10      MS. MICHAELIS:  One second, Your Honor.

11     (Discussion off the record.)

12      MS. MICHAELIS:  Sorry, I'm not very experienced at

13  putting these gloves on either.

14  BY MS. MICHAELIS:

15  Q.  Is this the dirt that you were referring to in your report on

16  the mask?

17  A.  Yes, it looks like it.

18  Q.  And then what would this, I don't know if you can see that,

19  these dots here, would you include this in your description of

20  dirt?

21  A.  Dirt, the mask appeared to be worn, used.

22  Q.  And then this strap on the mask, was this detached from this

23  other side of the mask when you received the mask?

24  A.  Yes.

25  Q.  And then your report also indicates that there was an orange,

1 brown smudge on the inside top of the mask, correct?

2 A.  That's correct.  I think there was a smudge beyond the very

3 top.

4 Q.  Indicating this area that I'm --

5 A.  And then up on the edge, too.

6 Q.  And then up on the edge.

7         And your report or, I'm sorry, your notes said that it

8 was possible makeup, correct?

9 A.  That was the color that it appeared to me to be.  It could be

10 anything.  But when I looked at it, I thought it might be a

11 makeup color stain.

12 Q.  Did you take any samples of these brown stains?

13 A.  No.

14 Q.  Did you make any attempt to confirm or deny that that was

15 makeup on the mask?

16 A.  No.

17 Q.  And you're aware that there are machines that are available

18 to test if that particular substance or to test what that

19 particular substance is, correct?

20 A.  There might be an analysis that could be done.

21 Q.  A gas chromatography machine, mass spectrometer?

22 A.  I imagine a trace analyst might know about that.  I was

23 looking for DNA.

24 Q.  Are there trace analysts at the Illinois State Police?

25 A.  Not in our laboratory, no.

Torrisi - cross

1  Q.  Did you swab the area of the mask where the makeup -- I'm

2  sorry -- where the brown smudge was?

3  A.  If you could hold it up again.  I think part of the smudge

4  did occur into the area that I swabbed.

5         Yes, part of that smudge is within the circumference

6  area that I swabbed.

7  Q.  So this line that is on the mask is not something that was on

8  the mask when it was submitted to the lab, correct?

9  A.  Correct.

10  Q.  This is something that you've added?

11  A.  I drew that line, yes.

12  Q.  Okay.  You examined this mask on October 24th, 2008, correct?

13  A.  That's correct.

14  Q.  And you were working with other samples that day, is that

15  also correct?

16  A.  I probably did do other analyses that day, yes.

17  Q.  How many other samples do you think that you worked with that

18  day?

19  A.  I don't know.

20  Q.  Was it more than one other sample?

21  A.  If it was an analysis day, I would suspect yes, there is more

22  than one.

23  Q.  How many samples do you typically work with on an analysis

24  day?

25  A.  However long it takes in my day.  So if it takes me longer

Torrisi - cross

1  than I think, not as many, if I go more quickly, I can finish up

2  what I've gotten out.

3  Q.  But you think that on October, I'm sorry, 24th -- I think I

4  said 28th earlier -- on October 24th, 2008, you probably analyzed

5  more than just this mask, or you probably examined more than just

6  this mask that day?

7  A.  Yes.

8  Q.  And when you examined, when you examined the mask on that

9  day, was that the only step in the DNA testing process that you

10  conducted that day?

11  A.  Do you mean for that specific case?

12  Q.  For all of the cases that you worked on that day.

13  A.  For that day, that's all I would be doing that day.

14  Q.  And the equipment that you use in your lab and the kits that

15  are provided to your lab are provided to you by Applied

16  Biosystems, is that correct?

17  A.  For the actual DNA analysis, yes.

18  Q.  And do you use those kits at all?

19  A.  I don't routinely do DNA right now, so I don't routinely use

20  them except on my proficiency tests.

21  Q.  So in 2008, you weren't doing any of the secondary testing of

22  the samples?

23  A.  Correct.

24  Q.  You were only doing the examination of pieces of evidence?

25  A.  That's correct.

Torrisi - cross

1  Q.  And when you received training on how to gather a piece of

2  evidence, does that training include techniques for using things

3  that are on paper and fabric as opposed to things that are on

4  glass and metal?

5  A.  Yes.  Depending on the surface, you can use different

6  techniques.

7  Q.  And would one of the techniques for using something like a

8  piece of evidence that's on a piece of fabric or a piece of paper

9  be to cut the stain or that piece of area that you are going to

10 swab out of that particular piece of evidence?

11 A.  That can be done.  We've moved away from cuttings, because a

12 lot of times we'll get inhibition from a material.

13         We also find that the swabbing of fabric is a very

14 effective way to gather cellular material from one fabric kind of

15 material on to a swab, which is also very -- if you see a swab

16 close up, it's very enmeshed kind of a thing, very good at

17 collecting and holding on to cells and anything on the surface of

18 a fabric.  So we've gone to mainly swabbing.  Also you can swab a

19 larger area than just a small cut-out piece.

20 Q.  And you had mentioned a word called "inhibition"?

21 A.  Correct.

22 Q.  Could you describe what that is?

23 A.  Inhibition is something that takes place in DNA analysis that

24 there is a chemical or something that happens that inhibits the

25 DNA process, whether it inhibits the polymerase, the enzymes we

Torrisi - cross

1    use, or it inhibits any other part of the process.  It just stops

2    it from happening so that even though DNA may be there when we

3    quant, we can't get a profile out of the sample because of this

4    chemical or something else, dirt, something that might be

5    inhibiting that sample from amplifying.

6    Q.  And you've created only one report with respect to this

7    particular mask, is that correct?

8    A.  That's correct.

9    Q.  And you also took a number of pictures of the mask, is that

10   correct?

11   A.  That's correct.

12   Q.  Why did you take pictures of the mask?

13   A.  Just as record shots to show where I swabbed, what it looked

14   like.

15   Q.  So it's important to document what you had just described,

16   correct, where you swabbed and the state of the evidence itself,

17   correct?

18   A.  And the general appearance, yes.

19   Q.  And one of the things that you're looking for when you

20   examine the mask is a stain, isn't that right?

21   A.  Not necessarily.

22   Q.  And so on this particular mask, there isn't necessarily a

23   stain that you're looking at?

24   A.  That's correct.

25   Q.  And with respect to the DNA, is there any point on the mask

Torrisi - cross

1  where you can actually see the DNA itself?

2  A.  No.

3  Q.  The DNA, the reason you can't see it is because why?

4  A.  In this particular exhibit, it's a mask that was maybe worn

5  by someone.  So I looked at the item and determined what parts of

6  the mask would have the most contact with human skin and,

7  therefore, have the most ability to have DNA skin cells on it,

8  and that's the area that I swabbed.

9  Q.  But you can't see the skin itself on the mask, is that

10  correct?

11  A.  No, you can't.

12  Q.  And that's because it's too small to see, correct?

13  A.  That's correct.

14  Q.  And when you are actually running a DNA sample through a

15  machine, the machine can't actually see the DNA, correct?

16  A.  I'm not sure what that question means.

17  Q.  Well, is there something that you could use to actually see a

18  strand of DNA in your lab?

19  A.  I don't know.

20  Q.  Is there something in your lab that you could use to actually

21  look at the different locations on a DNA strand?

22  A.  We use a genetic analyzer to analyze the DNA, yes.

23  Q.  But you're not actually looking at the individual strand

24  itself, correct?

25  A.  No.  We're looking at a cumulative amount of DNA.

1  Q.  So when you swabbed this area of the mask in the middle area,

2  you didn't actually know if there was DNA on the mask at that

3  point, is that correct?

4  A.  That's correct.

5  Q.  Did you run any tests on the mask to determine if there was

6  actually DNA present on the mask?

7  A.  No.

8  Q.  And you said you had worked with a number of different

9  samples that day, correct?

10  A.  That's correct.

11  Q.  And this clean technique that you had mentioned in direct,

12  does that involve a procedure for gloves?

13  A.  Yes.

14  Q.  How to use your gloves?

15  A.  Yes.

16  Q.  What is that procedure?

17  A.  We put on clean gloves, and then we bleach them.

18  Q.  Do you change gloves throughout the day?

19  A.  Oh, yes.

20  Q.  And do you specifically remember changing your gloves before

21  you worked with this sample?

22  A.  Yes.

23  Q.  Do you keep those gloves in case there is ever a question

24  about whether or not you actually remember changing those gloves?

25  A.  We have a big biohazard bin that sits off on the end of our

Torrisi - cross

1   work area.  So when I'm done with an exhibit, I wrap up the

2   paper, I take off my gloves, I put it all in that bin, and I

3   start over.

4   Q.  But those gloves aren't preserved in any way?

5   A.  No.

6   Q.  And the surface that you worked on, was this the same surface

7   that you worked on for each one of the samples that you worked

8   that day?

9   A.  Yes, bleached every time and with clean paper over it every

10  time.

11  Q.  And are there any preservation of the papers that you used to

12  cover that work station?

13  A.  No.  Those are thrown out.

14  Q.  And you said other tools that you used during the day, what

15  other tools are you using during the day?

16  A.  With that particular case, I just did a swabbing.  So my

17  tools would be my pen and my marker.

18  Q.  And what kind of pen is it that you are using?

19  A.  Just an ink pen.

20  Q.  And the marker, is that a special type of marker?

21  A.  Just a Sharpie marker.

22  Q.  Did you use this pen to take notes throughout the day?

23  A.  Yes.

24  Q.  And was it a pen that you used to write on the mask, or was

25  that the Sharpie?

Torrisi - cross

1 A.  I think that was the Sharpie.

2 Q.  And did you use this Sharpie when you were working with the

3 other samples?

4 A.  Yes.

5 Q.  Did you use this Sharpie to mark the other samples?

6 A.  Yes.

7 Q.  And do you clean the Sharpie after every sample that you use?

8 A.  Yes.

9 Q.  Including the tip?

10 A.  Not the very tip tip, but everything else.

11 Q.  But the tip is the part that's actually touching the

12 different samples, correct?

13 A.  It's the part that I label the outside of the samples with,

14 yes.

15 Q.  Well, in this particular case, the mask, you used the Sharpie

16 to write on the actual piece of evidence, correct?

17 A.  Uh-huh.

18 Q.  And that part of the Sharpie is not what is cleaned, correct?

19 A.  Correct.

20 Q.  And did the Sharpie come in contact with any other pieces of

21 evidence that day?

22 A.  It was used to mark all of my stuff.

23 Q.  And it was, the tip was never cleaned during the different

24 examinations that you did?

25 A.  The tip tip, no.

Torrisi - redirect

1  Q.  The tip that was touching the pieces of evidence that day.

2  A.  Right.  It wouldn't write any more if it was cleaned.

3          MS. MICHAELIS:  If I could just have one moment, Your

4  Honor?

5      (Discussion off the record.)

6          MS. MICHAELIS:  Nothing further Your Honor.

7          THE COURT:  All right.  We're going to take our

8  afternoon break.  It's a little late.  But about 10 minutes,

9  folks.

10     (Recess.  Jury in.)

11         THE COURT:  Redirect.

12         MS. BELL:  Yes, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MS. BELL:

15  Q.  Ms. Torrisi, your resume states that you were the Illinois

16  State Police Forensic Biology Quality Assurance Coordinator from

17  2005 to 2007.  What were your responsibilities in that position?

18  A.  In that position my responsibilities are to conduct quality

19  assurance checks on all of the analysts in the state and any

20  outsourcing vendors that we had at that time.

21         I do random reanalysis of case work.  And I do case file

22  reviews.  And I also administer the proficiency test for the

23  state in forensic biology.

24  Q.  Why did you leave that position in 2007?

25  A.  Those positions are three-year term positions.  They rotate

Torrisi - redirect

1  them among analysts.

2  Q.  Could you have stayed longer if you had wanted?

3  A.  I don't believe so.  No one does.

4  Q.  You mentioned as well when answering questions from

5  Ms. Michaelis that you had worked with different samples you

6  thought on the same day you had worked with this piece of

7  evidence, this mask in this case.

8          Did you follow the lab's clean techniques you described

9  earlier to the jury when you analyzed, inspected, and swabbed the

10  mask in this case?

11  A.  Yes, I did.

12  Q.  And why does the -- why do you and the lab change and then

13  dispose of the gloves and work top papers and the like that you

14  use when examining each individual piece of evidence in a case?

15  A.  Because each individual piece of evidence has touched those

16  clothes and that paper.  So when that item is put away, all of

17  the stuff that has touched that, it's either bleached or cleaned

18  or thrown out.  It could be a source of contamination if it

19  remains in the area, and it's removed.

20  Q.  You were also asked about this Sharpie that you use when

21  examining items of evidence.  Does that Sharpie's tip ever come

22  in contact with the stain or the area of the evidence that you

23  are swabbing or sampling?

24  A.  The Sharpie is used to circle around stains or to mark the

25  outer edge of an area that I am swabbing.  The part that is

200

Torrisi - recross

1  sampled is not marked with a Sharpie.

2  Q.  And why wasn't the stain on the mask here that looked to you

3  in your notes like makeup, why wasn't that separately analyzed?

4  A.  Because in the laboratory, the most discriminating piece of

5  evidence is done first.  We don't have unlimited resources.  And

6  DNA is a very discriminating piece of evidence to analyze.

7  Q.  Can environmental conditions like those you discussed with

8  Ms. Michaelis, can those change DNA?

9  A.  They don't change a DNA profile, but they do diminish your

10 ability to detect it.

11 Q.  Can DNA change with the age of a sample?

12 A.  Again, it doesn't change.  It just diminishes your ability to

13 detect it.

14        MS. BELL:  No further questions, Your Honor.  Thank you.

15        MS. MICHAELIS:  Your Honor, if I could just ask one or

16 two follow-up questions.

17                      RECROSS-EXAMINATION

18 BY MS. MICHAELIS:

19 Q.  Now, you had testified that you did not know exactly where

20 the stain was on the mask, correct?

21 A.  That's correct.

22 Q.  So there could have been DNA on the area of the mask that you

23 had circled, correct?

24 A.  That's correct.

25 Q.  So there could have been DNA under the tip of your Sharpie

201

                        Brown - direct

1    when you circled that section of the mask, correct?

2    A.  It's possible.

3           MS. MICHAELIS:  No further questions, Your Honor.

4           THE COURT:  All right.  You're excused.  Thank you.

5       (Witness excused.)

6           THE COURT:  Call your next witness, please.

7           MS. BELL:  The United States calls Keia Brown, Your

8    Honor.

9           THE COURT:  Please raise your right hand.

10      (Witness duly sworn.)

11          THE COURT:  Have a seat.

12              KEIA BROWN, GOVERNMENT'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14   BY MS. BELL:

15   Q.  Good afternoon.

16   A.  Hi.

17   Q.  Please state your name for the jury.

18   A.  Keia Brown.

19   Q.  Where are you employed?

20   A.  With the Rockford Crime Lab for the Illinois State Police in

21   Rockford, Illinois.

22   Q.  What is your position?

23   A.  I'm a forensic biologist.

24   Q.  How long have you been employed with the Illinois State

25   Police?

Brown - direct

1  A.  Since January of 2001.

2  Q.  What do you do as a forensic scientist?

3  A.  I identify body fluid stains recovered from crime scenes.

4  Q.  Do you also testify in court as to your findings?

5  A.  Yes.

6  Q.  What is your educational background?

7  A.  I have a bachelor's of science degree in microbiology from

8  Western Illinois University.

9  Q.  Did you also do additional coursework in biochemistry at

10  Southern Illinois University?

11  A.  Yes.

12  Q.  Did you receive any specialized training in the field of DNA

13  analysis?

14  A.  Yes.

15  Q.  What was that training?

16  A.  That training consisted of 18 months of DNA analysis

17  training, which consisted of extraction, quantitation,

18  amplification, and obtaining DNA profiles using computer

19  software.

20  Q.  Was there any testing in conjunction with that training?

21  A.  Yes.  During that training I did readings, lectures, mock

22  case work, mock trials, as well as supervised case work and court

23  testimony.

24  Q.  At the conclusion of that training, do you receive any type

25  of certification?

Brown - direct

203

1  A.  Yes.

2  Q.  What is that?

3  A.  You're certified as a DNA analyst.

4  Q.  Do you also receive continuing education each year regarding

5  DNA analysis?

6  A.  Yes.

7  Q.  Are you a member of any professional groups related to

8  forensic science?

9  A.  Yes.

10  Q.  What group is that?

11  A.  Midwestern Association of Forensic Scientists.

12  Q.  Approximately how many times have you testified as an expert

13  in the area of forensic DNA analysis in court?

14  A.  At least 20.

15       MS. BELL:  Your Honor, at this time I would tender the

16  witness as an expert in DNA analysis.

17       THE COURT:  Any objection?

18       MR. PETRO:  No objections, Judge.

19       THE COURT:  All right.  She'll be received as an expert.

20  BY MS. BELL:

21  Q.  Ms. Brown, what type of DNA analysis do you perform?

22  A.  I perform what is called PCR analysis, which stands for

23  Polymerized Chain Reaction.  This is basically making exact

24  copies of your DNA over and over using a heating and cooling

25  process on an instrument.

Brown - direct

1  Q.  What do you do after you've made those copies of DNA?

2  A.  A small amount of that copy is then used in conjunction with

3  chemicals and placed onto an instrument along with computer

4  software to obtain a DNA profile.

5  Q.  Could you briefly explain to the jury what DNA is?

6  A.  DNA stands for deoxyribonucleic acid.  And it's basically

7  what you inherit from your parents.  You obtain half from your

8  mother, half from your father.  It's what determines whether

9  you'll have two eyes, two arms, two legs, et cetera.

10  Q.  What do you look for in your DNA analysis?

11  A.  What I'm looking for in DNA is what is called STRs or short

12  tandem repeats.  These are basically sequences that are repeated

13  a certain number of times at a specific location.  And the

14  repeats of this sequence at the different locations is what makes

15  individuals different with the exception of identical twins.

16          So example, you might have a sequence of ABCD that's

17  repeated, say, 12 times, so ABCD, ABCD 12 times at a certain

18  location within your DNA.  Those repeats of that sequence at that

19  particular location is what differs from person to person making

20  everyone different with the exception of identical twins.

21  Q.  Is DNA different within a person's body?

22  A.  No.  Your DNA is the same throughout your entire body.

23  Q.  Where is DNA found in the body?

24  A.  DNA is found in red blood cells or -- I'm sorry.  DNA is

25  found in the center or the nucleus of your cells with the

Brown - direct

1  exception of red blood cells, because they do not have a nucleus.

2  But it's found in hair, blood, saliva, semen, skin cells.

3  Q.  Can environmental conditions like heat, moisture, sunlight or

4  soil change DNA?

5  A.  No.  The DNA remains the same.

6  Q.  Is there an analogy you could give us to kind of explain what

7  would happen though to DNA if it was exposed to environmental

8  conditions?

9  A.  DNA can degrade or weaken.  It will still remain the same,

10  but it might weaken.  So, for example, if you have like a red

11  T-shirt, you can wash it over and over and over again, and it may

12  fade a little, but it still stays a red t-shirt.  It doesn't

13  change.  It just becomes weaker or not as strong.

14  Q.  Can DNA change with the age of the sample as well?

15  A.  No.  Again, it's the same process.  It will stay exactly the

16  same.  It just may weaken some.  It's not as strong.

17  Q.  Can you briefly explain how you conduct DNA testing at the

18  lab?

19  A.  DNA testing is conducted with first starting with a process

20  called extraction.  And this is basically taking a small sample,

21  putting it into a tube with chemicals, incubating it in a water

22  bath to pull out the DNA out of that sample, so out of a piece of

23  material to get DNA in its pure form.

24        After that, a quantitation is then performed, which is

25  basically getting a rough estimate of the amount of DNA that was

206

Brown - direct

1 recovered from that sample.

2      Next, the sample is amplified, which is making exact

3 copies of that DNA using the heating and cooling process on an

4 instrument to have a larger sample of the DNA that was recovered.

5      And then lastly, a small amount of that sample is placed

6 onto an instrument with additional chemicals using computer

7 software to generate a DNA profile.

8 Q. What do you do with the results once you have them?

9 A. The results if a DNA profile is obtained is compared then to

10 a known standard from an individual to either include or exclude

11 them from having contributed to that sample, to that DNA profile

12 recovered from that sample.

13 Q. And what happens if you do not get a complete profile from

14 the crime scene evidence?

15 A. What was obtained, if anything, from that profile is still

16 compared to a known standard and put into a database.

17 Q. Is it common for you to work with non-complete DNA profiles?

18 A. Yes.

19 Q. Why is that?

20 A. Again, just due to the strength of the sample, depending on

21 how much DNA was there, if we were able to obtain a complete DNA

22 profile, the sample could have just been weakened or just not

23 enough there.

24 Q. Where do the samples you work from originally come from?

25 A. From crime scenes? Is that what you mean?

Brown - direct

1  Q.  Yes.

2  A.  From crime scene samples.

3  Q.  Do you use controls to ensure that your procedures or steps

4  are working correctly?

5  A.  Yes.

6  Q.  Could you describe what those are?

7  A.  Controls that are used along with doing DNA extraction are

8  simply tubes with a blank cotton swab in it.  And it's

9  manipulated the same way as the unknown sample.  So if I'm

10  working with a blood sample, a semen sample, I put a blank cotton

11  swab into a tube, and I work it the same way as if it were a

12  sample from a crime scene to ensure that no contamination was

13  introduced and that my chemicals and instruments are working as

14  they should.

15  Q.  How many samples do you work with at a time?

16  A.  It can range from 1 up to 48.

17  Q.  What are you wearing when you work with a sample?

18  A.  I'm wearing a lab coat, latex gloves, face mask.  The area is

19  bleached with a 10 percent bleaching solution.  And if I'm

20  working with a batch of samples, I'm only working with one sample

21  at a time.  So I only have one sample, one tube open at a time,

22  even if I'm working with a batch of samples.

23  Q.  And how do you avoid mixing up those samples?

24  A.  The samples are labeled with, each sample has an

25  identification case number, a sample number, and my initials and

Brown - direct

1  the date.

2  Q.  Do you somehow also prepare your tools before you work with a

3  sample?

4  A.  Yes.  All tools are bleached with a 10 percent bleaching

5  solution, dried completely off before using them.

6  Q.  Are the procedures you and the Illinois State Police use

7  accepted by the general scientific community?

8  A.  Yes.

9  Q.  Is the Illinois State Police Forensic Crime Lab accredited?

10  A.  Yes.

11  Q.  Who is it accredited by?

12  A.  It's accredited by ISO accreditation.

13  Q.  Can you explain what that is?

14  A.  It's basically an international set of standards that are

15  used internationally throughout the world.  They come up with

16  certain guidelines for DNA laboratories to follow, and we follow

17  those guidelines.

18  Q.  Does your lab also follow guidelines set up by the NRC?

19  A.  Yes, the National Research Council as well as the DNA

20  Advisory Board.  They set up certain standards and guidelines for

21  DNA laboratories to follow, and we follow those as well.

22  Q.  Ms. Brown, were you asked to examine an item for the presence

23  of DNA in this case?

24  A.  Yes.

25  Q.  What were you asked to review?

209

Brown - direct

1  A.  I received a swab in a tube from our biology vault.

2       MS. BELL:  May I approach the witness, Your Honor?

3  BY MS. BELL:

4  Q.  Ms. Brown, showing you what has been marked as Government's

5  Exhibit 10, take a moment to look at it and let me know if you

6  recognize it?

7  A.  No.

8  Q.  If you could open it.  Sorry.  I know you wouldn't recognize

9  the outside bag.

10 A.  May I get gloves?

11 Q.  Yes.

12    (Discussion off the record.)

13 BY THE WITNESS:

14 A.  Okay.

15 BY MS. BELL:

16 Q.  Do you recognize Government's Exhibit 10?

17 A.  Yes.

18 Q.  What is it?

19 A.  There is two tubes inside of a Ziploc bag.

20 Q.  And what are those tubes?

21 A.  The clear white tube is the tube that contains the cotton

22 swab in which I first extracted.  There is a pink tube in here

23 that had the final DNA extract product in it.

24 Q.  And how are you able to recognize those tubes?

25 A.  My markings are on the tube, the case number, the exhibit

Brown - direct

1  number, as well as the date and my initials.

2  Q.  From where did you retrieve the white tube with the swab

3  inside that's dated October 24th, 2008?

4  A.  That tube was retrieved from our biology vault.

5  Q.  And at the time you retrieved it from the vault, was there

6  already writing on that tube with the swab?

7  A.  Yes.

8  Q.  Whose writing was that?

9  A.  The biologist's writing, Cynthia Torrisi.

10  Q.  After you retrieved the tube with Ms. Torrisi's swab inside,

11  what did you do with it?

12  A.  I performed DNA analysis on it, the steps I described

13  earlier, the extraction, quantitation, amplification.

14  Q.  And what is the significance of the date of December 8th,

15  2008 on the tubes on Government's Exhibit 10?

16  A.  That is the date on which I took custody of the sample.

17  Q.  And what about the date on the pink tube?

18  A.  Again, just the date that I took, had custody of the sample.

19  Q.  Did you determine that the swab and the white tube in

20  Government's Exhibit 10 contained DNA?

21  A.  Yes.

22  Q.  And did you --

23         MR. PETRO:  I'm sorry, Judge, did she give a date as to

24  the pink tube?  I didn't hear it.  I'm sorry, I guess I thought

25  she said --

                         Brown - direct

1  BY MS. BELL:

2  Q.  Ms. Brown, if you could read the date that's by your initials

3  on the pink tube?

4  A.  12/8/08.

5  Q.  And that's the same date that you took custody of the white

6  tube, is that correct?

7  A.  Correct.

8         MS. BELL:  At this time I would offer Government's

9  Exhibit 10 in evidence.

10        THE COURT:  Any objection?

11        MR. PETRO:  I think she has to lay a foundation, Judge.

12        THE COURT:  I think between the two witnesses you have.

13        MR. PETRO:  No objection, Judge.

14        THE COURT:  All right.  It will be admitted.

15     (Government's Exhibit 10 was received in evidence.)

16        MR. PETRO:  Thank you.

17        THE COURT:  Thank you.

18        MS. BELL:  May I publish Government's Exhibit 10, Your

19  Honor?

20        THE COURT:  Sure.

21  BY MS. BELL:

22  Q.  Ms. Brown, I'm showing you Government's Exhibit 10.  Could

23  you just explain to the jury, I know it's a little hard to see

24  with the glare, but what we're seeing here on the screen?

25  A.  The clear tube with the initials CT was the biologist's

Brown - direct

212

1  initials.  The 1-A is the exhibit number.  W08927 is the case

2  number.  Then there is a date that obtained -- that held the

3  cotton swab that was collected.

4         And then the pink tube, the W08927 is again the case

5  number.  The 1-A is exhibit number.  And then the date and my

6  initials, KB, are on the pink tube.  This is where the liquid

7  extract, DNA extract was transferred into that tube.

8  Q.  Thank you.

9         Ms. Brown, how did you prepare a DNA profile from

10 Ms. Torrisi's swabbing of the mask?

11 A.  Again, just with the procedures that I explained earlier

12 through extraction, by adding the chemicals to the original

13 cotton swab and getting the DNA out of the swab into a liquid

14 form, then quantitating it, getting a rough estimate of the

15 amount of DNA that was in that swab, amplifying it, making copies

16 of the DNA, and then putting a small amount of that liquid onto

17 an instrument using software to generate a DNA profile.

18 Q.  Did you obtain a complete DNA profile when you first ran the

19 DNA in this case through the genetic analyzer?

20 A.  No.

21 Q.  Did you take any additional steps to obtain a complete DNA

22 profile?

23 A.  With our original injection of a sample, we do a 5 second

24 injection.  After I realized there wasn't a complete DNA profile,

25 I injected the sample for 10 seconds, a little longer to try to

Brown - direct

1  obtain more of the DNA profile.

2  Q.  And is that method a common and accepted practice when you

3  obtain a less than complete DNA profile from a piece of evidence?

4  A.  Yes.

5  Q.  What were the results after you ran the DNA in this case

6  again that did that second run?

7  A.  I obtained the DNA profile and I believe all of the locations

8  with the exception of three of the locations.

9  Q.  And after you completed your analysis, what did you do with

10 these two tubes?  Where did they get stored?

11 A.  They were sealed into a Ziploc envelope with evidence tape

12 and placed into our return vault to be returned to the police

13 agency.

14       MS. BELL:  May I approach the witness, Your Honor?

15 BY MS. BELL:

16 Q.  Ms. Brown, showing you what has been marked as Government's

17 Exhibit 20.  Do you recognize it?

18 A.  Yes.

19 Q.  What is that?

20 A.  It's my case file for this particular case.

21 Q.  What does your case file contain?

22 A.  All of the paperwork and notes that I write and acquire

23 during extraction of this case, of this sample.

24 Q.  Did you prepare a summary chart of the results of your DNA

25 analysis of the swabbing of the mask in this case?

Brown - direct                                214

1  A.  Yes.

2  Q.  Directing your attention to page 26 of your case file, could

3  you tell us what you see on that page?

4  A.  This is the summary chart of the DNA profile obtained.

5  Q.  Does that chart accurately reflect the DNA profile you

6  recovered from the swabbing of the mask?

7  A.  Yes.

8          MS. BELL:  Your Honor, at this time may I publish

9  Ms. Brown's chart?

10         THE COURT:  Do you want to move the admission of the

11 exhibit?

12         MS. BELL:  Your Honor, I move to admit Government's

13 Exhibit 20 at this time.

14         THE COURT:  Any objection?

15         MR. PETRO:  No objection, sir.  Thank you.

16         THE COURT:  Thank you.

17    (Government's Exhibit 20 was received in evidence.)

18 BY MS. BELL:

19 Q.  Ms. Brown, what does your chart show?

20         THE COURT:  Let me turn down the lights.  It makes it

21 easy for people to see.

22 BY THE WITNESS:

23 A.  The chart basically is showing the DNA profile that was

24 obtained from the swab.

25 BY MS. BELL:

215

Brown - direct

1  Q.  Directing your attention to the column labeled "Locus."

2  A.  Yes.

3  Q.  Well, first off, what does that mean?

4  A.  Locus, those are basically the locations that I was talking

5  about where these repeated sequences can be found.

6  Q.  And what information is contained in that column under

7  "Locus"?  What do we see under left side of the exhibit?

8  A.  Those are different chromosomes within your DNA profile.

9  Q.  And why do you look at those particular chromosomes?

10 A.  Those are what the kits that we use have been manufactured

11 for, these particular 13 locations that we look at.

12 Q.  Directing your attention to the next column called "Swab from

13 mask 1-A," what information is contained here in this second row

14 along the left?

15 A.  This is the DNA profile that was obtained.  And those numbers

16 represent the number of repeats of those particular, of a

17 particular sequence at each of those locations.

18      And the two numbers, basically when I described DNA

19 earlier is inheriting half from your mother, half from your

20 father, one of those numbers is what you inherited from your

21 mother, another of the numbers is what you inherit from your

22 father.

23 Q.  And looking for illustrative purposes at this first location,

24 D3S1358, we see the numbers in the next column 14,15.  Is that

25 location what you would term to be complete?

Brown - direct

1  A.  Yes.

2  Q.  And is that same thing true for the additional locations we

3  see under the mask column?

4  A.  Yes, with the exception of three.

5  Q.  All right.  So for those I see we've got them mixed among the

6  numbers here we have some letters.  If we go down to the fourth

7  location, we see under "Swab from mask" it says X,Y.  What does

8  that indicate?

9  A.  That location is titled amelogenin.  That's their sex

10  chromosome.  That's where we look at to determine if this DNA

11  profile belongs to a man or a woman.  And X,Y represents a male.

12  Q.  Next, if we go down to the seventh location we see again more

13  letters.  We see on the next row under Swab From Mask "17,INC."

14  What does that indicate?

15  A.  That's a 17 inconclusive.  I wasn't able to obtain the second

16  number related to that particular location.

17  Q.  And then at two locations further down, specifically

18  locations D7S820 and CSF1PO, we see the letters "ND."  What does

19  that stand for?

20  A.  "ND" stands for not detected.

21  Q.  And what would that mean as far as the profile?

22  A.  Again, I wasn't able to obtain the repeated sequence at those

23  particular locations due to that the sample could have been again

24  just weak, degraded.  There is no particular set reason as to why

25  we weren't able to pick up the profile at those locations.

217

Brown - cross

1  Q.  Now, Ms. Brown, other than those three locations that we

2  discussed, is this DNA profile complete?

3  A.  Yes.

4        MS. BELL:  If I might have a minute, Your Honor?

5      (Discussion off the record.)

6        MS. BELL:  No further questions, Your Honor.

7        THE COURT:  Your witness.

8        MR. PETRO:  Thank you, Judge.

9        THE COURT:  Do you want me to turn the lights down

10 again?

11       MR. PETRO:  Oh, keeper of the lights, please, yes.

12 Thank you, Judge.

13                      CROSS-EXAMINATION

14 BY MR. PETRO:

15 Q.  Good morning, Ms. Brown.  Mike Petro.

16       How are you today?

17 A.  Good.

18 Q.  We spoke on the phone the other day, is that correct?

19 A.  Yes.

20 Q.  With respect to this particular chart right here, that is

21 just a summary of other charts that you create during this

22 process of amplification, is that correct?

23 A.  This would be just one chart with the DNA profile that is

24 obtained after it's extracted.

25 Q.  Well, who makes this chart?  Do you make this chart?

218

Brown - cross

1  A.  I fill in the DNA profile for the chart, yes.

2  Q.  So that's not created by the machine, the -- what's the

3  machine called again?

4  A.  No.  The machine is called a genetic analyzer.

5  Q.  And that's made by Applied Biosystems, is that correct?

6  A.  Yes.

7  Q.  And Applied Biosystems is intimately involved in every step

8  of the process, from creating the chemicals to creating the

9  machines to creating the statistics, is that correct?

10  A.  The machine and the chemicals, yes.

11  Q.  What about the statistics, who creates the statistics?  Would

12  that be the Federal Bureau of Investigation?

13  A.  Yes.

14  Q.  And you also receive, I noticed in your packet, the packet

15  that's labeled Government's Exhibit 20 -- you've had an

16  opportunity to review that, is that correct?

17  A.  Yes.

18  Q.  It looks like you get to see some type of police reports that

19  are generated from the case also, is that correct?

20  A.  Correct.

21  Q.  And if you looked at your packet, you would see beginning on

22  308, for example, that would not be part of the work that you

23  created.  That's a police report that's created by whatever

24  police agency sent it to you?

25  A.  Correct.

219

Brown - cross

1  Q.  And that police department in this particular case would be

2  the Palatine Police Department, is that correct?

3  A.  I believe so, yes.

4  Q.  And the reason why you get these police reports is because it

5  allows you to exclude people almost immediately, isn't that

6  correct?

7  A.  No.

8  Q.  Well, for instance, if you were looking for a female, you

9  would be looking at this particular location to have an X,X,

10 isn't that correct?

11 A.  Yes.

12 Q.  So you use the police reports to exclude whether the sample

13 could possibly belong to this particular case report, is that

14 correct?

15 A.  No.

16 Q.  Well, did you know at the time you did the test, did you

17 review those police reports?

18 A.  I probably did, yes.

19 Q.  Why do you review them?

20 A.  Well, generally it's reviewed by the biologist, the person

21 that's going to start with the case, to understand why we're

22 looking at particular samples, why particular samples were

23 submitted to the lab, what it is that we're looking for on a

24 sample, whether we're looking for blood or semen or saliva or

25 hair.

Brown - cross

220

1  Q.  Well, you're not looking for it though, are you?

2  A.  No.  That's why I said usually the police report is read by

3  the biologist.

4  Q.  Did you read the police report?

5  A.  For this particular case, I can't remember.

6  Q.  Do you remember reading the police report?

7  A.  No, I don't remember reading it.

8  Q.  With respect to this chart though, the one that you've put in

9  evidence here, it has a date up here, 12/16 of 2008, is that

10 correct?

11 A.  Yes.

12 Q.  And that date is placed on there by you, is that correct?

13 A.  Yes.

14 Q.  Now, you mentioned in this particular case that you had a 5

15 second sample and a 10 second sample, is that correct?

16 A.  Yes.

17 Q.  I'm going to show you what has been labeled Defense Group

18 Exhibit No -- -

19          MR. PETRO:  Am I on 5?

20          THE COURT:  You're on 5.

21          MR. PETRO:  Thank you, sir.

22          May I approach, Judge?

23 BY MR. PETRO:

24 Q.  Would you take a look at that document please and tell me if

25 you recognize what that particular document is?

221

Brown - cross

1  A.  It appears to be an injection list from the instrument.

2  Q.  Is that something that would be part of your normal work

3  packet?

4  A.  No.

5  Q.  Well, that is generated though by the machine when you run

6  samples, is that correct?

7  A.  Correct.

8  Q.  That's an important document, because it shows you the date

9  and the time that a particular sample was run, is that correct?

10  A.  Yes.

11  Q.  And with respect to that particular document, is that

12  document important for you to remember how many samples you ran

13  at a particular time?

14  A.  No.

15  Q.  Well, do you remember how many samples that you ran at a

16  particular time in this particular case?

17  A.  If I were to go back through my case file I would.

18  Q.  But that document wouldn't help you at all?

19       Is that document accurate?  It's generated by --

20  A.  This is something I routinely look at, so I wouldn't know.

21  Q.  The reason I'm wondering is you did a 5 second extraction on

22  this particular case, and you did that extraction, for instance,

23  if you look at the electropherogram -- you know what an

24  electropherogram is, don't you?

25  A.  Yes.

Brown - cross

1  Q.  What is an electropherogram?  Can you tell these folks what
2  an electropherogram is?
3  A.  An electropherogram is the sheet that is generated by the
4  instrument that had the sample placed on using computer software
5  to generate your DNA profile.  It will show those numbers that
6  were on that summary chart are printed out on this
7  electropherogram.
8  Q.  Now, with respect to the electropherogram, I'm going to show
9  you what's page 11 of 49.  I'll just put it up here on the chart.
10 What is that that I'm putting up there just generically then?
11 A.  The electropherogram.
12 Q.  And with respect to the electropherogram, it looks like there
13 is some peaks, is that correct?
14 A.  Correct.
15 Q.  And those peaks have numbers underneath it, is that correct?
16 A.  Correct.
17 Q.  So, for instance, with respect to this first area, it says
18 D3S1358.  Is that significant to you at all?
19 A.  The D3S1358?
20 Q.  Correct.
21 A.  Yes.  That's a location that we look at for the DNA profile.
22 Q.  And with respect to the numbers underneath that DNA profile,
23 it says 14, is that correct?
24 A.  Correct.
25 Q.  And it says 1831, is that correct?

223

Brown - cross

1  A.  Correct.

2  Q.  And it also says 119.72, is that correct?

3  A.  Correct.

4  Q.  What do those three numbers mean in that particular location,

5  Miss?

6  A.  We're only concerned with the top numbers of those boxes.

7  Again, those are the number of repeats of a particular sequence.

8  And that's the individual's profile.

9  Q.  Well, what does the number underneath it, 1831, what does

10 that signify, for example?

11 A.  It basically references just the peak height of that peak.

12 Q.  Which one, this 1831, for instance, right here?

13 A.  Correct.

14 Q.  And then what is this number here then (indicating)?

15 A.  That number at the bottom again would be, geez, the number, I

16 believe the number of the repeats of -- I can't recall, because

17 we don't -- I don't use those numbers for anything.  I honestly

18 would have to look it up.

19 Q.  Well, they are important though, is that correct?

20 A.  They can be.  In this particular case, they weren't.

21 Q.  Well, if you don't know what it means, how can you tell the

22 folks on the jury that it's not important?

23 A.  It's not important to determine the person's DNA profile.

24 Q.  It's not important in any way, shape, or form?

25 A.  I mean, it can be used in certain situations.  In this

Brown - cross

1  particular case it wasn't needed.

2  Q.  Well, let me just ask you some questions about this

3  particular notation right here.  It says POS, for instance.  I

4  want to make sure I'm starting at the front.  I'm starting at the

5  front.  This says POS P-Plus KB.  KB is you, Keiara Brown, is

6  that correct?

7  A.  Keia Brown, yes.

8  Q.  Keia Brown.  My fault, my mistake.

9         And P-Plus means Profiler Plus.  What is Profiler Plus?

10  A.  That's the set of chemicals that was used.

11  Q.  Is that a machine?

12  A.  No.  It's a chemical that is obtained from the manufacturer.

13  Q.  So the manufacturer sends you a packet of chemicals that

14  analyzes these particular locations, is that correct?

15  A.  Correct.

16  Q.  And in this particular location it would be D3S1358, correct?

17  A.  Correct.

18  Q.  VWA, is that correct?

19  A.  Correct.

20  Q.  FGA, is that correct?

21  A.  Correct.

22  Q.  And this one over here X, that's the sex, that doesn't get a

23  name apparently.  That's called amelogenin, is that correct?

24  A.  Correct.

25  Q.  It goes down the line, D8S1179, correct?

225

Brown - cross

1  A.  Correct.

2  Q.  D21S11, is that correct?

3  A.  Correct.

4  Q.  D18S51, is that correct?

5  A.  Correct.

6  Q.  D5S818, is that correct?

7  A.  Correct.

8  Q.  D13S317, is that correct?

9  A.  Correct.

10  Q.  And D7S820, is that correct?

11  A.  Correct.

12  Q.  Now, with respect to this, it seems like you have some

13  notations here on the bottom.  It says "Original in" -- I can't

14  really read it.  I guess you can't read it either.  "Original

15  in," what does that mean in this particular notation?

16  A.  That's original printout paperwork is in that particular case

17  file.

18  Q.  So this is just a copy of the original printout, is that

19  correct?

20  A.  Right.  It's just a black and white copy.  The colored copy

21  is in that particular case file.

22  Q.  Why do you use the colored copy?

23  A.  Just to save on printing off 20.

24  Q.  Well, is there any significance -- aren't these chemicals

25  that you put into the machine, aren't they designed to show

226

Brown - cross

1  particular colors for the laser, is that correct?

2  A.  Yes.  But the colors, looking at a black and white versus

3  looking at a color copy doesn't say anything different.

4  Q.  So the colors on the color copy on the original won't somehow

5  match with respect to these particular locations then?

6  A.  Right.

7  Q.  And then right here it says "Positive amp."  Could you just

8  tell me what that says?

9  A.  "Positive amp control to verify anthem run."

10  Q.  With respect to that writing right here on this particular

11  area on this particular document, is that your writing?

12  A.  Yes.

13  Q.  You put that on there, is that correct?

14  A.  Yes.

15  Q.  And with respect to these boxes right here, do you put those

16  on there also?

17  A.  No.

18  Q.  That comes with the machine?

19  A.  Yes, with the software.

20  Q.  They put those on there, is that correct?

21  A.  Yes.

22  Q.  Well, right here on the top right here, it says "12/12/08 run

23  KB."  Ms. Brown, KB, correct?

24  A.  Yes.

25  Q.  Run is the date that you, the time, or what is that?  What

Brown - cross

1  does that mean "run," when you put it into the machine?

2  A.  Right.

3  Q.  And then this right here, it says "12/12/08 run," is that

4  correct?

5  A.  I can't see it, but yes.

6  Q.  I'm sorry, Miss.  You can see it now, right?

7  A.  Yes.

8  Q.  Is that the date that this was actually put into the machine?

9  A.  Yes.

10  Q.  Is that the date that you put it in the machine, or is that

11  the date that the machine actually did the testing of this POS

12  P-Plus on that particular date?

13  A.  That is the date that it was put into the machine and

14  generally the same date that it was ran on the machine.

15  Q.  Well, the reason I ask is because when I go to this

16  particular log -- do you know from this particular document

17  whether that's a 5 second run or a 10 second run?

18  A.  For this control?

19  Q.  Well, I don't know.  What is it?

20  A.  It's control.

21  Q.  What does POS mean?

22  A.  It's a positive control.

23  Q.  What does positive control mean?

24  A.  Positive control basically represents what I spoke about

25  earlier with running controls to make sure that your samples,

Brown - cross

1  chemicals, and instruments are performing properly.  This is a

2  known DNA profile given to us by the manufacturer with a known

3  profile.

4          So I run that sample onto the instrument and compare it

5  against the DNA profile that is printed out with this sample to

6  make sure that it matches to show that our chemicals and our

7  instruments are working properly.

8  Q.  Well, I'm going back to this chart, the original chart that

9  you gave us on page 26.  And I'll just pick one out, DAS1179.  It

10  says 133191.  14505.  Do you see that right here, Miss?

11  A.  Okay.

12  Q.  Isn't there supposed to be -- there is two numbers up here.

13  There is two numbers here.  There is two numbers here.  But there

14  is only one number here?

15  A.  Yes.

16  Q.  Are you telling me that to test the machine, that they only

17  give you one number at this location, only an X at this location,

18  and only one number at this location?  Is that what you are

19  telling me?

20  A.  That's what this particular profile represents.

21  Q.  Well, why, if you're testing the machine and you're doing

22  this positive -- what do you call it, a positive what blank?

23  A.  Positive control.

24  Q.  Positive control.  If you're doing this positive control, why

25  wouldn't the company give you a full and complete profile so that

Brown - cross

1  we know that the darn machine is working at all these various

2  locations?

3  A.  That is a full, complete profile.

4  Q.  Well, where is the other number?  Where is the Y right here?

5  A.  Actually this is a female profile.

6  Q.  Well, explain that.

7  A.  The company is sending you a person's known standard.  It

8  might be male or female.  This particular case, they sent a known

9  female standard.

10  Q.  So is this an XX then?

11  A.  Yes.

12  Q.  It's an XX?

13  A.  Right.

14  Q.  The machine is not sophisticated enough to determine or to

15  draw two peaks at that particular location, is it?  Is one X

16  hiding on top of the other X?

17          THE COURT:  Would you ask one question at a time,

18  please?

19          MR. PETRO:  All right.

20          THE COURT:  If that is a question.

21  BY THE WITNESS:

22  A.  It's not that the machine is not sophisticated enough.  When

23  it represents the same letter or same number, it only represents

24  it one time.  It only shows it one time.  There is no need to put

25  XX.  I know if it's represented there once.

Brown - cross

1  BY MR. PETRO:

2  Q.  Well --

3  A.  Again, with the number only 13 there, that demonstrates that

4  a 13 was inherited both from the mother, and a 13 was inherited

5  from the father.  So it's represented there one time.

6  Q.  This machine, this particular test is designed to see if the

7  machine is working, is that correct?

8  A.  Correct.

9  Q.  Well, what does peak right here, why doesn't the machine read

10 that particular peak right there?

11 A.  That's not a true peak.

12 Q.  That's not a true peak?

13 A.  It's just a bump.

14 Q.  Well, isn't the machine sophisticated enough to tell me what

15 that bump means?

16 A.  If it means nothing, it's not going to tell you anything.

17 Q.  Well, this is the one that tests to see whether the machine

18 works.  What about right here next to it, right here?  There is

19 something right there, too.  What is that then?

20 A.  Looks like a bump.

21 Q.  Well, it looks like a bump.  But the only reason it looks

22 like a bump is because of the scale of this particular diagram,

23 isn't that correct?

24      Like right here, if you look at this number right

25 here -- sorry, I'm not real quick with this machine yet, but I'm

Brown - cross

1  going to get better -- see this number right here, 3001?

2  A.  Yes.

3  Q.  You know what that number means, right?

4  A.  Yes.

5  Q.  That means that the RFUs at the particular -- what does RFU

6  stand for?

7  A.  Relative florescent units.

8  Q.  The relative florescent units at that particular location are

9  3001, is that correct?

10 A.  Correct.

11 Q.  But over here, if you look over here, the only standard that

12 we have to go by is 1300, isn't that correct?

13 A.  That's what the scale is set at, 1300.

14 Q.  So we really don't know.  It just may be a scaling problem.

15 This could be significant, but you're going to call it a bump, is

16 that what you are going to tell us?

17 A.  I'm calling it a bump, because it was not labeled.  The

18 instrument did not label it.

19 Q.  Well, can't you label it?  You can override the instrument in

20 certain circumstances, right?

21 A.  If that was a true peak, it would have been labeled.

22 Q.  Well, with respect to this particular document right here, is

23 there anything on this particular document here which would

24 indicate -- and I'll zoom out, you're going to watch me get good

25 with this, you watch -- is there anything on this document here

232

Brown - cross

1  that tells you whether this is a 5 second amplification or a 10
2  second amplification?
3  A.  Is there any writing at the bottom?
4  Q.  I can hand it to you.  Do you want to look at it personally?
5  Do you have it right in front of you?  I'm looking at page 11 of
6  43.
7  A.  This is a 5 second injection.
8  Q.  Where does it say that?
9  A.  It doesn't.  If it's not written, that means generally that
10  there was not another 10 second injection done on this day.  So
11  there was no need for me to write 5 seconds on there, because
12  that is what our instruments are default to do 5 second
13  injections.
14  Q.  Defaulted.  That's what the manufacturer tells you to run the
15  machine at, is that correct?
16  A.  That's what it is automatically set at.
17  Q.  And really when you say that it is standardly accepted and
18  the procedure is accepted that you can choose whether to run it
19  for 5 second or 10 seconds, that's not from the machine maker, is
20  it?
21          That 10 second run was devised by the Illinois State
22  Police Forensic Lab, and they're the ones that validated the 10
23  second run, isn't that correct?
24  A.  Correct.
25  Q.  So your own laboratory decided that it was okay to run it for

Brown - cross

1  10 seconds, not the machine maker, the expert on the machine, is

2  that correct?

3  A.  This sample was ran for 5 seconds.

4  Q.  All right.  Well, it's run for 5 seconds.  Did you run it for

5  10 seconds?

6  A.  I'd have to look.

7  Q.  All right.  Let's go to page 12.

8  A.  Okay.

9  Q.  Here is an additional run.  It says "Positive" -- what does

10  that say on the bottom there?

11        MR. PETRO:  It's page 12 of 43, Bates stamped 285 for

12  the record, Judge.

13  BY THE WITNESS:

14  A.  "Positive run control to verify run, original and R081050."

15  BY MR. PETRO:

16  Q.  And then with respect to this, this is run on 12/16, is that

17  correct?

18  A.  Correct.

19  Q.  That would be four days after the original run?

20  A.  Correct.

21  Q.  Is this a 10 second amplification, Miss?

22  A.  No.

23  Q.  What is it?

24  A.  The same as page 11, a 5 second, just done on a different

25  day.

234

Brown - cross

1  Q.  Well, it was done on a different day.

2       Even though it is a positive sample, I just want to pick

3  one out, because I'm hung up on this 3001 right here, because I

4  hope to live that long, but right here the RFUs say 3001.  And

5  then when you run it four days later it's 3162.  Is that what it

6  says?

7  A.  Yes.

8  Q.  That's not significant to you?

9  A.  No.

10  Q.  In order to call this particular bump right here significant,

11  you have internal guidelines that say that it has to be taller

12  than 150 RFUs, isn't it?

13  A.  Correct.

14  Q.  So this particular number is very, very important, is that

15  correct?

16  A.  Correct.  It's just above 150.

17  Q.  Well, that means by amplifying the sample here, 3162 minus

18  3001, I have 161 RFUs.  That's statistically significant, isn't

19  it?

20  A.  For what purpose?

21  Q.  Well, I don't know.  I mean, you've got a 5 second run here,

22  and you've got a 5 second run here.  This is a controlled sample.

23  And you've got two different numbers.  And I've only picked one

24  location.  You've got two different numbers for a control run, is

25  that correct?

Brown - cross

1   A.   Yes.

2   Q.   That's the one that makes sure that the machine is working

3   correct, right here?

4   A.   Right.

5   Q.   Is that correct?

6   A.   But I'm looking at the actual profile of the sample to make

7   sure that the profile is what should be obtained.

8   Q.   Well, I don't understand.  If you run a sample on two

9   different days, shouldn't these numbers be exactly the same,

10  3001, 5 seconds, 3162, 5 seconds?  Shouldn't those two numbers be

11  the same?

12  A.   No.

13  Q.   Well, is the machine always off by 161?

14  A.   No.

15  Q.   And 161 is 11 more than 150.  And you've determined that 150

16  is statistically significant, is that correct?

17  A.   Correct.

18  Q.   But it doesn't matter?

19  A.   No.

20  Q.   Well, the next one, we're going to do the next one, because

21  you've also run right here, this is an interesting one, this says

22  "Neg," I'm looking at 15 of 43, page 288.

23          Now, if you look up here in the corner right here, it

24  says "Neg, P-Plus KB."  Tell me what that means.

25  A.   That's a negative control, Profiler Plus, the same chemicals

Brown - cross

1  used, and my initials.

2  Q.  And that was run on 12/12/2008?

3  A.  Yes.

4  Q.  Oh, my God, Miss, there is something wrong.  There is no

5  peaks on this particular document.  How could that be?

6  A.  Because it's a negative control, meaning it is just a tube of

7  water.  And we run that negative control to verify that there was

8  no contamination introduced into the case.  So you don't expect

9  to see a DNA profile here.

10  Q.  Bear with me.  I know it's tough, but I'm going to get to it,

11  I promise.

12       Now, right here MB1.  I'm looking at page 17 of 43,

13  12/12/08 run.  This one up here says "Master blank 1 P-Plus KB."

14  What does that mean, MB1?  I'm sorry.  I shouldn't say it.  Does

15  that mean master blank?

16  A.  No.

17  Q.  What does MB1 mean?

18  A.  MB stands for manipulation blank.

19  Q.  Explain it.

20  A.  Manipulation blank is again when I talked about standards and

21  controls, this is when a blank cotton swab is placed into a tube

22  using the same chemicals that I would use on a case sample, and

23  it is ran and extracted the same way I do case samples, to ensure

24  that our chemicals and our instruments and everything is working

25  properly, and there is no contamination introduced.

237

Brown - cross

1 Q.  Well, this one here was run on 12/12/08.  So that's

2 significant with respect to this particular sample, is that

3 correct?

4 A.  Correct.

5 Q.  And it says on the bottom right here, "Original and RO81050."

6 That's your writing, is that correct?

7 A.  Correct.

8 Q.  And it says right here "5 seconds," is that correct?

9 A.  Correct.

10 Q.  And lo and behold, there is no peaks on this graph anywhere,

11 is there?

12 A.  Correct.

13 Q.  These parts down here, what do those mean for the people over

14 here?  Is that statistically significant down here?

15 A.  It's just what we call internal lane size standard.  And it's

16 just a sizing standard for, if you had peaks, for where peaks

17 would fall into this particular size standard.  It's just another

18 control.

19 Q.  So is it fair to say then you wouldn't expect to get any

20 peaks at this location, right?

21 A.  Correct.

22 Q.  If there were peaks, that would be indicative that there was

23 some type of contamination to the machine, isn't that correct?

24 A.  It could be contamination or it could not be contamination.

25 Q.  Well, you did a 10 second run on 12/16/08, KB.

238

Brown - cross

1        Now, on a 10 second run, this is MB.  This is a
2  manipulation blank, correct?
3  A.  Correct.
4  Q.  And when you look at the manipulation blank, you don't expect
5  to see any peaks on the manipulation blank at all, do you?
6  A.  Correct.
7  Q.  That means the machine is running correctly, is that correct?
8  There is no DNA that could possibly be contaminating the machine,
9  is that correct?
10  A.  Correct.
11  Q.  And then in this particular sample, the master, the
12  manipulation blank -- well, apparently it's been manipulated,
13  Miss.  What does that mean, DAS1179?
14        That's Profiler Plus, right?  It's the same packet of
15  chemicals, is that correct?
16  A.  Correct.
17  Q.  And in this particular case at DAS1179, we're seeing a peak
18  of 169, 11, 169, is that correct?
19  A.  Correct.
20  Q.  Well, what happened?  There is contamination there.
21  A.  If you turn the next page, that peak was blown up to look at
22  its morphology.  A peak has to have or consist of a certain
23  shape, a certain morphology to be a peak.  That after it's blown
24  up is a heel and not a peak.  So it doesn't represent a true,
25  it's not a representation of a true peak.

Brown - cross

239

1           Therefore, it could be from noise.  When you do longer

2    injections, you can introduce, it's like almost introducing like

3    junk into the instrument or noise.  It's overwhelming, it can

4    overwhelm the instrument and the sample, because you're doing a

5    longer injection time.

6           So when this peak was introduced, we blew it up to see

7    if it actually represented a true peak, which is usually a

8    slender peak with a like cone shape at the top.  And if you look

9    at the blown-up picture, which is the next page, it was not a

10   peak.  It was like a wavy heel.

11   Q.  Well, you say it's not a peak, is that correct?

12   A.  Okay, yes, correct.

13   Q.  That's your subjective interpretation, is that correct?

14   A.  Those are our guidelines of morphology on peaks.

15   Q.  Well, you said "We looked at it, and we determined that it

16   was not a true peak."  Who looked at it?

17   A.  My case file was peer reviewed by another analyst.

18   Q.  All right.  And with respect to this particular case -- I'm

19   going to stop just for one second.

20          The expert in this particular case is not Ms. Brown.

21   The expert in this particular case is the machine, the Applied

22   Biosystems machine that runs the sample, isn't that correct?

23          MS. BELL:  Objection, Your Honor, argumentative.

24          THE COURT:  Sustained.

25   BY MR. PETRO:

240

Brown - cross

1  Q.  Well, you're just reading the results that are produced by
2  the machine, isn't that correct?
3  A.  I'm interpreting the results produced by the instrument and
4  the software.
5  Q.  And you're subjectively interpreting that based on your
6  experience, is that correct?
7  A.  My experience and training.
8  Q.  But if your experience and training for whatever reason
9  disagrees with the machine, if you decide that you look at a
10 graph, for instance, you look at this particular graph, if you
11 look at it, and you look over here, for instance, and determine
12 that this particular graph is 199 RFUs, are you saying you could
13 say, well, I looked at the graph, this is 199 and not 169?
14 A.  No.  I can't change, change the results.
15 Q.  You can't change the results.  So it's the machine that's the
16 expert, isn't that correct?
17         MS. BELL:  Objection, Your Honor, argumentative.
18         THE COURT:  Sustained.
19 BY MR. PETRO:
20 Q.  And in this particular case the machine says that there is a
21 peak of 169 with an allele of 11 at this particular location.
22 Isn't that what the machine says?
23 A.  The machine called a particular bump.  That was enlarged and
24 determined that that was not a peak.
25 Q.  The machine called it?

Brown - cross

1  A.  Right, the machine called it.

2  Q.  But it is contamination.

3  A.  No, because it's not a true peak. Contamination has to be --

4 contamination would be DNA introduced into a sample. That's not

5 DNA. It's not a true peak.

6  Q.  Well, this number here for it to be statistically

7 significant, if this number was 139, for instance, you couldn't

8 call it a true peak even if it had the proper shape, is that

9 correct?

10  A.  If it was 139, it would have never showed up on the

11 electropherogram.

12  Q.  It has to be over 150, is that correct?

13  A.  Correct.

14  Q.  And then again it wouldn't show up on the electropherogram.

15     Going back to this blank way back here at the beginning,

16 then what is that then? These are just blank standards. I mean,

17 you're putting in a blank standard, and it's generating all that

18 noise. There is something wrong, isn't that correct?

19  A.  That's not a blank standard. It's a positive control. And

20 obviously it's just a bump being that it didn't get called.

21  Q.  Now, at the same time -- I want to go over this real quick.

22     (Discussion off the record.)

23     THE COURT: We're going to break in a couple of minutes,

24 counsel.

25     MR. PETRO: Thank you, Judge.

242
Brown - cross

1  BY MR. PETRO:

2  Q.  Now I'm going to go back to this log that was produced by the

3  machine.  On this particular log, the electropherogram that you

4  showed us says the date 12, 12/12, December 12th.  That is your

5  recollection also, Ms. Brown?

6  A.  Correct.

7       MS. BELL:  Your Honor, could defense counsel please

8  state for the record what he's referring to?

9       THE COURT:  Thank you.

10       MR. PETRO:  I will.  I shall.

11  BY MR. PETRO:

12  Q.  Now, if you look at this right here -- I'm referring to Bates

13  stamp number 346.  It would be in Government's Exhibit No. 20 I

14  believe, Judge.

15       It says here "Injection 24 positive P-Plus KB."  What

16  does that mean right there on 5:19 -- that's on 12/13/08, the

17  next date.

18       Did you run this on 12/13 and 12/12?

19  A.  12/12 is the date the run was started.  The run could have

20  ran overnight.

21  Q.  Well, right here if you look at the second line on 12/13 of

22  '08, this is the positive injection right here, 5 seconds, 25

23  minutes.

24  A.  Yes.

25  Q.  It didn't take a whole day to run a 25 minute injection, did

Brown - cross

1  it?

2  A.  I don't know if that's the first injection of that sample.  A

3  positive control sample can be injected more than once throughout

4  a run.

5         MS. BELL:  Your Honor, sorry.  Just to be clear, this is

6  not part of Government's Exhibit 20.  It's not actually been

7  introduced into evidence.

8         THE COURT:  It's not part of the exhibit?  I just

9  thought you said it was.

10        MS. BELL:  It's not, Your Honor.  It's not part of

11 Ms. Brown's case file.

12        MR. PETRO:  I'm just asking, Judge.  They gave me the

13 information, or they gave me the information.  Both of them gave

14 me the information.  I want to ask about it, that's all.

15        THE COURT:  Well, you can ask about it, but you have to,

16 you know, lay a foundation as to what we're talking about.  And

17 you'll have overnight think about it.

18        MR. PETRO:  Thank you, Judge.

19        THE COURT:  We're going to break for the day, folks.

20 Please remember what I tell you, but I'm going to tell you in the

21 light, please remember, don't talk about the case.  If there is

22 any publicity about it, don't expose yourself to it.  I don't

23 think there will be, but it's always possible.

24        We'll start again as close to 9:30 as possible.  Let's

25 hope -- was it Metra that messed us up today?  Okay.  Let's hope

244

Brown - cross

1  they don't do that again tomorrow.  I appreciate everybody being

2  here on time.  And certainly we all appreciate your service and

3  attention.  And we will start as close to 9:30 tomorrow as

4  possible.  So if you get here a little before that, make

5  yourselves comfortable, and we'll begin then.

6       (Jury out.)

7            THE COURT:  Ms. Brown, you're under cross-examination,

8  so please don't talk about your testimony at all until your

9  cross-examination is completed, which I hope will be soon after

10 we resume tomorrow.  So you're excused for the evening.  Thank

11 you.

12      (Witness excused.)

13           THE COURT:  Let's try to tighten this up.  I think

14 Ms. Bell has been very patient and not objecting to a lot of

15 these questions.  I really would like you to tighten it up and

16 focus in on what you need to do.

17           If you want to, I mean, I think it's only fair with an

18 expert witness for him to be able to use other materials that may

19 not be part of your precise exhibit.  But if you talk to each

20 other about what he intends to examine her on, I think you can

21 agree to do that.  You don't want to have --

22           MS. BELL:  Sure, Your Honor.

23           THE COURT:  -- the defense recall people for no reason

24 at all.

25           MR. YOUNG:  I think our objection was solely that it was

245

Brown - cross

1  not marked and it was unclear what he was referring to.

2        THE COURT:  Well, no, I think that's a good objection.

3  It definitely should be marked so that we're clear about what

4  we're talking about.  If you just talk to each other about where

5  you want to go with this.  You have one other expert after this,

6  right?

7        MR. YOUNG:  We do, Your Honor.  We'll have another DNA

8  expert who compared a profile.  We have an FBI agent who took the

9  buccal swab from the defendant.  And I believe the defendant

10  indicated he will be stipulating to the FDIC insured status.  So

11  we anticipate only those two more witnesses.

12        MS. BELL:  One more witness after that, Your Honor,

13  another short witness.

14        THE COURT:  Okay.  So you should be able to finish

15  tomorrow for sure?

16        MS. BELL:  Yes, Your Honor.

17        THE COURT:  And then maybe we could finish all the

18  evidence tomorrow if we work hard and then do --

19        MR. PETRO:  Well, Officer Martino would have to be

20  available tomorrow, Judge.

21        THE COURT:  Well, I'd make sure that he's available.

22        MR. YOUNG:  He will be, Your Honor.

23        MS. BELL:  He will be, Your Honor.

24        THE COURT:  I think if we say he'll be available after

25  lunch tomorrow, that would be safe?

246

                         Brown - cross

1           MR. YOUNG:  I will tell him afternoon, Judge.

2           THE COURT:  Okay.

3           MR. YOUNG:  Would Your Honor be anticipating closing

4    Friday morning?

5           THE COURT:  If everything works according to plan, that

6    would be very, very good obviously if we could get to that.  So

7    let's try to stay focused.  Otherwise everything is going well.

8    Thank you, folks.

9           MS. BELL:  Thank you, Your Honor.

10         (Adjournment 4:35 p.m. until 9:30 a.m., October 14th, 2010.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25