247

1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3
    UNITED STATES OF AMERICA,        )
4                                    )
                      Plaintiff,     )
5                                    )   No. 09 CR 846
             vs.                     )   Chicago, Illinois
6                                    )   October 14, 2010
    JOHN A. FORD,                    )   9:50 a.m.
7                                    )
                      Defendant.     )
8

9                        VOLUME 3

10           TRANSCRIPT OF PROCEEDINGS - TRIAL

11       BEFORE THE HONORABLE ROBERT W. GETTLEMAN

12                    AND A JURY

13  APPEARANCES:

14  For the Plaintiff:      HON. PATRICK FITZGERALD
                            United States Attorney
15                          219 South Dearborn Street
                            Chicago, Illinois 60604
16                          BY:  MS. CAROL A. BELL
                                 MR. RICK YOUNG
17

18  For the Defendant:      MICHAEL J. PETRO AND ASSOCIATES
                            53 West Jackson Boulevard
19                          Suite 324
                            Chicago, Illinois 60604
20                          BY:  MR. MICHAEL J. PETRO
                                 MS. QUINN A. MICHAELIS
21

22

23  Official Reporter:      JENNIFER S. COSTALES, CRR, RMR
                            219 South Dearborn Street
24                          Room 1706
                            Chicago, Illinois 60604
25                          (312) 427-5351

248
Brown - cross

1      (Proceedings in open court.  Jury in.)

2          THE COURT:  Mr. Klimson is ill, and he called in today,

3  and I excused him, because it didn't look like he was going to be

4  able to make it at all today or tomorrow.  So we are at lucky

5  number 13.  So everybody stay healthy, please.

6          All right.  We have a witness on the stand.  You're

7  still under oath.

8          MR. PETRO:  Thank you, Judge.  Good morning.

9          THE COURT:  Good morning.

10         MR. PETRO:  Good morning.

11         THE JURY:  Good morning.

12       KEIA BROWN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

13                    CROSS-EXAMINATION (Resumed)

14  BY MR. PETRO:

15  Q.  Good morning, Ms. Brown.

16         Yesterday when we adjourned, I had shown you an exhibit.

17         MR. PETRO:  May I approach, Judge, please?

18         THE COURT:  Sure.

19         MR. PETRO:  Thank you.

20  BY MR. PETRO:

21  Q.  I had shown you a document called Defendant's Group No. 5.

22  You indicated that those were the injection logs for this

23  particular sample, is that correct?

24  A.  Yes, for this instrument.

25  Q.  And when you say "this instrument," which instrument are you

Brown - cross

1  referring to?

2  A.   The instrument that I used for the samples in this case.

3  Q.   May I take that, please?  Are you able to see on that

4  monitor, Miss?

5  A.   Yes.

6  Q.   I just wanted to ask you just a couple of questions.  There

7  is a highlighted portion on there.  And I've placed that

8  highlighted portion on there for convenience of the jury and

9  yourself.  But it indicates there at 12/13/08 at 10:35 a.m., it

10  says "Injection 34 W089271A P-Plus KB."

11          What does that notation mean in your experience and

12  training?

13  A.   With this injection sheet -- I've only seen an injection

14  list.  This is probably my second time seeing an injection list

15  ever.  The case number, exhibit number, the P-Plus and KB is what

16  I type in to the instrument.  The date and time is something, and

17  injection 34 is something that the instrument notes that.  So

18  it's just the injection of that sample, the number of injection

19  of that sample, the date and the time that the sample was

20  injected.

21  Q.   And the machine generates this contemporaneously at least as

22  far as you're understanding is, contemporaneously with the actual

23  work on the sample, is that correct?

24  A.   Correct.

25  Q.   So in this particular injection, if you go to the end here

Brown - cross

1  and you looked towards the end, it looks like there were 50

2  injections that were done during this particular run, is that

3  correct?

4  A.  Yes, yes, it says injection 50, so yeah, that would have been

5  the 50th injection.

6  Q.  And going back to ours, it gives us some indication of what

7  went on at this particular time and location.  It says "Injection

8  5 seconds, 15, 25 minutes."  In your experience, does that "5

9  seconds," does that mean the amount of time that the sample

10  actually went into the machine?

11  A.  That's the amount of time that the sample was injected for.

12  Q.  All right.  And that would be consistent then -- and "P-Plus"

13  means Profiler Plus, is that correct?

14  A.  Correct.

15  Q.  And "CF" would be COfiler, is that correct?

16  A.  Correct.

17  Q.  And with respect to that notation there, "P-Plus KB 5

18  seconds," that would be consistent with the electropherogram that

19  was produced here, is that correct?  See how it says "5 seconds"

20  down here.  That's your handwriting on the bottom, correct?

21  A.  Correct.

22  Q.  And then on the top it says "W089271A P-Plus KB."  That's the

23  exact same notation that's right here, is that correct?

24  A.  Correct.

25  Q.  So when this electropherogram was created, it was created

251

Brown - cross

1   contemporaneously with this log right down here (indicating),

2   isn't that correct?

3   A.   It appears to be, yes.

4   Q.   Now, with respect to what I want to get to is right here

5   (indicating), if you look at this document, which is 22 of 43,

6   Bates stamped 295 on the bottom, this says "12/12/08 run KB"?

7   A.   Correct.

8   Q.   Now, with respect to the 12/12, this here says 12/13, which

9   would be the next day.  We can agree on that, is that correct?

10  A.   Correct.

11  Q.   Why is there a difference or a delineation between the 12/12

12  here and the 12/13 here?

13  A.   Because the run was started on 12/12, and if that was the

14  34th injection, it probably was injected on the second day.  By

15  the time it got to the 34th injection, it was then 12/13.

16  Q.   Well, with respect to that, for instance, shouldn't it say

17  right here in this area here, for instance, that the actual

18  injection time was 12/13/08 at 10:35:27 a.m.?  Shouldn't this

19  time stamp be right here so that we can ensure what time this

20  injection actually began?

21  A.   I'm not sure if you can set your instrument up to time stamp

22  this particular page.  So I guess maybe that's the reason for the

23  injection list.

24  Q.   And then with respect to the second part of this injection

25  list here, same thing, "12/13/08, injection 49 W089271A CF KB,"

Brown - cross

1 that would be consistent with the paperwork in this case, is that

2 correct?

3 A.  Correct, the case number and exhibit number and my initials,

4 yes.

5 Q.  And with respect to this, it says, "Inject 5 seconds, 25

6 minutes."  That means that another injection occurred, a 5 second

7 injection occurred, is that correct?

8 A.  Correct.

9 Q.  But the difference with this particular injection is that

10 it's CF, is that correct?

11 A.  Correct.

12 Q.  Now, "CF" stands for COfiler.  Is that also, are we agreeing

13 on that?

14 A.  Correct.

15 Q.  P-Plus is Profiler Plus.  CF is COfiler, is that correct?

16 A.  Correct.

17 Q.  What is the difference between Profiler Plus and COfiler?

18 A.  They're two different chemistries.  Profiler Plus looks at

19 more locations within that DNA profile.  And COfiler looks at a

20 different set of locations within the DNA profile.

21 Q.  Well, is it the same machine that does these examinations

22 then?

23 A.  Yes.

24 Q.  Is it the same sample for these particular examinations?

25 A.  No.  Those are two different samples.  It's the same DNA in

253

Brown - cross

1  the tube.  But there is a different set of chemicals in the

2  Profiler Plus tube, and there is a different set of chemicals in

3  the COfiler tube.

4  Q.  And just to be thorough, with respect to injection number 49,

5  if we looked at this document right here, you can see "12/12/08

6  run KB W099271A CF KB," that would be consistent with this right

7  here, is that correct?

8  A.  It's actually W08927.

9  Q.  But is there any doubt in your mind that the electropherogram

10 that was produced in this document, 5 seconds, W08, that's

11 consistent with injection number 49 in this injection log, is

12 that correct?

13 A.  Correct.

14 Q.  And it says right here "5 seconds," is that correct?

15 A.  Correct.

16 Q.  Now, you mentioned once again just right here (indicating),

17 it wouldn't indicate right here that the time and the date that

18 the actual injection went in to the particular machine?

19 A.  No.  In this instance, it doesn't.  I mean, I don't know if

20 our instruments can be set up that way.  I'm not sure.

21 Q.  But you're allowed to set up your instruments in ways that

22 are best for you, is that correct?

23 A.  Correct.

24 Q.  So, for instance, another gentleman is going to come in here.

25 His name is Blake Aper.  He does exactly what you do for a

Brown - cross

1  living, is that correct?

2  A.  Correct.

3  Q.  His machine may be set up a little bit different than yours?

4  A.  No.  We all use the same machines.

5  Q.  All use the same machines.

6        Well, you have ability though to set up in your machine,

7  for instance, filters to filter certain data, is that correct?

8  A.  Correct.

9  Q.  Well, there is default settings like 150 RFUs, that would be

10  a default setting of the machine, is that correct?

11  A.  Correct.

12  Q.  But you could set that much, much lower, isn't that correct,

13  if you wanted to?

14  A.  If I wanted to, yes.  But we have a procedure in which we

15  have to follow.

16  Q.  Well, it also gives you some ability to do some type of input

17  to the machine that would allow you to switch what widths to

18  screen for for a particular identification, is that correct?

19  A.  I don't understand the question.

20  Q.  Well, you mentioned that these peaks, they have certain

21  widths and that was significant.  That was how you were able to

22  tell it was significant, if there were certain peaks, is that

23  correct?

24  A.  Correct.

25  Q.  You can screen or filter how wide a particular allele or a

255

Brown - cross

1  particular peak is, you can set the machine up to filter that

2  out, isn't that correct?

3  A.  I'm not sure I understand that question.

4  Q.  I'll move along.

5        The printing of the graphs itself, there is a setting on

6  the machine that allows you to set what type of smoothing is used

7  to smooth out particular areas of the graph, is that correct?

8  A.  Correct.

9  Q.  And you can choose three particular things at that location.

10  It says "none," "medium" or "light" or "heavy," is that correct?

11  A.  I'm not sure what the setting choices are.

12  Q.  Do you know what the smoothing was for the charts that you

13  created on this particular day?

14  A.  No.

15  Q.  Now, with respect to these injection logs, if you do a 10

16  second run, this, for instance, it says "12/13/08, run

17  completed."  That means it's finished, is that correct?

18  A.  Correct.

19  Q.  You then went on and did some 10 second runs, is that

20  correct?

21  A.  Correct.

22  Q.  Do you know or does there exist an injection log much the

23  same as this injection log for the 10 second run?

24  A.  There should be.

25  Q.  But you don't know?

Brown - cross

1  A.  There should be.

2  Q.  Well, isn't it true, Miss, that it doesn't produce this type

3  of data for a 10 second run, because you're pushing the machine

4  past its designed limits from 5 to 10 seconds, isn't that true?

5  A.  I'm not aware of that.

6  Q.  Oh, and just one last thing.  The machine seems to have a lot

7  of options, the injection log and things along those lines.  It

8  seems to have a lot of options to keep track of particular

9  information.

10        The only thing that we have with respect to Profiler

11  Plus as to whether or not this is a 5 second in this sample here

12  or a 10 second in this sample here is you physically writing at

13  some time after the fact what is going on, is that right?

14  A.  What was the question?

15  Q.  Well, the only way that you can keep track of a 5 second run

16  versus a 10 second run is if, in fact, you write on here "5

17  seconds," "10 seconds," is that correct?

18  A.  Correct.

19  Q.  And without the benefit of this injection log, which is right

20  here in "5" where it says on here, the machine generates, it says

21  "5 seconds" right here, there is some reliability that your 5

22  seconds here is corroborated by this injection log, is that

23  correct?

24  A.  Correct.

25  Q.  But we don't have any injection logs for the 10 second runs,

Brown - cross

1  is that also correct?

2  A.  I'm not sure what was all given in the packet that you have.

3  Q.  Well, let me ask you this, is this the only thing that you

4  have -- and I'm right here.  This is W089271A P-Plus KB.  That's

5  the sample number, is that correct?

6  A.  Correct, the case number and exhibit number.

7  Q.  And the "P-Plus" means Profiler Plus.  That's one type of

8  amplification or one packet of amplification chemicals that you

9  use, is that correct?

10  A.  Correct.

11  Q.  But the only way that we know that this is a 10 second

12  amplification right here is because you physically wrote it down

13  with your hand, is that correct?

14  A.  Correct.

15  Q.  There is no way to tell from this document in any way, shape,

16  or form, there is nothing that the machine records in this

17  document that tells us whether this run was 5 seconds, is that

18  correct?

19  A.  Correct.

20  Q.  There is nothing that tells us whether it was 10 seconds, is

21  that correct?

22  A.  Correct.

23  Q.  And there is nothing that tells us whether it was 15 or 20

24  seconds, is that correct?

25  A.  Correct.

258

Brown - cross

1  Q.  And this is a very, very important thing down here, this 10

2  seconds, isn't it?  Is that an important notation?

3  A.  Correct.

4  Q.  The reason why that's important is because when you amplify a

5  sample beyond 5 seconds, it causes the machine to go a little

6  bit -- it causes it to make mistakes, doesn't it?

7  A.  No.

8  Q.  Well, in this particular case, and I'll just point this out

9  since I have the chart up here right here right now, right here

10  (indicating), for instance, isn't it true you could have just

11  amplified the sample to 20 or 30 seconds and gotten a reading of

12  these two particular peaks right here?

13  A.  No.

14  Q.  With respect to these two particular peaks right here, these

15  were not used in the analysis at all, is that correct?

16  A.  No.

17  Q.  And the reason why is because the machine automatically

18  screened that out, is that correct?

19  A.  No.

20  Q.  These boxes right here, these are generated by the machine,

21  is that correct?

22  A.  Correct.

23  Q.  But all you have to do to eliminate those boxes is to click

24  on this peak right here, and the boxes disappear, isn't that

25  correct?

259

Brown - cross

1  A.  I'm not sure.  I've never tried that.

2  Q.  Well, with respect to these two peaks right here, you

3  amplified it.  You got some type of noise right here or you got

4  two peaks, it looks like two peaks to me.  What are the RFUs and

5  what are the numbers that are associated with those two peaks?

6  A.  I don't know.  Actually I wouldn't call them peaks.  They're

7  not above our threshold of 150.

8  Q.  Well, did you do any further analysis or did you do anything

9  to preserve what those particular peaks were?

10 A.  No.

11 Q.  It looks like DNA, is that right?  There is two peaks, one

12 for the mother, one for the father if you look right here, is

13 that correct?

14 A.  Correct.

15 Q.  One for the mother, one for the father right here, correct?

16 A.  Correct.

17 Q.  One for the mother, one for the father here, correct?

18 A.  There just appears to be two bumps there.  I don't know if

19 they're alleles or what.  They weren't called by the instrument.

20 Again, if they were true alleles, they're not above 150 for the

21 instrument to call them.  So I'm not sure what they represent.

22 Q.  Well, you had color-coded charts, is that correct?

23 A.  Yes.

24 Q.  The color-coded charts are based on what type of primer was

25 used, is that correct?

Brown - cross

1  A.  Correct.

2  Q.  Isn't it true that certain colors of primer, yellow, blue,

3  and green, for instance, you have to have above 150 RFUs to call

4  those particular peaks?

5  A.  Correct.

6  Q.  But there is different color primers like red, for

7  instance -- and you're an expert.  I'm not an expert -- that you

8  can actually call a peak at much less than 150 RFUs, isn't that

9  true?

10 A.  You're asking would I call it a true allele if it was below

11 150?

12 Q.  Correct.

13 A.  That's possible.

14 Q.  Well, what were the RFUs for these two, these two male and

15 female peaks right here?

16 A.  I don't know.

17 Q.  You don't know.

18         And the truth of the matter is at any of these

19 particular locations, when you match the DNA to John Ford's DNA,

20 if any one of these locations is different than John Ford's DNA,

21 he is excluded.  He is not the person that did this.  Is that

22 correct?

23 A.  I didn't match this profile to John Ford's DNA, so I don't

24 know.

25 Q.  But generally, you have training in that particular area, if

Brown - cross

1  there is one dissimilarity in any of these areas, for instance,

2  if this is a 30, and John Ford is a 31, if 31 and 30 didn't match

3  at this particular location, you would call that an exclusion, is

4  that correct?

5  A.  Correct.

6  Q.  So it's fair to say that with appropriate technology we could

7  determine at this location whether this is significant, isn't

8  that correct?

9  A.  I'm not aware of other technology that may be able to call

10 those bumps.

11 Q.  Well, with respect to the number of alleles or loci in a

12 particular DNA strand, would it be fair to say that there is over

13 3 billion places that you could pair a DNA strand?

14 A.  Over 3 billion?  I'm not sure about the number.

15 Q.  But it's fair to say that if you're only checking for 13

16 locations, that's substantially less than the number of total

17 locations or loci of a DNA strand that you could examine, isn't

18 that correct?

19 A.  Correct.

20 Q.  And this was not significant at all to you?  You didn't do

21 anything to determine what the numbers were at this particular

22 location?

23 A.  Yes.  There was a 10 second injection done in trying to pull

24 up more of the DNA profile.  And with the 10 second injection,

25 with this particular sample at that location, nothing additional

Brown - cross

1  was retrieved.

2  Q.  I'm just curious about this down at the bottom.  "Printed by

3  GMID."  What is GMID?

4  A.  I just believe that is the software that is used.

5  Q.  The software that's used by the machine?

6  A.  Correct.

7  Q.  Or do the results come out of the machine, and then they're

8  printed somewhere else by some software somewhere?

9  A.  No.  The software used by the instrument.

10  Q.  So is that automatic, when it says "Printed by GMID," is that

11  automatic, or do you have to make some type of additional

12  analysis to make the software run?

13  A.  No.  That's automatic.

14  Q.  Miss, with respect to DNA analysis, there is all kinds of

15  checks and balances that are used to determine whether the

16  machine is running appropriately.  And with that in mind, there

17  is something that's called an allelic ladder.  Do you know what

18  an allelic ladder is?

19  A.  Yes.

20  Q.  What is an allelic ladder?

21  A.  The allelic ladder is basically a chemical that is used with

22  common known alleles, or those numbers that are representative

23  that you retrieve from your mother and father, they're common --

24  it's a mixture of common, of all those common alleles that you

25  can acquire from your parents.

263

Brown - cross

1  Q.  Before you run any type of sample, is it fair to say -- and

2  I'll just show this for demonstrative purposes, this is actually

3  a chart that was created by Blake Aper.  It's significant,

4  because it's for the sample that he ran.

5         But you've seen this document before, is that correct?

6  It's a number of pages long, is that correct?  Those are allelic

7  ladders?

8  A.  It appears to look like a ladder, yes.

9  Q.  Did you make any attempt or efforts to print an allelic

10  ladder with respect to the running of the samples in this

11  particular case?

12  A.  No.

13  Q.  Is that significant in any way, shape, or form?

14  A.  No.

15  Q.  With respect to the allelic ladder though, just going back

16  here, I'm looking, I've just chosen one at random here, W0892718,

17  this is Bates stamped 296, 296, page 23 of 43, isn't it true that

18  the allelic ladder is important to run at the beginning of each

19  sample, because the allelic ladder tells you where to look for a

20  particular allele or a particular location, isn't that correct?

21  A.  Correct.

22  Q.  So right here, for instance, and I'll choose these two,

23  because they're the easiest to pronounce.  But this here says

24  UWA.  And this one here from here to here says FGA.  That

25  determines, for instance, where to look on the electropherogram

Brown - cross

1  for a particular location, isn't that correct?

2  A.  It doesn't necessarily determine where to look.  I mean, it's

3  labeled VWA.  So I know the alleles that fall under that label

4  are the alleles within VWA location.

5  Q.  Well, for instance, the allelic ladder is important, because

6  say you had a huge peak over here.  You wouldn't look over here

7  for this allele, would you?

8  A.  Would I look at that location for that allele?

9  Q.  Say it came up right here over in this area before it gets to

10  this particular location, would you look over there if you saw a

11  peak, for instance, right here (indicating), would you call that

12  a peak or --

13  A.  I would look to see if that allele was represented in the

14  ladder.

15  Q.  But you didn't print a ladder for this particular sample, is

16  that correct?

17  A.  Correct.

18  Q.  The reason I ask is because when we went back, when you ran

19  the blank yesterday, we had a problem with one of the blanks.

20  You remember that, is that correct?

21  A.  Correct.

22  Q.  It says 10 seconds.  And you came up and you ran the blank

23  sample when you expect this chart to have absolutely nothing on

24  it, is that correct?

25  A.  Correct.

265

Brown - cross

1  Q.  And it had this "11" right here, is that correct?

2  A.  Correct.

3  Q.  And that was important to you.  You thought that that was

4  significant that there was a problem, because it says right down

5  here -- what does that say, Miss?

6  A.  It says "10 seconds will reinject."

7  Q.  All right.  So then you went and you reinjected it, is that

8  correct, in this one here, and you get another bump.  This is the

9  control sample, is that correct, MB-1 P-Plus 10 seconds.  This is

10 the reinjection, is that correct?

11 A.  Correct.

12 Q.  And here you get a notation, you get a bump, and it says

13 "OL"?

14 A.  Correct.

15 Q.  176.  What does "OL" mean?

16 A.  "OL" stands for off ladder.

17 Q.  And off ladder means that it's not on the allelic ladder, is

18 that correct?

19 A.  Correct.

20 Q.  We don't have the allelic ladder though, is that correct?

21 A.  Correct.

22 Q.  And even though it comes under this portion right here,

23 DAS1179, the machine has decided or you have decided that this is

24 off ladder.

25 A.  That's what the machine labeled it as, yes.

Brown - cross

1  Q.  So you recognized that there was a problem, you did it again,

2  and you got the exact same problem again, is that correct?

3  A.  No.  Actually, in the first injection the allele was called

4  an 11.  In the second injection it was not called.

5  Q.  You mentioned in your direct testimony that you're required

6  to do a DNA yield assessment, is that correct?

7  A.  I'm not sure what you're talking about.

8  Q.  Well, you're required to quantify the amount -- well, here is

9  what I'll do.  This is Bates stamp number 282.  It says "Page 9

10 of 43."  This would be exhibit Government Exhibit number 20.

11          MR. PETRO:  May I approach her please, Judge?

12 BY MR. PETRO:

13 Q.  You already have it.  This particular document here requires

14 you to quantify the amount of DNA that you have, is that correct?

15 A.  Correct.

16 Q.  And in this particular document here --

17          MR. PETRO:  May I display this, please, Judge?

18 BY MR. PETRO:

19 Q.  In this particular document right here, it says ".648

20 nanograms/UL," is that correct?

21 A.  Correct.

22 Q.  Is that your handwriting on this particular document?

23 A.  Yes.

24 Q.  It says right up here the sample number W089271A, correct?

25 A.  Correct.

Brown - cross

1   Q.   Now, that number is significant, isn't that true?

2   A.   Correct.

3   Q.   It's one of the most important numbers that you calculate,

4   because the machine requires a certain amount of DNA to run

5   reliably, isn't that true?

6   A.   Correct.

7   Q.   And in this particular case, .648 nanograms per what?

8   A.   Per microliter.

9   Q.   That's what this little "U" is, microliter?

10  A.   Yes.

11          MR. PETRO:  May I approach, Judge?

12  BY MR. PETRO:

13  Q.   I'm going to show her what has been labeled Defendant's

14  Exhibit No. 6 for identification.  Could you take a look at this

15  please and tell me, I realize and recognize that it's not the

16  exact manual, but do you recognize what it is in that particular

17  book right there?

18  A.   Appears to be the Profiler Plus User's Manual.

19  Q.   Now, Profiler Plus are the chemicals that you inject to get

20  these readings, is that correct?

21  A.   Right, one of the chemicals used.

22  Q.   You're familiar with that document.  That's the document that

23  you used to run the machine, is that correct?

24  A.   I'm not sure what year document you have.

25  Q.   Well, it's the one that was on the Internet.  So it would be

Brown - cross

1  whatever year was on the Internet.

2  A.  I don't know what year was on the Internet.

3  Q.  Well, have there been substantial variations to this

4  particular document?

5  A.  I'm not sure.

6  Q.  Well, one of the things I wanted to ask you about, for

7  instance, in this manual, it starts out in the introduction, it

8  basically tells you that the amount of DNA that you need to

9  reliably run the Profiler Plus packet is 1 to 2.5 nanograms per

10  milliliter, is that correct?

11  A.  I'm not sure.  I can't see the document.

12  Q.  Well, in your training, isn't that true that you're looking

13  for the amount of DNA between 1 and 2.5 nanograms per milliliter?

14  A.  No.

15  Q.  Well, for instance, on page I-9 --

16          MS. BELL:  Objection, Your Honor.  I don't believe

17  Mr. Petro has laid a foundation.

18          THE COURT:  She said she didn't know, counsel.

19          MR. PETRO:  Well, I can ask her if she's familiar with

20  this.

21  BY MR. PETRO:

22  Q.  It says here the recommended range of input sample DNA is 1

23  to 2.5 nanograms.  So it is important that the DNA be quantified

24  prior to amplification.

25          Is that a true statement, Miss?

269

Brown - cross

1  A.  Yes.

2  Q.  And then later on if you go through the manual, on page 4-1,

3  it says "DNA quantification is particularly important for amp STR

4  Profiler Plus amplifications where optimal results are obtained

5  using a range of 1.0 to 2.5 nanograms of input DNA."

6          MS. BELL:  Objection.

7  BY MR. PETRO:

8  Q.  Is that a true statement, Miss?

9          MS. BELL:  Objection again, Your Honor, relevancy,

10  foundation.

11          THE COURT:  Overruled.

12  BY MR. PETRO:

13  Q.  Is that a true statement?

14  A.  It sounds correct.

15  Q.  And then later on in the manual, later on in the manual in

16  12-10, it says, "The amp FLSTR Profiler Plus PC amplification kit

17  has been optimized to amplify approximately 1.0 to 2.5 nanograms

18  of sample DNA reliably."

19          And then it goes on to say, "The suggested minimum peak

20  height threshold for detection and assignment of genotypes is 150

21  relative florescent units."

22          Is that a true and accurate statement to the best of

23  your training and ability, Miss?

24  A.  Correct.

25  Q.  I want to go back to this particular document here.  And I'm

1  not picking it for any particular reason.  But you did comment

2  upon it yesterday.  This document here says "Positive P-Plus KB

3  12/12/08 run KB."

4         This is the standards that you put into the machine to

5  determine if the machine is running reliably, is that correct?

6  A.  Correct.

7  Q.  And you stated yesterday that you receive industry-grade

8  samples from Applied Biosystems, and that they know these are the

9  particular measurements at those particular locations, is that

10 correct?

11 A.  Right.  They're particular alleles for that profile.

12 Q.  Now, yesterday there is only one allele here.  This is a

13 locus, right?  This is the amelogenin locus.  And yesterday we

14 talked about the amelogenin locus or whatever.  I'm saying it

15 close, but I'm not sure that I'm a hundred percent right.  But

16 you said that there is an X here, is that correct?

17 A.  Correct.

18 Q.  And that even though there was only one X at that particular

19 location, you knew that it was from a female, is that correct?

20 A.  Correct.

21 Q.  Wouldn't it be true that a female would have an X,X at this

22 particular location?

23 A.  A female does have an X,X.  But if it's there twice, the

24 instruments represents it, presents it as one X.

25 Q.  What about this one right here where it says 13?

271

Brown - cross

1  A.  Right.  That particular --

2  Q.  Is that a 13,13 then?

3  A.  Correct.

4  Q.  And then there is only one allele, but it's a 13,13, is that

5  correct?

6  A.  Correct.

7  Q.  And then like for instance right here, it's 30.  Is that a

8  30,30 then?

9  A.  Correct.

10 Q.  And that's because at a particular location if you only have

11 one allele, that the machine will call it as two alleles for all

12 practical matter, is that correct?

13 A.  No.  Incorrect.

14 Q.  Well, an X, one allele X is an X,X, is that correct?

15 A.  Correct.

16 Q.  And one allele 13 is a 13,13, is that correct?

17 A.  Correct.

18 Q.  And then you have the 30,30,30, is that correct?

19 A.  Correct.

20 Q.  Then you have the 11, which would be an 11,11 at that

21 particular location, is that correct?

22 A.  Are you at D-5?

23 Q.  Yeah.

24 A.  Yes.

25 Q.  And then down here, this would also be an 11,11, is that

Brown - cross

1  correct?

2  A.  Correct.

3  Q.  Now, with respect to the general structure of this chart, the

4  reason why these peaks get lower and lower is because the length

5  of the DNA gets higher and higher, isn't that correct?

6  A.  Correct.

7  Q.  And if you see degradation in the sample DNA, you're

8  generally going to see it over on this end of the graph, isn't

9  that correct?

10 A.  Correct.

11 Q.  And that's because when that end of the graph, the larger

12 strands of DNA break up and are destroyed easier than the smaller

13 strands of DNA, is that correct?

14 A.  Correct.

15 Q.  Now, on 12/12 you did a 5 second run for COfiler.  You do a 5

16 second run, and right here -- can you see that document, Miss?

17 It's page 297, 24 of 43.  I don't mind if you look at your one in

18 front of you.

19         But in that 5 second run right here, you call that peak

20 or the machine calls that peak an 11, is that correct?

21 A.  Correct.

22 Q.  And you interpret that particular result at that particular

23 location an 11,11, is that correct?

24 A.  I'd have to refer to my summary sheet.

25         MR. PETRO:  Do we have the summary sheet?

273

Brown - cross

1  BY MR. PETRO:

2  Q.  I'm going to show you what has been labeled 253 for

3  identification.

4      (Discussion off the record.)

5  BY MR. PETRO:

6  Q.  All right.  This is part of Government's Exhibit 20 for the

7  record.

8          MR. PETRO:  May I approach the witness please, Judge?

9  BY MR. PETRO:

10 Q.  If you look at that, can you take a look at that, please, and

11 tell me if you recognize what that particular document is?

12 A.  It appears to be a summary sheet.  But it's not mine.

13 Q.  That is not yours?

14 A.  No.

15         MR. PETRO:  I'm sorry, Judge, I'm going to have to do

16 this one more time, if I may?

17         Number 252, Government's Exhibit -- I'm sorry, counsel,

18 number 252, Government's Exhibit.  That's the problem with

19 papers, they all look the same.

20 BY MR. PETRO:

21 Q.  Could you take a look at that document and tell me if you

22 recognize what that is?

23 A.  Yes.

24 Q.  What is that?

25 A.  It's my summary sheet in which I recorded the DNA profile.

Brown - cross

1  Q.  And with respect to this particular profile, that's where you

2  actually apply your training to determine whether or not that

3  that profile is an 11 or an 11,11, is that correct?

4  A.  Correct.

5  Q.  And in this particular case it says "Swab from mask" right up

6  here.  So this is your work, is that correct?

7  A.  Correct.

8  Q.  In this particular case at that location, D16S539 from the

9  electropherogram on 297, and then we have D16S539 here, you call

10 that an 11,11, is that correct?

11 A.  Correct.

12 Q.  Now I'm showing you the 10 second run here, W089271AP

13 Profiler Plus KB, 10 seconds, is that correct?

14 A.  Correct.

15 Q.  Now, on this particular chart right here, you have a 17, is

16 that correct?

17 A.  Correct.

18 Q.  But in this particular chart here, even though you only have

19 a 17, in your summary chart you say it's 17,INC, is that correct?

20 A.  Correct.

21 Q.  That is your subjective determination, is that correct?

22 A.  Correct, through my training.

23 Q.  Through your training.  This one here is an 11,11 because of

24 your training.  But this one here is not a 17,17?

25 A.  Correct.

Brown - cross

1  Q.  But it could be a 17,17, isn't that correct?

2  A.  Right, it could be.

3  Q.  Well, that's important though, because a 17,INC is different

4  than a 17,17, isn't it?

5  A.  Correct.

6  Q.  This is the most important part of the case, isn't it, this

7  "INC" right here.  You amplify it from 5 seconds, at 5 seconds

8  you get no result at that particular location, isn't that

9  correct?

10 A.  I don't understand.

11 Q.  Let me go ahead and show it to you.

12 A.  Yeah.

13 Q.  I get so excited when I do DNA.  I'm sorry.  Just give me one

14 second here.

15        If you look right here, same thing, P-Plus KB W08927

16 Profiler Plus.  If you look at D18S51, here is the 10 second,

17 here is the 5 second.  When you look at the 5 second, right here

18 (indicating), you don't get any reading there, is that correct?

19 A.  Correct.

20 Q.  Nothing?

21 A.  Correct.

22 Q.  And then you amplify it to 10 seconds?

23 A.  I reinject it for 10 seconds.  I don't amplify it.

24 Q.  You reinjected it for 10 seconds.  I don't have my

25 nomenclature down exactly.  You reinject it for 10 seconds, and

276

Brown - cross

1  you get a 17?

2  A.  Correct.

3  Q.  And you're not sure if it's a 17,17 or just a 17 with a

4  missing allele, is that correct?

5  A.  Correct.

6  Q.  And it's not uncommon for you to get a loci with only one

7  allele, is that correct?

8  A.  Correct.

9  Q.  And if you're missing one allele, you have substantial

10 discretion as to whether to label that missing allele allelic

11 drop-out -- you're familiar with that term, aren't you?

12 A.  Correct.

13 Q.  That means a missing allele, is that correct?

14 A.  Correct.

15 Q.  But you can also call it a 17,17 if you wanted.  You could

16 call this a 17,17, is that correct?

17 A.  I wouldn't with my experience and knowledge of that peak

18 being that it was only brought up through a 10 second injection

19 and not in the 5 second injection.

20          And the 193, the RFUs, it's not far over 150.  If you

21 look prior to that allele, that peak, there is an additional

22 small peak there.  There could be an additional allele that's

23 below 150 that didn't get called.

24          So to be on the conservative side, it's labeled as a

25 17,INC in case there is an additional allele there that is below

Brown - cross

1  the threshold.

2  Q.  But it could be a 17,17, is that correct?

3  A.  Correct.

4  Q.  What you are just doing is making an educated guess, is that

5  correct?

6          MS. BELL:  Objection, Your Honor, argumentative.

7          THE COURT:  She's an expert.

8  BY MR. PETRO:

9  Q.  Is that correct?

10  A.  What was the question again?  I'm sorry.

11  Q.  You're just making an educated guess then it sounds like?

12  A.  Through my training and experience, yes.

13  Q.  Now, there is other differences that occur between the 5 --

14          MR. PETRO:  I'm sorry.  Strike that, Judge.

15  BY MR. PETRO:

16  Q.  I just want to get the whole procedure down in my mind.  You

17  do a 5 second run, is that correct?

18  A.  Correct.

19  Q.  And you inject blanks, is that correct?

20  A.  Correct.

21  Q.  And then the 5 second run is inadequate, is that correct?

22  A.  No.

23  Q.  Well, was the 5 second run adequate?

24  A.  Yes.

25  Q.  But then you went ahead and did a 10 second run, is that

278

Brown - cross

1  correct?

2  A.  Correct.

3  Q.  And in the middle, what happened somewhere in the middle or

4  somewhere right around there is you inject these blanks in, and

5  you get the false 11 or what you've labeled a false 11, is that

6  correct?

7  A.  Correct.

8  Q.  And that sends up some type of signal from your experience

9  and training that something is wrong, is that correct, because

10  you did it again?  You redid that blank sample, is that correct?

11  A.  Right.  I did it for verification purposes.

12  Q.  And then you run the 10 second run, and you get this 17,INC,

13  is that correct?

14  A.  I got the 17, yes.

15  Q.  But there is inherent problems because of that 11, that

16  marking of the 11 on the blank, you can't trust those results, is

17  that correct?

18  A.  Incorrect.

19  Q.  And this is on top of the fact that if you go, you're

20  starting with a substandard sample size at .648 nanograms per

21  milliliter, isn't that correct?

22  A.  Incorrect.

23  Q.  The machine says that you should run between 1.0 nanograms

24  per milliliter and 2.5 nanograms per milliliter, is that correct?

25  A.  Incorrect.

Brown - cross

1  Q.  Well, I just went through all those statements, and you said
2  that they were true statements, isn't that true?
3  A.  It was not per milliliter.  It's per microliter.  And I
4  believe it's a total amount of 1 to 2 and a half nanograms, not
5  per microliter.
6  Q.  Well, that's what it says right here, it says nanograms per
7  microliter right here.  That's what you told us.
8  A.  That's on my paper.  That's not what you read out of the
9  manual.
10 Q.  Well, let's go to this next page then.  What is this column
11 right here?  And I'm showing you Government Exhibit 2283, right?
12 Do you see this column right here "dilution for amplification"?
13 A.  Yes.
14 Q.  Right here you have 38.34 nanograms per milliliter, right?
15 A.  I can't see that.
16 Q.  Per microliter?  I'm sorry.  Is that correct?
17 A.  Correct.
18 Q.  And because of that, you dilute it.  Right here, do you see
19 that?
20 A.  Correct.
21 Q.  When you get down here, for instance, if you look
22 consistently down the line here, you have .0876, which is under
23 1.0 nanograms.  So it says "dilution for amplification," "No."
24        And then if you go right here, this is our sample, .648,
25 that's less than 1.0 nanograms per microliter.  It says

Brown - cross

1  "dilution," "No."

2       And then it says right here, another sample apparently

3  run on the same day, you have 1.48, and it says "dilution," "No."

4  Is that correct?

5  A.  Correct.

6  Q.  This is a very, very small sample, and because it's a small

7  sample, you can't dilute the sample, isn't that correct?

8  A.  Per microliter, it's a small sample.  Total volume, it was

9  not a small sample.

10  Q.  Well, the volume comes from you though?

11  A.  Correct.  But it was the total amount of DNA.

12  Q.  Well, it's a small sample though, right?

13  A.  In retrospect to the other ones on that list, yes.

14  Q.  It's nowhere near 38.34, is it?

15  A.  No.  But those are two totally different types of samples.

16  Q.  I'm almost done, Ms. Brown.  I appreciate your patience in

17  educating me about this.

18       Now I'm going to go back.  This is the P-Plus run,

19  Profiler Plus run 12/16.  This is a 10 second run, same sample.

20  Those are your initials, is that correct?

21  A.  Correct.

22  Q.  Now, for instance, at this location right here (indicating),

23  you get something right here, Miss, is that significant?

24  A.  No.

25  Q.  Why is it not significant?

Brown - cross

1  A.  Nothing was called by the instrument.  And if you look

2  according to your -- on the ladder, there is no location prior to

3  amelogenin.

4  Q.  But you never preserved the ladder though, so we don't know.

5  Is that fair to say?

6  A.  The ladder wasn't printed off.  It wasn't required when I did

7  DNA on this case.

8  Q.  So the only reason that you know it's not on the ladder, we

9  don't have any records to show what the ladder is that particular

10  day?

11  A.  I don't understand that question.

12  Q.  I'll move on.

13        If you go to the COfiler, same sample, COfiler KB 12/16.

14  This is the 10 second run.

15        Now, right here, this gives me some concern right here,

16  because we have a tall peak.  It would look like it would be

17  consistent with an allele.  And that peak looks like it's over --

18  I mean, I'm just guessing, but we're looking at approximately,

19  you know, if this one here is 768 -- and I'll zoom out so you can

20  look at it, I'm looking at it right here -- if this one here is

21  768, if we look over here, this is a very tall peak right here,

22  it's like 1,000, 1100 or something.

23        What would your experience say that that particular peak

24  is?

25  A.  It's a tall something.  If it was an allele, it would have

282

Brown - cross

1  been labeled.  But again, being that there is no location before

2  the sex chromosome, they can't be peaks or alleles.

3  Q.  Well, that's an awful tall peak to disregard, wouldn't you

4  agree?

5  A.  No.

6  Q.  Well, did you do any further analysis with respect to that

7  peak?

8          I remember when you did the blanks, when you saw

9  something that was strange, you did some additional analysis.

10 Did you do anything with respect to the analysis of this peak

11 here to determine what it was?

12 A.  No, because I know there is no DNA location there before the

13 sex chromosome.

14 Q.  And you know that because of the allelic ladder, is that

15 correct?

16 A.  Correct.

17 Q.  But we don't have the allelic ladder, is that correct?

18 A.  Correct.

19 Q.  With respect to this particular chart here, did you prepare a

20 chart like this for the 5 second run?

21 A.  This chart represents the 5 and the 10 together.

22 Q.  Okay.  Isn't it true when you ran or you amplified the sample

23 from 5 seconds to 10 seconds, you were able to get additional

24 information from the sample?

25 A.  Correct.

283

Brown - redirect

1  Q.  So you get the best of both worlds when you print this out,

2  is that correct?

3  A.  When I composed that chart, I get my total representation of

4  both the 5 and the 10 together and then record it on this summary

5  sheet.

6          MR. PETRO:  May I have one second, please, Judge?

7      (Discussion off the record.)

8          MR. PETRO:  Judge, I have no additional questions.

9  Thank you.

10          MS. BELL:  Redirect please, Your Honor?

11                      REDIRECT EXAMINATION

12  BY MS. BELL:

13  Q.  Good morning, Ms. Brown.

14  A.  Good morning.

15  Q.  Directing your attention to the first page of what has been

16  marked as Defense Exhibit 5, does this injection log reflect when

17  the run started for the DNA?

18  A.  It appears to look like it was started December 12, 2008 at

19  5:11 p.m.

20  Q.  And are you looking at the line that I'm highlighting right

21  here?

22  A.  Okay.  Yes.

23  Q.  Ms. Brown, is it a common and accepted practice to do a

24  second run for 10 seconds when you obtain a less than complete

25  DNA profile?

Brown - redirect

1  A.  Yes.

2  Q.  And what's the purpose of doing that additional run?

3  A.  The purpose of injecting the sample for 10 seconds is to try

4  to pull up additional alleles or additional DNA profile.

5         With the 10 seconds, the instrument stays in the sample

6  longer and pulls up more of the sample in hopes to try to bring

7  up additional profiles.

8  Q.  And do you review and interpret the results you receive from

9  the digital analyzer?

10  A.  Yes.

11  Q.  There was some discussion about whether there was one number

12  or two at a location.  I'd like to have you look at what's in

13  evidence as Government Exhibit 20, which is your summary chart of

14  the DNA profile in this case.

15         If we go down and we look at location D15S51, you have

16  17,INC.  When you're reviewing the results from the digital

17  analyzer, how do you know whether that is a 17,17 or in this case

18  you chose to say 17,INC?

19  A.  Based on experience and training, when I looked at that

20  sample, it appeared, I'd say the peak height of that sample was

21  barely above our 150 threshold.  There was an additional peak or

22  bump prior, before that, and so to be more conservative, instead

23  of saying it's a 17,17 without actually knowing if something

24  that's barely there under the threshold it's called a

25  17,inconclusive, which is then also peer reviewed by another

Brown - redirect

285

1  analyst to confirm that that is the best call for that location.

2  Q.  And let's look at one more location on Government Exhibit 20.

3  Directing your attention to location D16S539.  You have another

4  column for swab from mask 11,11.  How did you make that

5  determination that those were both 11s there?

6  A.  There appear to be no additional information or additional

7  cause of concern that there may be another allele or another peak

8  there not called.

9  Q.  You testified and spoke a lot with Mr. Petro about the

10 different standards and controls that you ran on the machine

11 before running the DNA sample in this case.  Through the

12 standards and controls you ran, were you able to determine that

13 the digital analyzer you used to generate the DNA profile in this

14 case was properly functioning?

15 A.  Yes.

16 Q.  Is the equipment used by the Illinois State Police lab for

17 DNA analysis like this digital analyzer accepted and commonly

18 relied upon in the general scientific community?

19 A.  Yes.

20 Q.  Does use of such equipment fall within the guidelines for DNA

21 testing that are set up by the National Research Council and the

22 DNA Advisory Board?

23 A.  Yes.

24 Q.  Does use of such equipment also fall within the ISO or

25 international standard for quality certification, which you

Brown - redirect

1  previously testified that the Illinois State Police Forensic

2  Crime Lab had?

3         MR. PETRO:  Objection, Judge.  She asked two questions.

4  It's a two-part question.

5         THE COURT:  If I held you to that standard, we'd be here

6  all day.  I think we're going to be here all day.  Overruled.

7  BY THE WITNESS:

8  A.  Yes.

9  BY MS. BELL:

10  Q.  Ms. Brown, would it even be possible, let alone practical for

11  a forensic scientist to ever attempt to determine a DNA profile

12  by hand?

13  A.  No.

14  Q.  You testified that the ISP lab also had a peer review

15  process.  What does that entail?

16  A.  At the finishing of a case, after the case is completed --

17         MR. PETRO:  Judge, I'm going to object.  This calls for

18  a hearsay answer I believe if she's going to testify to the peer

19  review.

20         THE COURT:  She's an expert.  Overruled.

21  BY THE WITNESS:

22  A.  When I'm finished working a case, I get a packet together or

23  a case file together with all of my notes and analysis that I did

24  from the beginning to the end of the process with that sample.

25  It is then given to a peer of mine, who goes through all of my

Brown - redirect

1  paperwork and my analysis and verifies and rechecks that

2  everything I did was done correctly and that my results have been

3  interpreted properly.

4  BY MS. BELL:

5  Q.  Who conducted the peer review with respect to your analysis

6  in this case?

7  A.  I believe it was analyst Blake Aper.

8            MR. PETRO:  Judge, I'm going to object to what she

9  believes.  This is ultimately going to call for a hearsay answer.

10 It's going to be offered for the truth.

11           MS. BELL:  I believe if Ms. Brown could refer to her

12 case file as far as her notes?

13           THE COURT:  Go ahead.

14 BY THE WITNESS:

15 A.  Yes.  It was peer reviewed by analyst Blake April.

16 BY MS. BELL:

17 Q.  Ms. Brown, did the results in this case show any evidence of

18 contamination?

19 A.  No.

20 Q.  If another person's DNA had gotten mixed into this sample,

21 would you know?

22 A.  Yes.

23 Q.  How is that?

24 A.  On those sheets where the alleles are present, where the DNA

25 profile, whenever there is more than two peaks at one specific

Brown - redirect

1  location that are called, that shows that there is an additional

2  person, an additional profile mixed in with that sample.

3  Q.  How many people contributed to the DNA profile in this case?

4  A.  One.

5  Q.  And was that person male or female?

6  A.  Male.

7         MS. BELL:  No further questions, Your Honor.

8         MR. PETRO:  Nothing Judge.

9         THE COURT:  All right.  You're excused.  Thank you.

10     (Witness excused.)

11         THE COURT:  Call your next witness, please.

12         MR. PETRO:  Judge, may I take just a slight break for

13  one second?

14         THE COURT:  I'd like to keep going, counsel.

15         MR. PETRO:  Okay.

16         THE COURT:  We're running late.

17     (Witness excused.)

18         MS. BELL:  Your Honor, the government calls Grissette

19  Almann-Camacho.

20         THE COURT:  Raise your right hand, please.

21     (Witness duly sworn.)

22         THE COURT:  Have a seat.

23     GRISSETTE ALMANN-CAMACHO, GOVERNMENT'S WITNESS, SWORN

24                      DIRECT EXAMINATION

25  BY MS. BELL:

Almann-Camacho -direct

1  Q.  Good morning.

2  A.  Good morning.

3  Q.  Please state your name and spell it for the record?

4  A.  My name is Grissette Almann-Camacho.

5  Q.  I'm sorry, how are you employed?

6  A.  I am a regional manager for Horizon Management Group.

7  Q.  And what's the Horizon Management Group?

8  A.  They are a management company that manages several properties

9  in the Chicagoland area.

10  Q.  Where are your offices located?

11  A.  Our offices are located at 4242 North Sheridan Road in

12  Chicago 60613.

13  Q.  How long have you worked with the Horizon Realty Group?

14  A.  I've been there since March 1st of 2006.

15  Q.  What are your primary duties as Horizon's regional manager?

16  A.  My primary duty is to manage the managers that manage the

17  sites; schedule, run the operations of the properties; ensure

18  that the integrity of the property meets the owners' goals.

19  Q.  Is one of those properties the Sheridan Glen Apartments

20  located at 6040 North Sheridan Road here in Chicago?

21  A.  Yes.

22  Q.  And are you familiar with a man named John A. Ford?

23  A.  Yes, in the sense that he was our tenant.

24  Q.  Did you ever meet Mr. Ford?

25  A.  Yes.

Almann-Camacho -direct

1  Q.  Do you recall for what period of time Mr. Ford was a resident
2  of yours?
3  A.  He moved in to the property February 15th of 2005.
4  Q.  And which property was that?
5  A.  6040 North Sheridan Road in Chicago.
6          MS. BELL:  May I approach the witness, Your Honor?
7          THE COURT:  You may.
8  BY MS. BELL:
9  Q.  I'm showing you what has been marked as Government Exhibits
10 13 through 16, if you want to take a look at them.  Do you
11 recognize those documents?
12 A.  Yes.
13 Q.  What are they?
14 A.  Well, the first document is a Chicago apartment lease, a
15 standard Chicago apartment lease, and the following documents are
16 renewal forms.
17 Q.  Do your duties as regional manager include maintaining and
18 reviewing lease documents such as these including through audits?
19 A.  Yes.
20 Q.  How do you access those lease documents?
21 A.  Well, they're located in the tenant files in the main office.
22 Q.  Are they also loaded electronically?
23 A.  No, not yet.
24 Q.  Do the individuals you supervise, namely, the property
25 managers with knowledge of those lease agreements share those

Almann-Camacho -direct

1  with you?

2  A.  Yes.

3  Q.  Are the lease agreements typically made at or near the time

4  of the leases?

5  A.  Yes.

6  Q.  Is it Horizon Realty's regular business practice to make and

7  maintain lease documents?

8  A.  Yes.

9        MS. BELL:  Your Honor, I offer Government Exhibits 13

10 through 16 in evidence.

11       THE COURT:  Any objection?

12       MR. PETRO:  No, Judge.  No, Judge.  Thank you.  I'm

13 sorry.

14       THE COURT:  That's all right.

15    (Government Exhibits 13 through 16 were received in

16     evidence.)

17       MS. BELL:  At this time I'd like to publish Government

18 Exhibit 14.

19 BY MS. BELL:

20 Q.  Ms. Almann-Camacho, what is this document?

21 A.  That is an Offer to Renew Lease.

22 Q.  And where on the document can we see to whom the offer to

23 renewal was addressed?

24 A.  You can see it at the very top under the date.

25 Q.  Are you indicating this area which I'm highlighting now?

292

Almann-Camacho - cross

1  A.  That is correct.

2  Q.  Where on this document can we see the dates covered by the

3  lease?

4  A.  If you scroll down you'll see that in a row, box, you'll see

5  the dates there, the beginning, the beginning lease term and then

6  the ending lease term.

7  Q.  And is the area you indicated what I just have magnified

8  here?

9  A.  Correct.

10  Q.  Please indicate on this document where we can determine if

11  the lease offer was accepted?

12  A.  At the bottom of the page in a box.  Right there, yes.  It's

13  option number one, renewing.

14  Q.  And so that's the area I've just highlighted?

15  A.  Correct.  Usually the tenant will sign off where they are

16  renewing.  That's what is evident here.

17  Q.  Thank you, Ms. Almann-Camacho.

18        MS. BELL:  No further questions, Your Honor.

19                    CROSS-EXAMINATION

20  BY MS. MICHAELIS:

21  Q.  I'm sorry, I didn't catch what your name was?

22  A.  My name is Grissette.

23  Q.  Grissette.

24  A.  Almann-Camacho.

25  Q.  Good morning.

Almann-Camacho - cross

1  A.  Good morning.

2  Q.  Ms. Almann-Camacho, correct?

3  A.  Correct.

4  Q.  Okay.  Do you have any knowledge that John Ford was actually

5  living at that apartment?

6  A.  Yes.

7  Q.  And is that personal knowledge or is that through the

8  managers that were managing those properties?

9  A.  That is personal knowledge.

10  Q.  Okay.

11  A.  I did meet him.

12  Q.  You met him?

13  A.  Yes.

14  Q.  But you don't know that he was actually living at the

15  apartment during March 1st, 2007 through February 28th, 2008?

16  A.  Yes, he was living there.

17  Q.  But you met him one time?

18  A.  I met him one time.

19  Q.  So between March 1st, 2007 and February 28th, 2008, you

20  didn't see him entering the apartment and exiting the apartment

21  every single day during that time period?

22  A.  Not every single day, no.

23         MS. MICHAELIS:  If I could have one moment, Your Honor?

24  Nothing further.

25         THE COURT:  Thank you.  Anything else?

Keiper - direct

1           MS. BELL:  No, Your Honor.

2           THE COURT:  All right.  You're excused.  Thank you,

3   ma'am.

4           THE WITNESS:  Thank you.

5       (Witness excused.)

6           THE COURT:  Call your next witness, please.

7           MR. YOUNG:  The government calls Monte Keiper, Your

8   Honor.

9           THE COURT:  Raise your right hand, please.

10      (Witness duly sworn.)

11          THE COURT:  Have a seat.

12             MONTE KEIPER, GOVERNMENT'S WITNESS, SWORN

13                       DIRECT EXAMINATION

14  BY MR. YOUNG:

15  Q.  Good morning.

16  A.  Good morning.

17  Q.  Can you please state your name and spell your last name for

18  the record?

19  A.  Monte Keiper, it's K-e-i-p-e-r.

20  Q.  Can you tell us for whom you work?

21  A.  FBI.

22  Q.  How long have you worked for the FBI?

23  A.  Approximately five years.

24  Q.  What is your position with the FBI?

25  A.  Special agent.

Keiper - direct

1  Q.  Are you assigned to a particular squad or unit?

2  A.  I work a violent crimes squad in the north RA.

3  Q.  Directing your attention to the date of December 23rd of

4  2009, were you asked to obtain a sample of cheek cells from

5  someone?

6  A.  Yes, I was.

7  Q.  Was that extraction done for the purpose of analyzing that

8  person's DNA?

9  A.  Yes.

10 Q.  Can you tell us who it was you were asked to obtain a sample

11 of cheek cells from?

12 A.  John Ford.

13 Q.  Can you tell us where, what location this occurred?

14 A.  In Chicago.

15 Q.  Do you see Mr. Ford in the courtroom today?

16 A.  Yes.

17 Q.  Can you identify him by pointing to him and identifying an

18 article of his clothing?

19 A.  He's over at the defense table.

20 Q.  Can you tell us how you went about collecting this sample of

21 cheek cells from Mr. Ford on December 23rd, 2009?

22 A.  We have a packet that we use.  It has a swab on the inside.

23 We fill out the packet with the name and other identifiers.  And

24 then you take the swab, and you run it around the inside of the

25 mouth and the gum line for at least 15 seconds, maybe longer.

Keiper - direct

1  Once you've done that, it's snapped down so it touches the

2  surface on a -- it's a white sheet, it touches that surface for

3  about 10 seconds.  And then it's lifted up off of that.  It's

4  allowed to dry, and then it's sent off.

5  Q.  Is this process sometimes called or referred to as the taking

6  of a buccal or a buccal swab?

7  A.  Yes.

8         MR. YOUNG:  May I approach the witness, Your Honor?

9         THE COURT:  You may.

10  BY MR. YOUNG:

11  Q.  Agent Keiper, I'm going to hand you what has been marked as

12  Government Exhibit 11.  Are you familiar with that exhibit?

13  A.  Yes.

14  Q.  And if you could take an opportunity to remove it from the

15  bag and examine the exhibit, please.

16         Can you tell us what Government Exhibit 11 is?

17  A.  This would have been the form that I filled out and signed

18  prior to taking the DNA sample.  And these would have been the

19  two samples that I would have taken.

20  Q.  And directing your attention specifically to the item that is

21  tagged Government Exhibit 11, can you tell us what that is?

22  A.  That would have been, yeah, that would have been the buccal

23  swab sample that I would have taken from Mr. Ford.

24         MR. YOUNG:  May I approach again, Your Honor?

25  BY MR. YOUNG:

297

Keiper - direct

1  Q.  How do you know that this particular buccal swab kit or

2  sample pertains to John Ford?

3  A.  Prior to taking the sample, it shows a collection date and

4  then it shows the collector prior to taking the sample and

5  placing it on there.  We pull the little white card out, write my

6  name as the collector, the collection date, and who the sample is

7  being taken from.  Then that is placed back in there, and then

8  the sample is taken.

9  Q.  And directing your attention to the top of this piece of

10 paper, approximately 2 inch by 2 inch square, the name John A.

11 Ford appears.  Is that your writing?

12 A.  Yes.

13 Q.  And is that your writing below next to the portion where it

14 indicates collector?

15 A.  Yes, it is.

16 Q.  Is this swab or kit in substantially the same condition as it

17 was when you took it on December 23rd, 2009?

18 A.  Other than it looks like they have cut out a portion there to

19 test it, but other than that, yes.

20      MR. YOUNG:  Your Honor, the government would move into

21 evidence Government's Exhibit 11.

22      MR. PETRO:  No objection.  Thank you, sir.

23      THE COURT:  Thank you.

24   (Government's Exhibit 11 was received in evidence.)

25      MR. YOUNG:  Your Honor, may I publish the exhibit to the

Keiper - cross

1  jury?

2          THE COURT:  You may.

3      (Said exhibit was viewed in open court.)

4          MR. YOUNG:  May I have a moment, Your Honor?

5      (Discussion off the record.)

6          MR. YOUNG:  Nothing further, Your Honor.

7          THE COURT:  Thank you.

8                          CROSS-EXAMINATION

9  BY MR. PETRO:

10 Q.  Sir, Mike Petro.  I represent John Ford.

11         Good morning, sir.  How are you?

12 A.  Fine.

13 Q.  With respect to the buccal swab, have you been trained in any

14 way, shape, or form to perform that particular test?

15 A.  Mostly in practice over the years in taking them.

16 Q.  You never received any type of formal course or anything from

17 the FBI?

18 A.  At the academy we would have had some basic training in DNA

19 samples.

20 Q.  You indicated at some point in time that you followed some

21 procedures, is that correct?

22 A.  Yes.

23 Q.  You swab for approximately 15 seconds, is that correct?

24 A.  Yes.

25 Q.  And with respect to that particular requirement, is that

Keiper - cross

1  something that you are taught?

2  A.  What I do is each time that I take one, just so that I don't

3  or try not to make any mistakes is I go through, and they have a

4  checklist as you go down, you read through that, and part of the

5  list is to swab for approximately 15 seconds.

6  Q.  Is that a checklist prepared by the FBI?

7  A.  I believe it is.  It comes as a packet here.  And this is,

8  yeah, I believe it is prepared by the FBI.

9  Q.  So you just essentially open up the packet, and it gives you

10  some rules to follow, is that correct?

11  A.  Yes.

12  Q.  And when you say that it is snapped down and allowed to dry,

13  is that part of the checklist then?

14  A.  Yes, it is.

15  Q.  Are you wearing any type of protective clothing when you do

16  this?

17  A.  Prior to opening the package, I make sure I put latex gloves

18  on.

19  Q.  And that comes with the packet, is that correct?

20  A.  They have them in there or I'll have them on already.

21       MR. PETRO:  May I just approach quickly, Judge?

22       If I may have one second, please, Judge?

23     (Discussion off the record.)

24       MR. PETRO:  I have no other questions, sir.

25       THE COURT:  Thank you.

Aper - direct                                        300

1          THE COURT:  Mr. Young, anything?

2          MR. YOUNG:  Nothing, Your Honor.

3          THE COURT:  All right.  Thank you, Agent.  You're

4  excused.

5          MR. YOUNG:  May I retrieve the exhibits?

6          THE COURT:  You may.

7     (Witness excused.)

8          MR. YOUNG:  Your Honor, the government calls Blake Aper.

9          THE COURT:  Raise your right hand, please.

10    (Witness duly sworn.)

11         THE COURT:  Have a seat.

12              BLAKE APER, GOVERNMENT'S WITNESS, SWORN

13                      DIRECT EXAMINATION

14  BY MR. YOUNG:

15  Q.  Good morning.

16  A.  Good morning.

17  Q.  Could you please state your name and spell your last name for

18  the record?

19  A.  Yes.  My name is Blake Aper.  The last name is spelled

20  A-p-e-r.

21  Q.  Mr. Aper, can you please tell us for whom you work?

22  A.  I currently work for the Illinois State Police at the

23  Rockford Forensic Science Laboratory.

24  Q.  Can you tell us how long you've worked for the Illinois State

25  Police?

Aper - direct

1  A.  Nine years now.

2  Q.  Can you tell us what position you hold with the Illinois

3  State Police?

4  A.  Yes.  I'm a forensic scientist in the biology and DNA

5  section.

6  Q.  Have you held that position during the entire time you've

7  been with the Illinois State Police?

8  A.  Yes, I have.

9  Q.  Can you briefly tell us what your duties are as a forensic

10  scientist?

11  A.  Well, basically in the biology and DNA section, my role as a

12  forensic scientist is to receive and analyze evidence for the

13  presence or absence of bodily fluids.  If we find a bodily fluid

14  or have some type of skin cell DNA evidence, I can try to obtain

15  a profile from that evidence and eventually see if someone can be

16  the source of that DNA profile from the evidence.  I then write

17  written reports with all of my findings, and I can testify in

18  court when needed.

19  Q.  Before we go into the type of DNA analysis you do, I'd like

20  to ask you a little bit about your background.  Can you describe

21  for us what your formal educational background is?

22  A.  I have a Bachelor's Degree in microbiology from the

23  University of Illinois at Urbana-Champaign.

24  Q.  Can you tell us when you received that degree?

25  A.  I got that degree in the spring of 2000.

302

Aper - direct

1  Q.  When you joined the Illinois State Police approximately nine

2  years ago, did you undergo any type of training program?

3  A.  Yes.  We have, basically it's about a two-year program in the

4  biology and DNA section.  And I kind of liken it to grad school.

5  Basically you are doing a lot of readings.  You have written

6  assignments, reports that you have to prepare.  You're spending a

7  lot of time in the laboratory doing lab exercises, laboratory

8  practicals.

9          You have written exams, oral exams.  You also have a

10  period of mock casework where basically your trainer kind of

11  makes up samples or provides samples that aren't really related

12  to a case so you can actually practice as if it were a case.

13          You then also do a period of supervised casework before

14  you're released from training.  During that period of time,

15  you're actually working on real forensic cases, but your trainer

16  actually has to sign off or co-sign off on all of your reports.

17  You also do go through a period of mock trial type of training

18  for court testimony.  Once you've successfully completed all

19  those modules, you are released from training.

20  Q.  Did this training all relate to DNA analysis?

21  A.  Yes, it did.

22  Q.  Did it include modules or components that related to

23  determining the probabilities of the likelihood of DNA matches

24  between different samples?

25  A.  Statistics basically?

Aper - direct

1  Q.  Yes.

2  A.  Yes.  Statistics was a part of the training module for DNA.

3  Q.  Can you tell us what portion of the training program it

4  consisted of?

5  A.  Well, basically I think there was a series of, I'd say at

6  least three to four lectures over the course of several months.

7  As with any training module in DNA, you had, say, assigned

8  readings, you had exercises, you had quizzes that you pad to pass

9  and written tests that you had to pass as well as obviously go to

10  these lectures.

11       You know, I've got a binder from training that's

12  probably a 3-inch binder just dedicated to all the statistics

13  training from that module.  That would include all my readings,

14  notes from the lecture, and the quiz and test results.

15       MR. PETRO:  Judge, I'm going to object at this point as

16  to the foundation as to when all this training occurred.

17       MR. YOUNG:  The witness indicated it was 18 months

18  after, during the 18-month period that he joined, initially

19  joined the Illinois state crime lab.

20       THE COURT:  That's good enough.  Thank you.

21  BY MR. YOUNG:

22  Q.  Since completing this 18-month initial period of training

23  with the Illinois State Police, have you undergone additional

24  training in DNA?

25  A.  Yes.

Aper - direct

1  Q.  Can you describe that for us?

2  A.  Well, basically every year we are required to get at minimum

3  eight hours of continuing education each year.  So a lot of times

4  it's attending seminars or training type things that are related

5  to the DNA field.  And specifically I know, say, I've got

6  training at the FBI academy, training for a week down in West

7  Virginia, advanced DNA training class, and also did receive some

8  supplementary training in statistics for DNA.

9  Q.  Do you belong to any professional associations?

10 A.  Yes.  I'm a member of MAFS, which stand for the Midwestern

11 Association of Forensic Scientists.

12 Q.  Are you certified in any capacity?

13 A.  Yes.  Part of being released from training is being certified

14 as an examiner in forensic DNA for the state.

15 Q.  Is there any additional training that occurs with respect to

16 the laboratory into which you work or your qualifications?

17 A.  Just basically, you know, part of the laboratory system is

18 that we do undergo routine inspections, both by Illinois State

19 Police inspection teams and outside audit teams.  Basically what

20 they do to make sure that our laboratory is properly putting out

21 a good product is they're coming in, they're checking our

22 procedures manuals, checking our validation studies that

23 everything looks like we've done good work.

24      They check some of our case files to make sure that,

25 like myself as an analyst, that I'm following all the procedures

305

Aper - direct

1  manuals that we have validated.  They even check things like

2  reagent log books, instrument log books, to make sure that we're

3  actually doing all of the quality control type of checks that

4  we're supposed to.  And that's part of our certification as a

5  laboratory that says that we're putting out a good product.

6  Q.  Can you estimate for us how many times over the course of

7  your nine years with the Illinois State Police that you have

8  examined objects for the presence of DNA evidence?

9  A.  I'd say in terms of the numbers of evidence that I've looked

10 at, it's several thousand.

11 Q.  What type of objects or items would we be talking about?

12 A.  Basically anything that might have a DNA in it, you know, if

13 it's a swab of blood, semen from a sexual assault kit, swabbing

14 from a shirt collar, swabbing from the sweatband of a hat, mask,

15 cigarette butts, pop cans, anything like that.

16 Q.  With respect to the objects you've examined for DNA, can you

17 give us an estimate of on how many occasions you've actually

18 recovered or extracted DNA from these items?

19 A.  I'd say at least half, so let's say, you know, 1,000 to

20 2,000.

21 Q.  And on how many occasions have you prepared DNA profiles for

22 DNA that you've extracted or found on an item?

23 A.  How many of those pieces of evidence have we obtained or have

24 I obtained profiles, is that what you are asking?

25 Q.  Yes.

Aper - direct

1  A.  Yeah, that's what I thought was about 1 to 2,000.

2  Q.  And with respect to the profiles that you've obtained from

3  those items, have you also on occasion compared them to known

4  samples of DNA?

5  A.  Yes.  If we have standards available, we do make those

6  comparisons.

7  Q.  Can you estimate how many times you've compared an unknown

8  sample of DNA to a known sample of DNA?

9  A.  Roughly I'd say of the instances of, let's say, the 1 or

10  2,000 times that I've gotten profiles from evidence, I'd say 50

11  to 75 percent of the time you do end up making a comparison to a

12  standard for that profile.

13  Q.  And in connection with those comparisons, have you also

14  prepared statistical opinions relating to the probability of

15  finding a match in the random population if there is, in fact, a

16  match?

17  A.  Yes.

18  Q.  Have you previously testified in court as an expert?

19  A.  Yes.

20  Q.  On how many occasions have you testified as an expert

21  approximately?

22  A.  I'd say about 20 times now.

23  Q.  Did that testimony all relate to DNA analysis?

24  A.  Yes.

25  Q.  On some of those occasions, did you testify on behalf of the

307

Aper - voir dire

1  defense?

2  A.  Yes, I've done that before.

3          MR. YOUNG:  Your Honor, the government would move to

4  certify Mr. Aper as an expert in forensic biology and DNA

5  analysis.

6          MR. PETRO:  Can I cross, Judge, please?

7          THE COURT:  All right.  Briefly.

8                      VOIR DIRE EXAMINATION

9  BY MR. PETRO:

10  Q.  When you were practicing back in the academy, when you were

11  practicing on these samples, did you make mistakes?

12  A.  I can't recall specifically, but I'm sure that that could

13  have happened.

14  Q.  So maybe?

15  A.  Yeah, it's possible.

16  Q.  And then when you say you're certified, you're certified by

17  the Illinois State Police, is that correct?

18  A.  Yes.

19  Q.  Do you have other certifications other than the Illinois

20  State Police?

21  A.  No.

22  Q.  And then with respect to this, you seem to be estimating that

23  with respect to extractions, you did 1,000 to 2,000 extractions,

24  is that correct?

25  A.  I've probably gotten profiles from about 1,000 to 2,000

Aper - voir dire

1  pieces of evidence.  The actual number of samples that I've

2  extracted is going to be greater than that, I'd say 3,000, maybe

3  4,000.

4  Q.  Well, when you say 1,000 to 2,000, for instance, since you

5  seem to be an expert in statistics, there would be a possibility

6  for error there of 50 percent, would that be correct?

7  A.  I guess I don't, I don't come up --

8  Q.  I guess it would be a hundred percent, wouldn't it?

9         THE COURT:  You didn't -- let him finish, please.

10 BY MR. PETRO:

11 Q.  Go ahead.

12 A.  I guess I'm not understanding what you are coming up with.

13 Q.  Well, did you do 1,000 or 2,000?

14 A.  I don't actually keep track of the specific number of samples

15 I do.  It's so many, it would be -- and there is really no point

16 to track how many samples I actually have worked.

17 Q.  Well, you seem to be estimating today.  What I want to know

18 is your statistical ability.

19        If you did 1,000 samples, but you may have done 2,000

20 samples, then your possibility for an error would be 1,000,

21 right?  Is that correct?

22 A.  If you're talking in statistics terms, that is correct.

23 Q.  So you almost have a 100 percent chance of error that 1,000

24 is the right number, isn't that correct?

25 A.  Yes.

Aper - direct

1  Q.  And then when you say 3,000 to 4,000, I suppose a 1,000

2  difference in that particular situation --

3          MR. YOUNG:  Objection, Your Honor.  This goes beyond the

4  scope of cross-examination.

5          THE COURT:  It does.  We're only talking about the

6  motion to qualify him as an expert.

7          MR. PETRO:  Well, I'm just asking whether he knows how

8  many times you've extracted samples.

9  BY MR. PETRO:

10  Q.  Do you know?

11  A.  Rough estimates, yes.

12  Q.  But you're just guessing today, is that correct?

13  A.  I am giving you an educated guess as to how many samples I've

14  worked.

15  Q.  But there is a substantial margin for error statistically,

16  isn't that correct?

17  A.  I guess you could say that.

18          MR. PETRO:  I have no other questions.

19          THE COURT:  He'll be received as an expert.

20          MR. YOUNG:  Thank you, Judge.

21                  DIRECT EXAMINATION (Resumed)

22  BY MR. YOUNG:

23  Q.  We've already heard a great deal of testimony regarding DNA

24  and what it is, so I'll try not to be too redundant.  Can you

25  tell us what you're looking at when you are comparing one sample

Aper - direct

1  of DNA to another, an unknown sample to a known sample, for
2  example?
3  A.  Sure.  Basically with DNA as I'm sure you guys have heard at
4  great length from the previous expert, half of it is inherited
5  from our mother, half of it is inherited from our father.  Now,
6  if you could think of a strand of DNA, I don't know how much
7  you've seen on TV or whatever, if you think of a strand of DNA,
8  you've probably seen in a picture that kind of looks like a
9  spiral staircase, I'm guessing, well, basically what that is a
10 picture of is it's showing the one strand inherited from your
11 mother paired up with the strand that's inherited with your
12 father.
13         Now, basically each strand of DNA is made up of four
14 basic building blocks.  And they're strung together in a variety
15 of orders.  Now, if you could think of these four building blocks
16 as, let's say, colored beads on a necklace.  Let's just say we've
17 got a red, yellow, green, and blue bead, that each color
18 represents one of these basic building blocks of DNA.
19         So let's say comparing these strands of DNA to
20 necklaces, so if you've got a necklace from your mom, and you've
21 got this red, yellow, green, blue pattern repeated over and over,
22 like red, yellow, green, blue; red, yellow, green, blue; red,
23 yellow, green, blue, you see that same pattern repeated over and
24 over.
25         So what we're doing is we're counting up how many times

1  that pattern of red, yellow, green, blue repeats itself on that

2  necklace.  Let's say you see that red, yellow, green, blue

3  pattern seven times on one necklace.  And you may have another

4  necklace where that red, yellow, green, blue pattern is repeated

5  ten times.

6          So that's kind of how it works in DNA.  We're looking at

7  repeat sequences of four, and we're just counting how many times

8  that same sequence is repeated over and over on the strand that

9  you get, the strand of DNA that you get from your mother and how

10  many times that repeat sequence is found on the strand from your

11  father.

12          So if you see it repeated seven times on one strand and

13  ten on the other, that person would be called a 7,10 at that

14  location.  And then for a DNA profile, we actually look at 13

15  total locations for those differences, and that's what makes up a

16  DNA profile.

17  Q.  I'd like to ask you about these 13 locations that you look

18  for these repeating sequences at.  How long have those 13

19  locations been used?

20  A.  I would say since probably the late '90s.

21  Q.  And when I say how long have they been used, let me ask you

22  as a follow-up, who uses those 13 locations?

23  A.  Basically all these 13 locations that we're typing it are

24  used by every forensic laboratory in the United States at a

25  minimum.  We all type these same 13 locations.

Aper - direct

1  Q.  Can you tell us how it was these 13 locations that are used

2  by every forensic laboratory in the United States were chosen?

3  A.  I believe some scientists got together that knew, had some

4  knowledge about different sequences of DNA, where they're found

5  at in our DNA, and also the manufacturers and the kits came

6  together, and they tried to find locations where basically they

7  would have enough variation from person to person at these 13

8  locations to eventually come up with a profile or hopefully be

9  unique to an individual.

10        So they basically selected these 13 locations trying to

11 find pieces of our DNA that varied enough to make us unique

12 people.  And also these locations aren't linked to any genetic

13 factors, so hopefully they're inherited independent of one

14 another as well.

15 Q.  When you say they're not related to any genetic factors,

16 what's the relevance of that?

17 A.  Well, basically what we're doing, we're looking -- we're not

18 looking at the parts of our DNA that are critical to our

19 existence.  So we're not typing the DNA that's code for, let's

20 say, how your body's metabolism or things like that function, or

21 it's not coding for anything that's physical appearance, like

22 hair color, eye color, skin color, anything like that.

23        We're looking at pieces of our DNA that sometimes are

24 called junk DNA, where the scientists really don't know what this

25 DNA is responsible for.  They just know that it's not critical

313

Aper - direct

1  for this DNA to be in our bodies, because it doesn't seem to be

2  responsible for any chemical or any type of function.

3          So the nice thing about these areas is those you can

4  have a lot of areas, and it won't cause any problems.

5          Now, if we all varied at a location let's say that was

6  metabolism that was critical to us existing, we obviously don't

7  want those areas to vary, because people would be, you know, not

8  being born at all.  So we look at this junk DNA.  It doesn't

9  matter if there is changes from person to person in that DNA.  So

10  that's where we find all the variation from person to person.

11  Q.  Apart from the fact that there may be not a great deal of

12  variation in other parts of the DNA outside of these 13

13  locations, would it even be possible to type all of a person's

14  DNA?

15  A.  They have done that, you know, as part of the human genome

16  project, entire sequences of people's DNA have been typed before.

17  Q.  Is that something that is commonly done in the forensic

18  science field?

19  A.  Not in forensics, no.

20  Q.  With respect to the comparisons of these 13 locations that

21  you've discussed and comparing the random sequences that occur at

22  those locations, is it possible to compare one sample to another

23  even if one of those samples does not have -- you found nothing

24  at some of those locations?

25  A.  Yes.  As long as you've got information at at least one

Aper - direct

1  location, you can still make a comparison.

2  Q.  Is that a common practice in your field?

3  A.  Yes.  Any time you've got any type of profile you've

4  developed from a forensic piece of evidence, and you received a

5  standard to compare to that, you're always going to make a

6  comparison if you've gotten any type of result from your forensic

7  profile.

8  Q.  And when you compare a known sample to an unknown sample to

9  determine if they match, what are you looking for?

10  A.  I'm basically looking at the types at those 13 locations to

11  see if they're consistent with one another.  Basically if I find

12  one location where it's not a match, I absolutely know that that

13  standard that I'm comparing it to is going to be excluded as a

14  source of that DNA found on the forensic profile.

15  Q.  Can you take us through the process you take when you are

16  analyzing a sample of DNA?

17  A.  Sure.  Basically the first step that I do is called

18  extraction.  Now, I'm adding reagents to, let's say, a cotton

19  swab or a piece of a shirt or something like that.  And what I'm

20  trying to do on extraction is get the DNA out of the cell and get

21  it into solutions so that I can do work with it later on.

22          And I kind of liken it to I would say a washing machine.

23  If you think you have a stain on a shirt, and you want to get it

24  off, what do you do?  You put it in the washer.  Put some water

25  in there, put some detergent in there, the water spins out with

315

Aper - direct

1  the stain in the water, and you've got a clean shirt you can put

2  in the dryer.

3          Well, DNA is kind of the same, but opposite.  Now, I've

4  got that stain on the shirt that I care about.  And I want that

5  stain in solution just like you want it in your washer at home.

6  But rather than spin it out and get rid of that dirty water, that

7  water is what's important to me, because that's where all the DNA

8  from that stain is found.

9          And then I basically put that clean shirt off to the

10  side and I don't even use it.  I just keep that stain that's in

11  the water and move that along to the next step of DNA.

12  Q.  What happens once you take that water, if you will, using

13  your analogy, that dirty water with the DNA --

14  A.  Right.

15  Q.  -- what's the next step in the process?

16  A.  Once you've got your DNA in solution, I then take a small

17  portion of that and check how much DNA is there and what quality

18  it's in.

19  Q.  How do you do that?

20  A.  Basically we use a PCR technique.  That stands for polymerase

21  chain reaction.  And it's used to check how much DNA I have

22  there.  Basically I load a small portion of my stain in that

23  solution, add some reagents to it and load it on to an

24  instrument.  The instrument has a computer attached to it that

25  has this software that tells me how much DNA is there and what

Aper - direct

1  quality it's in.

2  Q.  What do you do after you load it into this instrument to

3  determine the amount of DNA that you have?

4  A.  Well, once you've got your results and you find, let's say,

5  for instance, you do have enough DNA, you would proceed on to the

6  next step, which also uses PCR technique.  In this step, it's

7  called amplification, and what's happening in this step is

8  basically at those 13 specific locations that we look at for

9  forensics, the DNA that was there in that starting stain is

10  replicated over and over and over millions and millions and

11  millions of times.  So it's making exact copies of DNA that was

12  found in that original stain at those 13 locations.

13  Q.  Once you've made all these copies of the DNA, what's the next

14  step in your process?

15  A.  After I've got this amplified DNA product, I then take a

16  portion of that sample and put it on to a genetic analyzer

17  instrument.  Once again, this is an instrument that has a

18  computer connected to it with software on it.  Basically what it

19  does is it goes through, looks at all these 13 locations.  It

20  sees what DNA is there.  And it gives it, it types it basically.

21  It calls it the 7,10, for example.

22  Q.  You've described using instruments in connection with your

23  analysis of a DNA sample.  Are these instruments types of

24  instruments commonly used in the scientific community?

25  A.  Yes, absolutely.

317

Aper - direct

1  Q.  Do other forensic laboratories throughout the country use the

2  same instruments in analyzing and typing DNA?

3  A.  Yes.

4  Q.  Are you aware of any laboratories, forensic crime

5  laboratories or otherwise that type DNA in this fashion without

6  using these types of instruments?

7  A.  I'm not aware of any, no.

8  Q.  Have you received specialized training in using these types

9  of instruments?

10  A.  Yes.

11  Q.  And how long have you been using the instruments to which

12  you've referred?

13  A.  Basically the genetic analyzers are pretty much the same from

14  when I've started, so nine years.  The basic instrument that we

15  use to check how much DNA is there, that's a newer instrument

16  that probably we've been using for the last four years, I would

17  say.  So I've been using that instrument that checks how much DNA

18  is there and what quality for at least four years.

19  Q.  Can you take us, tell us what steps, if any, you take to

20  ensure that the instruments are functioning proper, in a proper

21  fashion when you use them?

22  A.  Sure.  Well, during basically when I start the extraction,

23  the very first step, now, I've got my forensic sample, and I also

24  have to introduce at that time what we call like a reagent blank.

25  What that is, I'm adding a sterile swab to a tube.  I add all the

318

Aper - direct

1  same reagents to that sample as I'm adding to that forensic

2  sample.  So basically what it's doing, it's worked side by side

3  with my forensic sample from step one all the way through DNA

4  typing.

5         I'm checking for any type of contamination in that

6  sample.  And if I don't see anything, it tells me that all my

7  reagents that I used from the very first step all the way through

8  the end were not contaminated.  They were basically clean.

9         During the amplification step where I'm making the exact

10  copies of that DNA, I also introduce positive control.  What that

11  is, it's a sample that's been previously typed.  So I know going

12  into that experiment, all right, this is the profile that I

13  should see in the end.  So basically when I get the types from

14  that positive control at the end, I compare the types from my

15  sample run to what was expected to make sure that that positive

16  control was typed correctly.  That tells me that the genetic

17  analyzer and the software is all working properly.

18         And also at that amplification step, I have a negative

19  control where no DNA is added, just the reagents.  And once again

20  that negative control, I'm looking to make sure that there is no

21  DNA profile in that.  If I did see any type of DNA in there, it

22  would maybe tip me off that there was contamination somewhere,

23  possibly in the reagents.

24  Q.  Do you run these negative controls or essentially these

25  blanks every time you're analyzing a sample?

Aper - direct

1  A.  Yes.  We're required to.

2  Q.  Do you also utilize these positive controls or these known

3  samples, as I understand them, every time you analyze a sample of

4  DNA?

5  A.  Yes.

6  Q.  In addition to these steps that you take every time you use

7  these instruments to analyze DNA, are there also steps that you

8  or other members of the laboratory take to validate the equipment

9  that you use on a regular basis?

10  A.  Yes.

11  Q.  Can you tell us about that?

12  A.  Sure.  Well, basically any instrument that we use in the

13  forensic laboratories, the manufacturer, actually before they

14  even release it to the forensic community, they do what's called

15  developmental validation where they're required to run a certain

16  number of samples, conduct certain studies that the machine has

17  to pass before they can say:  Okay, forensic laboratories, we

18  came out with this new instrument.  Here it is.  You can start

19  using it in your labs.  They first have to in-house develop, you

20  know, their own manuals and run their own validations.

21          Then once it is rolled out to the forensic labs, if we

22  decide to use that piece of equipment in our laboratory system,

23  we then have to do an in-house validation where we're running

24  samples ourself on that specific instrument.

25          And then a lot of times we actually have our own

Aper - direct

1   dedicated research and development laboratory for our state, so a

2   lot of the instruments are first validated in Springfield at that

3   laboratory.  And then like in Rockford when we order one, when it

4   is shipped to me from the company, I have to do kind of a

5   performance check where I even run more additional samples to

6   make sure that machine is performing as it should be.

7   Q.  In addition to the steps you take with the instruments, the

8   use of the positive/negative controls, the blank samples, and the

9   validation procedures, are there other steps that you take in the

10  lab to ensure the quality of your analysis?

11  A.  Yes.  Well, first thing, I'm proficiency tested three times a

12  year both through the Illinois State Police and outside agencies.

13          All the written guidelines that we follow, the

14  procedures that I follow have been validated prior to use in

15  casework.

16          A certain percentage of the cases that I work get

17  randomly selected and reanalyzed by another forensic scientist

18  within our laboratory.  Also they select a random number, and

19  they do a supervisory review of my files.

20          Every file that I do generate has to be 100 percent

21  technically reviewed by another trained analyst in forensics DNA.

22  And those are a few of the things that we do to make sure that we

23  are being quality analysts and putting out quality products.

24  Q.  Can you describe for us what types of precautions you take at

25  the lab to ensure there is no contamination of a sample that you

Aper - direct

1   are analyzing?

2   A.  Yes.  Contamination, you know, basically that's a way of

3   saying that something foreign has been introduced into the

4   sample, foreign DNA.  So that could either be my DNA contaminated

5   something or we'll call it cross contamination, where

6   contaminating one sample with another.

7            So we have clean procedures called clean technique,

8   which we have to follow to help limit any chances of

9   contamination.  So steps that we have to do are let's say

10  bleaching down my lab bench before I work on a piece of evidence,

11  after I work on a piece of evidence.  I can only have one piece

12  of evidence open at a time.  I can only have one tube open at a

13  time.

14           We have -- we're always wearing a lab coat.  We have

15  gloves and a mask on.  You either have to change your gloves

16  between each sample or bleach your gloves between handling

17  samples.

18           When I'm opening tubes I have a special little plastic

19  tube opener that I have to use to open the tubes.  It gets

20  bleached between every tube that I open.

21           Anytime I handle a sample or cut into a sample with

22  scissors or forceps, I have to bleach those tools every single

23  time.  Even if I'm looking at different stains on the same shirt,

24  I have to bleach those tools so I'm not cross contaminating from

25  one stain to another even if it's on the same piece of evidence.

Aper - direct

1      Once we get into DNA, all our tubes are exposed to UV
2  light.  UV light helps break down or destroy any DNA that might
3  have been in those tubes prior to using them in our case.
4      I have to UV some of the hoods that I do some of the
5  steps in.  Gosh, yeah, I think that gives you an idea of some of
6  the things we have to do.  We just have all these extra steps for
7  us to be careful not to introduce any type of contamination into
8  our cases.
9  Q.  Assuming a worst case scenario and there was some type of
10 contamination of a DNA sample, could that contamination alter or
11 change the sample?
12 A.  It wouldn't change what DNA was in that sample to begin with.
13 Contamination might show up as you're seeing extra types in your
14 forensic profile, for instance.
15 Q.  If a sample was contaminated, would you be able to determine
16 that when you're reviewing the results of the analysis procedure
17 you've described?
18 A.  Yes.  Most often times if you do have contamination, you try
19 your best to determine the source of that contamination.  Any
20 analyst that's in our laboratory system as a scientist in DNA,
21 their profile -- I've been typed, so I know what my profile is.
22 So I would, let's say, compare any contamination profile to my
23 own profile probably first and then to anybody else in our
24 laboratory to make sure it was not any of us that's contaminated
25 the profile.

323

Aper - direct

1    Then you would probably also compare it to any profiles

2  in that batch of samples you processed during that extraction

3  that day, just to make sure that you didn't cross contaminate

4  from a sample from another case to yours.

5    And those are probably the two ways that you would check

6  to try to find the source of that contamination profile.

7  Q.  I'd like to ask you a few questions about if DNA can be

8  changed before we move on to specifically what you've done in

9  this case.

10    Can exposure to heat, light, moisture, other

11  environmental factors change DNA?

12  A.  It won't change the DNA profile.  It may make it harder to

13  detect the entire profile.

14  Q.  Can the passage of time change DNA?

15  A.  Once again, it won't change the profile, but it may make it

16  harder to detect the entire profile.

17  Q.  How far or how long can DNA exist in an ideal setting?

18  A.  In an ideal setting, I don't really know the exact answer to

19  that.  I mean, it's very hard in forensics, because most of our

20  samples aren't pristine samples.  They have been exposed to heat,

21  humidity, sunlight, bacteria.  So it depends how long a sample is

22  exposed to that basically how good a profile you get.

23    If you had a sample that was collected right at the time

24  it was deposited, and that sample was dried out and store in a

25  nice condition, it could probably produce a good DNA profile for

Aper - direct

1  a very long time, I would say easily at least 10, 15 years.

2  Q.  Has analysis been done on DNA from items recovered from crime

3  scenes from several years in the past?

4  A.  Yes.

5  Q.  You were asked to compare DNA samples in this case, is that

6  correct?

7  A.  Yes.

8          THE COURT:  I think this is a good place to break for

9  lunch.

10          MR. YOUNG:  Okay.

11          THE COURT:  All right, folks.  We'll resume, it's just

12  12:00 o'clock, that clock is a little slow, it's just 12:00

13  o'clock on my watch, so let's resume at 1:00 o'clock sharp.

14      (Jury out.)

15          THE COURT:  You're excused until lunchtime, until 1:00.

16          THE WITNESS:  Thank you.

17      (Witness excused.)

18          THE COURT:   Two things, one is we were told yesterday

19  that Ms. Herring has some sort of welfare hearing or some --

20  maybe welfare is wrong, maybe some sort of public assistance

21  hearing tomorrow morning.  I'm going to talk to her, if it's okay

22  with you, I'm going to talk to her just privately off the record

23  to see what that's all about.

24          MS. BELL:  Yes, Your Honor.

25          THE COURT:  See if we can get her here at a reasonable

Aper - direct

1  hour anyway.  She is now a juror because we lost a juror.  She

2  was alternate number 1.

3       The second thing is I've been through the jury

4  instructions.  They appear to be fine.  I flagged them where they

5  refer to the defendant's testimony.  We'll have to alter them

6  depending on that.

7       And there was also no note-taking instruction, which

8  should be added.  That's the only two things I can think of.  So

9  take one more look at those before tomorrow for sure, and we'll

10  get them ready to go.  Okay.

11       MS. BELL:  Thank you, Your Honor.

12       MR. PETRO:  Thank you, Judge.

13       THE COURT:  Okay.  And make sure Officer Martino is

14  here.

15       MR. YOUNG:  He will be, Judge.

16       MS. BELL:  Yes, Your Honor.

17     (Recess at 12:00 p.m. until 1:00 p.m.)

18

19

20

21

22

23

24

25

326

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,      )
 4                                   )
                       Plaintiff,    )
 5                                   )  No. 09 CR 846
                  vs.                )  Chicago, Illinois
 6                                   )  October 14, 2010
      JOHN A. FORD,                  )  1:00 p.m.
 7                                   )
                       Defendant.    )
 8

 9                          VOLUME 3

10             TRANSCRIPT OF PROCEEDINGS - TRIAL

11         BEFORE THE HONORABLE ROBERT W. GETTLEMAN

12                        AND A JURY

13   APPEARANCES:

14   For the Plaintiff:      HON. PATRICK FITZGERALD
                             United States Attorney
15                           219 South Dearborn Street
                             Chicago, Illinois 60604
16                           BY:  MS. CAROL A. BELL
                                  MR. RICK YOUNG
17

18   For the Defendant:      MICHAEL J. PETRO AND ASSOCIATES
                             53 West Jackson Boulevard
19                           Suite 324
                             Chicago, Illinois 60604
20                           BY:  MR. MICHAEL J. PETRO
                                  MS. QUINN A. MICHAELIS
21

22

23   Official Reporter:      JENNIFER S. COSTALES, CRR, RMR
                             219 South Dearborn Street
24                           Room 1706
                             Chicago, Illinois 60604
25                           (312) 427-5351
```

                    Aper - direct

1     (Proceedings in open court.  Jury in.)
2          MR. YOUNG:  The witness is on the way back in, Your
3  Honor.
4          THE COURT:  I knew we were missing somebody.
5     (Pause.)
6          THE COURT:  All right, Mr. Young.
7       BLAKE APER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
8                    DIRECT EXAMINATION (Resumed)
9  BY MR. YOUNG:
10 Q.  When we broke I was just beginning to ask you about the work
11 you did in connection with this matter.  Were you asked to
12 compare a DNA profile taken from a mask to a known sample of DNA
13 taken from John Ford?
14 A.  Yes, that's correct.
15 Q.  Can you tell us when it was you were asked to do this
16 comparison?
17 A.  I believe I was first contacted end of 2009, beginning of
18 2010 about the collection of a standard from John Ford and
19 wanting that comparison done to a profile developed by Keia
20 Brown.
21 Q.  When you refer to the profile built by Keia Brown, is that in
22 connection with the profile built from the mask?
23 A.  Yes.
24 Q.  Did you review her work in connection with the comparison you
25 did between those two samples?

328

1  A.  Yes.  Actually, I was the technical reviewer of her original

2  work that was done on that mask.

3  Q.  Did you again review her work in connection with the

4  comparison you were asked to do at the end of 2009, beginning of

5  2010?

6  A.  Yes.  Simply when I make my comparison, I would have copied

7  some pages from her file that I had technically reviewed and used

8  basically the copies of her electropherogram or the data that we

9  get from the genetic analyzer is what I make for copies for my

10 file.

11        MR. YOUNG:  May I approach, Your Honor?

12 BY MR. YOUNG:

13 Q.  Mr. Aper, I'm handing you what has been marked as Government

14 Exhibit 20 or I should say entered into evidence as Government

15 Exhibit 20.  Are you familiar with that document?

16 A.  Yes.  This is the file of Keia Brown's from the work on this

17 mask.  It has my technical review, initials and date, from

18 November 6th -- or I'm sorry, it looks like January 6 -- 16th,

19 2009.

20 Q.  Did you prepare the DNA profile for or from the sample

21 obtained from John Ford?

22 A.  Yes.

23        MR. YOUNG:  May I approach, Your Honor?

24 BY MR. YOUNG:

25 Q.  Showing you what has been marked as Government's Exhibit 11

Aper - direct

1  and previously entered into evidence, are you familiar with this

2  exhibit?

3  A.  Yes.  I recognize that as being the sample that was collected

4  from John Ford that was sent to me at the laboratory.

5  Q.  And this is a sample from which you built a DNA profile?

6  A.  Yes.

7  Q.  Can you tell us how you went about compiling a DNA profile

8  for the sample that had been attained from John Ford?

9  A.  Sure.  Basically the process of working a standard is exactly

10  how I described it before.  The first step is I'm going to take a

11  small piece of the standard.  I do the extraction step where I'm

12  adding the chemicals that release the DNA into solution.  I then

13  check how much DNA is there and what quality it's in.

14        After that I replicate, make all the copies of the DNA,

15  load some of that sample on to our genetic analyzer, which then

16  prints out the data that shows the types at the 13 locations for

17  John Ford.

18  Q.  After you built or compiled a DNA profile for the sample

19  obtained from John Ford, did you compare that to the DNA profile

20  that had been compiled from the mask by Ms. Brown?

21  A.  Yes, I did.

22  Q.  What did you find?

23  A.  I found that John Ford could not be excluded from having

24  contributed to that profile that was found on the mask.

25  Q.  When you say "cannot be excluded," can you explain to us what

Aper - direct

1  you mean by that?

2  A.  Basically what I'm saying is that anything that I see in that

3  forensic profile, any DNA type that is in that forensic profile

4  can be found in John Ford's DNA profile.

5  Q.  Was there a match between the DNA profile compiled from the

6  mask and the DNA profile that you compiled from the sample

7  obtained from John Ford?

8  A.  Everything that was in the forensic profile was consistent

9  with the profile of John Ford.

10 Q.  There were no differences at any of the locations?

11 A.  There was only one location where I believe Keia had a

12 partial result at one of those 13 locations where it was, you

13 know, what we call an allele INC.  And at that location, I think

14 it was a type 17,INC or inconclusive, what Keia called it.  And

15 John Ford I believe is, I'd have to check my notes for sure, but

16 I believe he's a 16,17 there.

17       So although it's not a perfect -- I'm not seeing the

18 16,17 in the forensic profile at that location, all I'm worried

19 about is at least the 17 is found in John Ford's profile.

20       The reason it's the 17,INC is Keia just did not have

21 enough information to make a full call at that one location.

22       MR. YOUNG:  May I approach the witness, Your Honor?

23 BY MR. YOUNG:

24 Q.  Mr. Aper, I'm handing you what has been marked as Government

25 Exhibit 21.  Are you familiar with that exhibit?

331

Aper - direct

1  A.  Yes.  This would be my case work file for the work of the

2  standard.

3  Q.  Does that contain all the results of the testing you

4  performed in connection with the sampling or profile you built

5  with respect to Mr. Ford's DNA sample?

6  A.  Yes.  It looks like all the pages are here.

7          MR. YOUNG:  Your Honor, if I may publish portions of the

8  report as a demonstrative exhibit?

9          THE COURT:  Any objection?

10         MR. PETRO:  No.  Absolutely.  Is he asking to put it

11  into evidence then, Judge?

12         THE COURT:  Are you?

13         MR. YOUNG:  I was simply asking as a demonstrative

14  exhibit at this time, Your Honor.

15         MR. PETRO:  Thank you, Judge.

16         THE COURT:  Any objection to that?

17         MR. PETRO:  Well, I think it should be probably placed

18  into evidence.  We did have discussions before court as to --

19         THE COURT:  Well, if there is no objection, let's admit

20  it then.

21     (Government's Exhibit 21 was received in evidence.)

22         MR. PETRO:  All right.  Thank you, Judge.

23         THE COURT:  Thank you.

24  BY MR. YOUNG:

25  Q.  Let me direct you if I can to page 38 of your report.

332

Aper - direct

1      THE COURT:  Would it help if I put the lights down, Mr.
2  Young?
3      MR. YOUNG:  Yes, please.  Thank you, Judge.
4  BY THE WITNESS:
5  A.  Okay.
6  BY MR. YOUNG:
7  Q.  Can you tell us what's at that page?
8  A.  Basically page 38 in my file is a copy of the summary sheet
9  from Keia Brown's work on the swab from the mask.
10  Q.  And directing your attention to the screen in front of you,
11  is that a copy of page 38 from your report?
12  A.  Yes, it is.
13  Q.  And those are Ms. Brown's findings for each of the 13
14  locations?
15  A.  Yes.
16  Q.  And if I may direct your attention now to the page of your
17  report marked page 39?
18  A.  Yes.
19  Q.  Can you tell us what we find at that page?
20  A.  Page 39 in my case file is the summary sheet that I prepared,
21  which includes all the types at the 13 locations for John Ford.
22  Q.  Okay.  Directing your attention to the screen in front of
23  you, is that a copy of page 39 of your report that's now being
24  published to the jury?
25  A.  Yes, it is.

333

Aper - direct

1  Q.  I'm going to overlay the two summaries found at pages 38 and

2  39 of Government's Exhibit 21 and ask you about these charts.

3  A.  Okay.

4  Q.  Directing your attention to the left-hand column of page 38

5  first, it's labeled "Locus."  What does that refer to?

6  A.  Basically that's a fancy term for location.

7  Q.  And that is the same heading in the far most left-hand corner

8  or column of your report as well, is that correct?

9  A.  Yes.

10  Q.  And then with respect to page 38 of the Government Exhibit

11  21, the next column is labeled "Swab From Mask 1."  Can you tell

12  us what information is then located in that column?

13  A.  Basically in that column, Keia would just be transcribing her

14  results obtained from that sample to the columns at all the 13

15  locations.

16  Q.  Directing your attention now to the column second from the

17  left on page 39 of Government Exhibit 21, the column that is

18  labeled "Standard for -- from John A. Ford."  Can you tell us the

19  information that is contained down that column?

20  A.  Yes.  Those are the results that I obtained from the profile

21  of John Ford or from the sample from John Ford.

22  Q.  Direct your attention now to the first row on both reports

23  for location DSD --

24          MR. PETRO:  DS3.

25          MR. YOUNG:  I'm sorry.  Thank you.

Aper - direct

1  BY MR. YOUNG:

2  Q.  D3S1358.  It indicates a type 14,15 in Ms. Brown's report and

3  a type 14,15 in your report?

4  A.  That's correct.

5  Q.  Would that be a match at that location?

6  A.  Yes.

7  Q.  Directing your attention now to the next location, which

8  would be VWA, it reflects a type 15,16 in Ms. Brown's report and

9  a type 15,16 in your report.  Would that be a match at that

10  location?

11  A.  Yes, that's correct.

12  Q.  Directing your attention now to the next location reflected

13  on the charts, location FGA, that reflects type 21,23 on

14  Ms. Brown's report and type 21,23 on your report at that

15  location.  Would that be a match?

16  A.  Yes.

17  Q.  Directing your attention now to the next location, which

18  would be the amelogenin location.  I'm not sure I'm pronouncing

19  that right.

20  A.  Amelogenin; close.

21  Q.  And is that the location that pertains to a person's sex?

22  A.  Yes.  This is what we call the sex marker.  That's just

23  telling us that this profile is originating from a female or

24  male.

25  Q.  Is that a location that you look at in addition to the 13

Aper - direct

1  standard locations we discussed earlier this morning?

2  A.  Yes, we use this one.  But in terms of any type of

3  statistics, this is not used for those.

4  Q.  In connection with this location, Ms. Brown's report reflects

5  X,Y, and your report reflects X,Y as well, correct?

6  A.  Correct.

7  Q.  Is that a match?

8  A.  Yes.

9  Q.  It means it's a male?

10  A.  Yes.

11  Q.  Directing your attention to the next location on the chart,

12  location D8S1179.  Ms. Brown's chart reflects it is a 13,14, the

13  type at that location.  Your chart reflects a 13,14 as well at

14  that location.  Is that a match?

15  A.  Yes, it is.

16  Q.  Directing your attention now to the next location, location

17  D21S11.  Ms. Brown's chart reflects that the DNA obtained from

18  the mask is a profile 28,31 at that location.  Your chart

19  reflects that Mr. Ford's type is also 28,31 at that location.  Is

20  that a match?

21  A.  Yes, it is.

22  Q.  Directing your attention now to the next location, D18S51,

23  Ms. Brown's report reflects that the profile or the sample

24  obtained from the mask is a 17,INC.  Can you explain what that

25  means?

Aper - direct

1  A.  INC is short for inconclusive.  Basically she didn't have

2  enough information at that locus to be certain whether it was a

3  17,17 or if its other allele was just below our threshold.  So

4  she went with a 17,INC.

5  Q.  And you peer reviewed or technically reviewed her conclusions

6  in this regard?

7  A.  Yes, that's correct.

8  Q.  Did you agree with that conclusion?

9  A.  Yes, I did.

10  Q.  Directing your attention to your chart for that same

11  location, it reflects that Mr. Ford is a 16,17 at that location?

12  A.  That's correct.

13  Q.  Is this a difference?

14  A.  When we're comparing these profiles, I'm just making sure

15  that any type found in the forensic profile, the column on the

16  left, is at least present in my standard.  So I do have a 17

17  present at that locus.  So based on that I cannot exclude him

18  having that profile present at that one location.

19  Q.  Directing your attention now to the next location reflected

20  on these charts, location D5S818.  Ms. Brown's chart reflects

21  that the profile obtained from the mask is a 9,10 at that

22  location.  Your chart reflects that Mr. Ford is a 9,10 at that

23  same location.  Is that a match at that location?

24  A.  Yes, it is.

25  Q.  Directing your attention to the next location, location

Aper - direct

337

1  D13S317.  Ms. Brown's chart reflects that the profile obtained

2  from -- I'm sorry -- the DNA obtained from the mask is a type

3  9,13 at that location.  And your chart reflects that Mr. Ford is

4  a 9,13 at that location.  Is that a match?

5  A.  Yes, that's a match also.

6  Q.  Directing your attention now to the next location, which is

7  location D7S820.  Ms. Brown's chart reflects an ND.  Can you tell

8  us what that means?

9  A.  Yes.  That's short for not detected.  That means she did not

10 see any allele calls or allele types in that profile at that one

11 location.

12 Q.  And your chart reflects that Mr. Brown is a 9,12 at that

13 location?

14 A.  Mr. Ford, yes.

15 Q.  Mr. Ford.  Excuse me.

16 A.  Yes, is a 9,12.

17 Q.  That is not a difference, is it?

18 A.  No.

19 Q.  With respect to the next location, D16S539, Ms. Brown's chart

20 reflects that the DNA obtained from the mask is type 11,11 at

21 that location.  Your chart reflects that the sample obtained from

22 Mr. Ford is 11,11 at that location.  Is that a match?

23 A.  Yes, it is.

24 Q.  With respect to the next location, THO1, Ms. Brown's chart

25 reflects that the DNA obtained from the mask is type 6,8 at that

338

Aper - direct

1  location.  Your chart reflects that Mr. Ford is type 6,8 at that
2  location.  Is that a match?
3  A.  Yes, it is.
4  Q.  Directing your attention to the next location, TPOX,
5  Ms. Brown's chart reflects that the DNA obtained from the mask
6  was type 8,11 at that location.  Your chart reflects that
7  Mr. Ford was type 8,11 at that location.  Is that a match?
8  A.  Yes.
9  Q.  And finally directing your attention to the last location,
10  location CSF1PO, Ms. Brown's chart again reflects not determined,
11  ND.  Your chart reflects type, Mr. Ford as type 9,12 at that
12  location?
13  A.  That's correct.
14  Q.  That is not -- is that a difference?
15  A.  Right.  We would not call it no match just because there is
16  no information in her profile at that location.
17  Q.  Is it common to compare samples in a situation where one of
18  the profiles is not complete at all 13 locations?
19  A.  Yes, that's definitely not uncommon.  Like I said, a lot of
20  the samples that we do work aren't always in the best condition.
21  So some of those different factors, whether it's time, heat,
22  humidity, bacteria, the amount of time, even the contact time,
23  whether it is face to a mask, all those types of things can, you
24  know, lead to leaving behind more or less DNA, which means we may
25  not always get a full profile.

Aper - direct

1  Q.  Did you conduct any type of statistical or probability

2  analysis after compiling your profile and determining that the

3  profile of Mr. Ford matched the DNA taken from the mask at all

4  these locations?

5  A.  Yes.  When I found that he could not be excluded, then I

6  proceeded to do a statistical analysis on this case.

7  Q.  Can you tell us the purpose for which this statistical

8  analysis was performed?

9  A.  Sure.  Basically any time in DNA, if we find a profile that

10 matches someone or someone can't be excluded, we conduct a

11 statistic that basically tells you how frequently you would

12 expect to encounter that forensic profile, the one that Keia

13 developed, how frequently you would expect to find that in the

14 random unrelated population.

15 Q.  Can you tell us how these types of statistics or

16 probabilities are calculated?

17 A.  Yes.  Basically in the forensic world we've got kind of what

18 we call or forensic Bible.  The National Research Council issued

19 a report in 1996 that basically laid the groundwork for how to

20 conduct DNA testing, how to conduct statistics in the analysis of

21 evidence, and also a DNA Advisory Board also issued

22 recommendations and guidelines that basically every forensic

23 crime lab in the country follows.  So we follow those.

24       And in those reports, they said that with these 13

25 locations that we look at to tell from person to person, you can

Aper - direct

1  develop, basically what we're doing is they sampled the random

2  population.  Basically the FBI did a study where they went out

3  and sampled a couple hundred people, typed at least a couple

4  hundred people at each of those 13 locations.  What they did is

5  they compiled data based on, okay, at this one location I saw,

6  out of 300 people, let's say I saw 5 people that had type 7, 10

7  people had type 8, 20 people had a type 11.

8          So they basically looked at how many times they saw that

9  common type at each location, and then they figured out, okay,

10 well, this type 7 is seen in approximately 5 percent of the

11 population.  Type 10 at this location is seen in maybe 30

12 percent.

13         They actually did that within each population subgroup.

14 They calculated for the black population, Caucasian population

15 and also the Hispanic population, because a lot of times certain

16 types are more common in different races.

17         So basically they calculated all those allele

18 frequencies.  And it's from that FBI study that they created a

19 database that has all those frequencies that they've calculated,

20 and we use those to compile our statistic for the profile.

21 Q.  Based on your work in this case, did you form an opinion

22 about the probability of the profile taken from the mask matching

23 the profile of John Ford that you compiled?

24 A.  Yes.  The statistic reflects how frequently you would expect

25 to find that profile from the mask in a random unrelated

Aper - direct

1 population.

2 Q.  Can you tell us how you went about doing that?

3 A.  Yes.  Basically if you can think of it, you know, through

4 this study that calculated these frequencies on how often in the

5 population you see certain types.  And really how it works is

6 kind of what we call a product rule.  If you can think of if

7 someone asks you to flip a coin, and, you know, what are the

8 chances of flipping heads?  Fifty percent.  What are the chances

9 of flipping heads two times, you know, two times in a row?  You

10 would have to take .5 times .5.  So it's a quarter.

11          Now, we kind of do that with this.  Basically I

12 multiplied the frequency of each type at each locus.  So let's

13 say a 7 is found in a quarter of the population, and a 10 is

14 found in a quarter of the population.  Those are multiplied

15 together.

16          Then I multiply that number by the number from the next

17 location by the next location.  Wherever I've got a complete

18 profile, we conduct a statistical analysis on that.  And that's

19 what we refer to as the product rule.  That's kind of the

20 foundation of how these stats are developed.

21 Q.  You performed those calculations in this case?

22 A.  Yes.

23 Q.  Did you do them by hand, or did you use a calculator or

24 computer?

25 A.  The FBI provides a program called Pop Stats that basically

Aper - cross

1  has all those allele frequencies from that study built into the

2  software.  All I have to do as an analyst is simply type in the

3  types at the locations that I'm going to do statistics on.

4  Q.  Can you tell us what your conclusion is with respect to the

5  probabilities?

6  A.  Yes.  This profile from the mask that Keia developed would be

7  expected to occur in 1 in 81 trillion black, 1 in 29 trillion

8  white or 1 in 9.5 trillion Hispanic unrelated individuals at the

9  locations where she got a complete profile.

10  Q.  What does that mean?  Can you explain what you mean by that?

11  A.  Yeah, sure.  Basically that means if you sampled, let's take

12  the lowest number, 9.5 trillion Hispanics, you would have to

13  sample at least 9.5 trillion Hispanic unrelated individuals to

14  see that profile one time.

15         If you look in the Caucasian population, you would

16  theoretically have to sample 29 trillion individuals to find that

17  same profile from the mask.

18         MR. YOUNG:  May I have a moment, Your Honor?

19     (Discussion off the record.)

20         MR. YOUNG:  I tender the witness, Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. PETRO:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  Is it professor or something like that?  Professor Aper, what

343

Aper - cross

1 would I call you?

2 A.  Mr. Aper sounds good.

3 Q.  Mr. Aper.  Great.

4        MR. PETRO:  Good afternoon, everyone.  How are you,

5 everyone?

6 BY MR. PETRO:

7 Q.  I just want to, this coin-flipping example that you used, it

8 caught me, because I actually read about this.  So I want you to

9 explain this for the folks using your expertise in statistics.

10        The coin flipping rule, you flip it 10 times, you would

11 multiply 5 times 5 times 5 times 5, and you would have a

12 probability?

13 A.  Point five times.

14 Q.  Point five.  1 over .5, is that correct?

15 A.  Well, it would be 1 over 2 is .5.

16 Q.  Well, isn't it true, sir, that if you flipped a coin 20

17 times, that if you expected to get heads 20 times in a row based

18 on your formula, the odds would be 1 in a million.  You've read

19 this study, haven't you?

20 A.  I'm not sure which one you're citing.

21 Q.  Well, you flip a coin 20 times.  If it's equally weighted so

22 that it has exactly the same probability you get heads or you get

23 tails, if you flip that coin 20 times in a row, because if you

24 multiply .5, .5, .5  20 times in a row, the odds are 1 in a

25 million that you would get 20 heads, is that correct?

344

Aper - cross

1  A.  I don't have a calculator, but that sounds about right.

2  Q.  And the problem is someone actually had enough time to go

3  through and flip that coin 20 times over and over and over and

4  over again.  They had computer programs that simulated that.

5  You're aware of this study, correct?

6  A.  I'm not sure which one you're citing.

7  Q.  And you know what they found with respect to that study, sir?

8  That the odds were one in one, one in one that if you flipped a

9  coin 333,000 times that you would get 20 heads or 20 tails.

10 Would you agree with that?

11 A.  I'm not sure which report you're citing.

12 Q.  Well, they also have another one called the birthday problem.

13 You've heard about the birthday problem, haven't you?

14 A.  I've heard about that, yes.

15 Q.  And there is 365 days in a year, is that correct?

16 A.  Yes.

17 Q.  But they did studies, if you put people in a room, how many

18 people would you need in the room before you had two people with

19 the same birth date.  You're familiar with this problem, isn't

20 that correct?

21 A.  Yes.

22 Q.  And common sense and statistics would tell us that if you

23 have 365 different days of the year, it would probably take 366

24 people in the room to get two people with the same birthday,

25 isn't that correct?

Aper - cross

1   A.  It depends on which question you're asking.  Are you

2   asking --

3   Q.  Well, there is 365 different outcomes, aren't there?

4   A.  For a birthday in a year, yes.

5   Q.  That's right.  So if you want two people with exactly the

6   same, you would need 366 people in the room, right?

7   A.  Yes, if you picked one person, if I was to say I want to find

8   somebody else that shares my exact birthday, to at least have a

9   50 percent chance of finding somebody with my specific birthday,

10  I would need to probably ask at least 180 or so people.

11  Q.  Well, that's not true though, because you've read about the

12  birthday problem.  They have done studies about the birthday

13  problem.  And in all those studies and using all the statistics,

14  you know what they found?

15  A.  Yes.

16  Q.  You needed 23 people in the same room in order to get two

17  people with the same birthday, is that correct?

18  A.  Yes, that's correct.

19  Q.  And that's the same product rule that you're using, isn't

20  that correct?

21  A.  Not quite.

22  Q.  Well, the coin flipping example is the same product rule that

23  you are using, is that correct?

24  A.  That is correct.

25  Q.  Well, I want to stick on statistics, because I can only

Aper - cross

1   remember them for so long.

2          MR. PETRO:  Just to be clear, Judge, I'm looking at

3   Government Exhibit 21.  And I'm looking at pages 37 and 38.  I

4   believe it's 37 and 38.  I might be doing this backward from what

5   counsel was doing it.

6          Did you have them the other way, counsel?  Do you

7   remember?

8          MR. YOUNG:  It's page 38 that you have up there now and

9   39.

10         MR. PETRO:  I love these statistics.

11  BY MR. PETRO:

12  Q.  Now, with respect to this location here, no determination,

13  for what I'm focusing on right here, D7S820 -- I guess I better

14  zoom out -- you have a 9 and a 12 on the left, and you have a no

15  determination on the right, is that correct?

16  A.  That's correct.

17  Q.  And with respect to that no determination, that doesn't mean

18  that there is no -- there are no alleles at that particular

19  location.  They exist, is that correct?  They exist in John Ford

20  at 9,12, is that correct?

21  A.  They do exist in the profile I developed, yes.

22  Q.  But we don't know what they are at that particular location,

23  is that correct?

24  A.  In the profile on the right, that's correct.

25  Q.  And with respect to that particular profile, and you're free

347

Aper - cross

1  to disagree if you want, but I was reading some literature, but

2  you expect to find alleles at that particular location of 6, 7,

3  8, 9, 10, 11, 12, 13, 14, or 15?

4  A.  Yes.

5  Q.  Is that accurate?

6  A.  That sound about right.

7  Q.  Well, do you know?

8  A.  I'd have to look at the types available at that location.

9  But from my experience, that sounds like the right answer, yes.

10  Q.  Well, with respect to your product rule then at that

11  particular location, since you can have a 9,9, a 9,10, a 9,11, a

12  9,12, a 9,13, et cetera, et cetera, et cetera --

13  A.  Right.

14  Q.  -- your product rule would say that we would multiply 9 times

15  9, because each combination, 1 for 9, you could have a 9,9, you

16  could have a 9,10 at the next location, so what you would do is

17  you would say 9 times 9 times 9 times 9 times 9 times 9, and you

18  would do that.  And what you would have at the end is you would

19  have 9 times 9 times 9 times 9 times 9 times 9 times 9 times 9.

20  Nine 9s multiplied together, isn't that correct?

21  A.  That's not how it works.

22  Q.  Well, explain how many different combinations exist at D7820.

23  How many different combinations could there possibly be at that

24  particular location?

25  A.  Well, it works as he was saying, you know, if you've got

348

Aper - cross

1  let's say 9, 10, 11, 12, 13, 14, 15 as possibilities you would

2  have to consider, you know, there could be a type 9,9, there

3  could be a type 9,10, 9,11, 9,12, 9,13, 9,14, 9,15.  And then you

4  would say, okay, you could have a 10,10.  I've already said 9,10.

5  So then you would go 10,11, 10,12, 10,13, 10,14, 10,15.  You

6  could have an 11,11, 11,12, 11,13, 11,14, 11,15, 12,12, 12,13,

7  12,14, 12,15, 13,13, 13,14, 13,15, 14,14, 14,15, and lastly

8  15,15.

9          Those are all the possible combinations in his example

10  of using D7S820.

11          But in calculating the frequency at that location isn't

12  as simple as saying 9 times 9 times 9 times 9 times 9.

13          The way that you calculate the frequency if you want to

14  add up all those combinations is I would use the allele frequency

15  for a 7,7 and a 7.  So I multiply those two numbers for the

16  frequencies.  And then I add that to the frequencies of each of

17  those other choices.  So I'm not multiplying each possibility by

18  each other.  I end up adding them together.

19  Q.  Well, in order to clarify the statistics for the people of

20  the jury, I'm going to make this simple.  If this one here is

21  9,10 at D7S820, for instance -- which is a possible combination,

22  can we agree on that?

23  A.  Yes.

24  Q.  What is the possibility that the mask and John Ford's profile

25  is the same?

Aper - cross

1  A.  If we saw in this profile on the right, if it was called a

2  9,10, we would say that it's a no match for the profile.  No

3  statistical comparison would be done, because we've now found one

4  location where we have total information, we have all information

5  on the right, what we found does not match the standard we

6  compared to.  All it takes is one location to say that it's not

7  someone.  In that situation we would call it a no match.  It's

8  not John Ford.

9  Q.  Well, based on my view of what you just said, when this

10 number, when these two numbers here don't match these two numbers

11 here, what we do is we multiply it by zero, is that correct?  So

12 27 trillion times zero would be zero.  At least that's what I

13 remember from when I was in grade school.

14          MR. YOUNG:  Object to relevance, Your Honor.

15          THE COURT:  I'm not sure where you are going with this

16 either.  But he is an expert.  I'm not --

17          MR. PETRO:  If you just --

18          THE COURT:  Excuse me.  Excuse me.  Are you asking him

19 to do the math?

20          MR. PETRO:  Yes, absolutely.

21          THE COURT:  Well, I don't think you have to ask him to

22 do the math.

23 BY MR. PETRO:

24 Q.  If it doesn't match, you multiply it by zero, right?

25          MR. YOUNG:  Objection, Your Honor.  The witness, it's

350

Aper - cross

1   asked and answered, the witness indicates there is no statistical

2   probability done if it's a non-match, because it's a non-match.

3            THE COURT:  I think we can all agree about that.

4            MR. PETRO:  Okay.  Thank you, Judge.  I'll move on.

5   BY MR. PETRO:

6   Q.  Now, down here at the bottom, CSF, CSF1PO.

7            MR. PETRO:  Is that a COfiler or Profiler Plus, do you

8   know?  It is, isn't it?

9   BY MR. PETRO:

10  Q.  The same thing, what are the possible or what is the possible

11  range of alleles for CSF1PO?

12  A.  That's CSF1PO, I don't have an exact number, but I believe

13  there is I would say at least probably 8 common types at that

14  location, 7 or 8.

15  Q.  So the same thing, we'll just stick because what I know is

16  that there is at least three common types, because over here it's

17  9 and 12, is that correct?

18  A.  Yes.

19  Q.  So we know for a fact that it's 9, 10, 11, and 12 at the very

20  least?

21  A.  Well, you can't assume that.  But, yes, in fact, there is a

22  9, 10, 11, 12.

23  Q.  And there is probably even more than that, is that correct?

24  A.  Yes.

25  Q.  But the same thing right down here.  This was a 9, and this

Aper - cross

1  one was an 11.  What would your analysis be of that particular

2  situation right there, sir?

3  A.   Once again if you see that in the profile on the right, we're

4  seeing two types, you know you've got all the information at that

5  location, because we know the most types that one person can have

6  is two.  You get one type from your one mother, one type from

7  your father.  So when you see two types, you're comfortable that

8  you've got all the information there.

9         So in this situation I see a 9,11 in the forensic

10  profile.  My standard is a 9,12.  I would call it a no match, end

11  of story, no statistics.

12  Q.   Multiplied by zero again, correct?

13         MR. YOUNG:  Objection, Your Honor, same line of

14  questioning.

15         THE COURT:  Sustained.

16  BY MR. PETRO:

17  Q.   And then the last thing I just kind of want to flesh out with

18  respect to these statistics, in 2006 you were working at the

19  Illinois State Police, weren't you, sir?

20  A.   Yes.

21  Q.   Now, in 2006, a bunch of people got together, lawyers

22  representing people, and they actually wanted you to take your

23  database, the database that the Illinois State Police uses, and

24  they wanted you to search your database to determine if there

25  were people that had common profiles, isn't that correct?

Aper - cross

1  A.  Yes.

2  Q.  And when they searched those databases at the time that they

3  searched them in 2006 --

4          MR. YOUNG:  Your Honor, I'm going to object to

5  relevance.

6          THE COURT:  Let's have a sidebar on this.

7      (Discussion at sidebar on the record.)

8          MR. YOUNG:  Your Honor, there have been various studies

9  done of state databases in which they randomly sampled them.  I

10  think Mr. Petro is getting at the fact that Illinois has not done

11  such a request or complied with such a request.

12          MR. PETRO:  Oh, they did.

13          MR. YOUNG:  Correct me if I am wrong.

14          MR. PETRO:  They did comply, Judge.  And they found that

15  in the 230,000 profiles, they found 903 people that matched at 9

16  locations.  They have done this also in Maryland, they had 20,000

17  profiles --

18          THE COURT:  Keep your voice down, please.

19          MR. PETRO:  -- they found 33 matches.

20          THE COURT:  Keep your voice down, please.

21          MR. PETRO:  All right.  They did it in Arizona, too, and

22  they found 144 matches.  The important thing is that in Maryland

23  when they did it, they actually found 3 people that matched at

24  all 3 particular locations.

25          I just want to know if he's aware of the results of the

Aper - cross

1  test when they examined the big database.

2       THE COURT:  He certainly testified enough about his

3  training and knowledge and expertise in this field.  I think it's

4  fair game.

5     (End of discussion at sidebar.)

6       THE COURT:  Go ahead, Mr. Petro.

7  BY MR. PETRO:

8  Q.  In 2006, they asked you to go through or they asked the

9  Illinois State Police to go through their particular database and

10  see if there were people that had common profiles, is that

11  correct?

12  A.  Yes.

13  Q.  And they did this specifically, because you guys come in and

14  you give these astronomical numbers, 1 in 27 trillion, they

15  wanted to know if they searched the database whether 2 people had

16  the same profile, is that correct?

17  A.  Yes, that's correct.

18  Q.  And they also did this study in Arizona, is that correct?

19  A.  Yes.

20  Q.  And they also did the study in Maryland, is that correct?

21  A.  I believe so.

22  Q.  And with respect to the study that was done in 2006 in

23  Illinois, out of the 230 profiles that were searched, they got

24  903 people that matched at 10 loci, is that correct?

25  A.  Out of 230 or 230,000?

Aper - cross

1  Q.  230,000 profiles.

2  A.  I'm sorry, what was the last part of that?

3  Q.  They found 903 people that had the exact same DNA profiles at

4  10 locations, is that correct?

5  A.  I believe it was at 9 locations.

6  Q.  But there were 903 people with the exact same profile, is

7  that correct?

8  A.  Not exactly.

9  Q.  Go ahead.  You can explain.

10 A.  Within the database, CODUS, it's not always the best database

11 for doing types of studies like this, within this database, there

12 are numerous duplicate samples where the same sample has been

13 collected from the same exact person multiple times, and it's

14 still in the database multiple times.

15      Also there can be identical twins that are also in the

16 same database.  Identical twins share the same profile.  Those

17 profiles, of course, would match.

18      And there is also relatives, very close relatives of

19 these people in the database, which could also make it seem like

20 profiles occur more frequently than what they actually would in a

21 random unrelated population.

22 Q.  And just to be clear, I was reading your book over here, your

23 manual over here, to be clear, to develop all these odds or all

24 these frequencies, the number is, the magic number for Caucasians

25 or white people would be 200 people that they sampled, is that

Aper - cross

1  correct?

2  A.  Sampled for?

3  Q.  These statistics.

4  A.  Do you mean the study that the FBI conducted to develop the

5  allele frequencies?

6  Q.  These statistics come from the FBI, correct?

7  A.  Yes.

8  Q.  And the study that they did with regards to the frequencies

9  was 200 people, they studied the DNA from 200 people, is that

10  correct?

11  A.  It depends.  Each locus, they sampled a different number of

12  people.  Some could have been more than 200, some could have been

13  200.  But basically they followed the guidelines National

14  Research Council report that I said is kind of like the forensic

15  Bible that we all follow, where they laid the foundation saying

16  sampling 100 to 150 people is even enough to come up with

17  accurate statistics based on these 13 locations.

18  Q.  And it's kind of the same math that goes with these political

19  polls where you sample 200 people in the United States, and you

20  know who is going to be president, is that correct, same method?

21  A.  I don't know if I would liken it to that.

22  Q.  Now, to be clear, there is actually a database in the United

23  States of America, the FBI database, the CODUS database that you

24  are aware of, is that correct?

25  A.  Yes.

356

Aper - cross

1  Q.  And in that particular database there is over 8 million

2  profiles in that particular database?

3  A.  That sounds about right.

4  Q.  To your knowledge, has that database ever been challenged in

5  any way to determine in any way, shape, or form if there was

6  common profiles at 13 locations?

7  A.  At 13 locations?

8  Q.  Uh-huh.

9  A.  I'm not aware of that being pressed upon by the national

10  index.

11  Q.  Now, in your experience, sir -- I forgot one thing, I almost

12  forgot one thing over here.  We forgot D18S51.

13        In that particular case at D18S51, there is a lot of

14  different alleles at that particular location, a lot of different

15  allele combinations at that particular location, is that correct,

16  sir?

17  A.  Yes, that's correct.

18  Q.  And it goes from actually allele number 9,10 all the way up

19  to 26, is that correct?

20  A.  That sounds right.

21  Q.  There is 17 different possible combinations or alleles that

22  could exist right here where "INC" is, is that correct?

23  A.  Yes.

24  Q.  Now, with respect to this course work on this particular

25  case, if you look at D16S539, you know that there was only one

Aper - cross

1  peak at that particular location, is that correct?

2  A.  Yes.

3  Q.  And with respect to that one peak at that particular

4  location, even though you had one peak at that particular

5  location, you called that an 11,11, is that correct?

6  A.  Yes.

7  Q.  Now, with respect to the 16 and the 17 at this particular

8  location, the 16 and 17 and the 17,INC, you only had one peak

9  from Keia Brown's DNA profile at that particular location, is

10 that correct?

11 A.  Yes, that's correct.

12 Q.  So one interpretation of that particular number would be that

13 that particular number is 17, isn't that correct?

14 A.  That it's 17,INC or a 17?

15 Q.  17,17, one interpretation would be that this is a 17,17, is

16 that correct?

17 A.  Not if you're following our interpretation guidelines from

18 the state police.  We would not call that a 17,17.

19 Q.  Well, down here you have one peak, and you call it an 11,11,

20 is that correct?

21 A.  Yes, that one was called an 11,11, once again, following our

22 written procedures and guidelines on how to interpret DNA

23 profiles.

24 Q.  Because you kind of slipped when you were talking about this

25 particular location when you were testifying, you kind of said it

358

Aper - cross

1  could be a 17,17 at that particular location.  That's one

2  interpretation for that particular number, is that correct?

3  A.  At D18?

4  Q.  This one right here (indicating).

5  A.  We would not type that, we would not call it a 17,17 from the

6  peak that Keia Brown saw in the profile based on our guidelines

7  on how to interpret DNA profiles.

8  Q.  But that is one interpretation.  There is disagreement with

9  respect to allelic dropout, is that correct?

10 A.  In our state police, if another analyst even at another lab

11 looked at the same profile, they would call it a 17,INC.

12         If I would have let her call it a 17,17 the first time,

13 I would have told her to change it or else I'm not signing off on

14 your report.

15 Q.  So there is some subjectivity to it, is that correct?

16 A.  No, because if you are following our guidelines, you would

17 never call that a 17,17.

18 Q.  Well, if she called it 17,17 though, you could override here,

19 is that correct?  You're her boss, is that correct?

20 A.  Nope.  I am her peer.  And if I -- you know, I could say,

21 "Keia, based on our guidelines you cannot call it a 17,17.  So

22 until you change it to a 17,INC, I will not sign off on it."

23 Q.  So you guys do disagree then as to how to interpret these

24 various alleles or this allelic dropout, is that correct?

25 A.  Not in this instance, no.

Aper - cross

1  Q.  Are there ever disagreements among the people as to what you
2  call a particular loci?
3  A.  Typically not in single source profiles like this.  The only
4  time usually you can get in some discussions on possibilities is
5  when you are seeing mixtures of two or more people.  Those can
6  get a little bit more complex.
7  Q.  What is observer bias, sir?
8  A.  You tell me.
9  Q.  Well, isn't observer bias, sir, when someone expects or wants
10  a particular result, it can influence what they observe at a
11  particular location, isn't that true, sir?
12  A.  It sounds right.
13  Q.  And there is also comparative bias, too, isn't that correct,
14  where when someone is comparing the results to something else,
15  and they want a particular result, it would be the same thing, it
16  could influence the way that they see particular things, isn't
17  that correct?
18  A.  Yes.
19  Q.  Now, in this particular case, you knew that there was a
20  buccal swab coming from John Ford in this particular case, is
21  that correct?
22  A.  Yes.
23  Q.  And with respect to that particular buccal swab, even though
24  you had some previous involvement in the case -- you had some
25  previous involvement, correct?

360

Aper - cross

1  A.  I peered every page of Keia's file, so yes.

2  Q.  So even though you had some particular bias with respect to

3  that particular file, you specifically asked that it be sent to

4  you, isn't that correct?

5  A.  That's not correct.

6  Q.  Well, you sent e-mails that said to direct any buccal swab

7  that was taken from the suspect, John Ford, and make sure that

8  they get to Blake Aper, isn't that correct?

9  A.  I believe the only reason I did that is because the detective

10 that collected the sample called the lab, it happened to go to

11 me.  He said he was collecting the sample and needed to know

12 where to send it.  So I said just send it to me, to my attention.

13 Q.  Send it to you so you could analyze it, isn't that correct?

14 A.  Yes.  I could have analyzed it just as easily as anyone else.

15 Q.  Well, why didn't you just give it to someone else since you

16 already had some type of observer bias built in to this

17 particular result, why didn't you just give it to someone else

18 blind to do the analysis of this particular sample?

19 A.  We don't have any bias in our analysis.  Our goal isn't to

20 try to find somebody that matches.  Like we talked about earlier,

21 I've easily -- I don't just work for the state.  I've testified

22 for the defense.  So we are not biased individuals while we're

23 working a case.

24 Q.  Well, you slipped again.  You said your goal was to try to

25 find matches, isn't that correct, sir?

361

Aper - cross

1  A.  That's not our goal either.

2  Q.  You're in law enforcement, is that correct?

3  A.  I am an employee of the state police.  But I'm not a sworn

4  officer.

5  Q.  But you work for law enforcement.  When you got this file

6  here, you were working for law enforcement, is that correct?

7  A.  I'm an employee of the state police, correct.

8  Q.  And when you slipped and said your goal was to find matches,

9  that was just a mistake, is that correct?

10  A.  I don't recall saying that.  Our goal isn't to find matches

11  at all.  Our goal is to compare what was found on the evidence

12  profile, compare it to the standard.  If it doesn't match, it

13  doesn't match.  If it does match, I let you know what the

14  statistics are on finding that forensic profile in the general

15  population.

16  Q.  Now, you talk about this peer review.  That seems to be

17  something that's important for you, is that correct?

18  A.  Yes.  It's required.

19  Q.  It's not really peer review though.  Keia Brown is not just a

20  peer.  She's a friend, is that correct?

21  A.  She's a co-worker.

22  Q.  I saw you guys before court here when you came in to court

23  here today, you were at lunch and waiting to buy lunch together,

24  is that correct?

25  A.  Yes.

362

Aper - cross

1  Q.  You've known her for a long period of time, is that correct?

2  A.  At least since I've been in Rockford, yes.

3  Q.  How many years is that?

4  A.  Just over five years.

5  Q.  And then before you came in and testified over the lunch

6  break, I saw you with Keia Brown in the witness room, and you

7  guys were sharing conversation, is that correct?

8  A.  Yes.

9  Q.  You weren't talking about her testimony this morning, were

10  you?

11  A.  No.

12  Q.  Is there any guidelines in your office about once one analyst

13  testifies and is cross-examined thoroughly, about going and

14  spending time in the same room with them, possibly contaminating

15  the testimony of the second analyst?

16  A.  Part of our courtroom training is basically common knowledge

17  that if you testify, you're not to share your testimony with a

18  witness that's about to go on the stand.  So Cindy Torrisi

19  testified yesterday.  She did not share any of her testimony with

20  us at any time, not on the ride -- two-hour car ride back to

21  Rockford.  Keia did not share any of her testimony with me.  So

22  think of it what you may, but we can have conversations other

23  than court.

24  Q.  Well, think of it as you may, people like to make fun of

25  lawyers, because they perceive us maybe as being unethical, but

363

Aper - cross

1  we would call that in my profession the appearance of

2  impropriety.

3          MR. YOUNG:  Objection, Your Honor.

4          THE COURT:  Sustained.  And I'm striking that.  You'll

5  save your argument for the end, please.

6          MR. PETRO:  Thank you, Judge.

7  BY MR. PETRO:

8  Q.  Going back to this one more time, sir, if this was in fact a

9  17,17 at that particular location, what would the odds be at that

10 point?

11 A.  If we had enough information to call this a 17,17, once again

12 it doesn't -- it would not match John Ford.  If we had total

13 information knowing that, yes, I do feel confident that I've got

14 a 17,17, then I would have said that does not match John Ford.

15 Q.  And it's just an interpretation by you, a single peak at a

16 particular location is sometimes the same number, but sometimes

17 it's different, is that correct?

18 A.  Not in that instance.  The only way that should have been

19 interpreted was a 17,INC just as Keia had interpreted it.

20 Q.  While I'm looking at your reports here, well, this is

21 Government Exhibit 20 --

22          MR. PETRO:  Where is Government Exhibit 21?  I'm sorry.

23 BY MR. PETRO:

24 Q.  When you do your analysis of a particular sample, is it

25 proper to run an allelic ladder for that particular sample?

Aper - cross

1  A.  Yes.  Allelic ladders are required just as positive control

2  and negative control.

3  Q.  Would you, if for whatever reason, if you were to determine

4  or to discover that one of your peers did not include an allelic

5  ladder with her analysis, would that cause you to distrust that

6  analysis?

7  A.  Not distrust it, no.  But you would expect that they would

8  rerun those samples.

9  Q.  And with respect to your peer review, if you had a situation

10  where you put a blank into a particular location, and the machine

11  came back and gave you an 11 for an allele at that particular

12  location, would that cause you to distrust those particular

13  results?

14  A.  No.

15  Q.  Now, I noticed with respect to your particular tests in this

16  particular case, you've had an opportunity to review those before

17  you came in today, is that correct?

18  A.  Yes.

19  Q.  Sorry, all these charts look a little bit the same, sir.  I

20  want to focus on this particular location right here.  This is

21  the one where it's an 11, but you call it an 11,11, is that

22  correct?

23  A.  Yes.

24  Q.  Right next to that though --

25          MR. YOUNG:  Your Honor, could we ask that Mr. Petro

Aper - cross

1  specify the page of the exhibit that he's referring to?

2          MR. PETRO:  I'm sorry.  I will.  Page 33 of 56,

3  Government's Exhibit 21.

4          MR. YOUNG:  Thank you.

5  BY MR. PETRO:

6  Q.  It looks like there is a bump right here, sir, isn't that

7  correct?

8  A.  Page 30, what was that?

9  Q.  Page 33 of 56.

10  A.  Yes, there is a tiny little bump there.

11  Q.  And despite that tiny little bump there, you still called

12  that particular location 11,11, is that correct?

13  A.  Yes.

14  Q.  And when you see two bumps at a particular location where you

15  would expect to see them, one would be, for instance, if you look

16  at 14,15 over here, one would be from the male and one would be

17  from the female.  That's what you explained to us, is that

18  correct?

19  A.  Yes.  One of those types they inherited from their mother and

20  one of the types from their father.

21  Q.  So despite the fact that there is a second bump there, you

22  did not call that anything other than an 11,11, is that correct?

23  A.  Yes.

24  Q.  Now, isn't it true, sir -- one other thing I wanted to go

25  over with you also.

Aper - cross

366

1      (Discussion off the record.)

2  BY MR. PETRO:

3  Q.  Sir, I'm going to show you what has been labeled Defendant's

4  Exhibit No. 7, Group 7 for identification.  Could you take a look

5  at that document and tell me generally if you recognize what that

6  is, sir?

7  A.  It looks like this is, basically it's a run log that

8  starts -- this is created at the moment that you start a sample

9  run on the genetic analyzer that does all the typing.

10 Q.  With respect to that injection log, sir, log, sir, I'm going

11 to direct your attention -- and I'll take it back from you.  I'm

12 only going to go through one of them.  Since I already have the

13 COfiler up here, I'm going to stick with that one, all right?

14      Now, with respect to the highlighted portion of that

15 particular document, you can see that, sir, can't you?

16 A.  Yes.

17 Q.  What does that mean right there, injection 43, 1291080122?

18 Could you just explain generally what that top highlighted line

19 means?

20 A.  Basically that's saying that the sample was injected at 1/29,

21 on the date of 1/29/10 at 8:01 a.m., assuming that the clock is

22 set right on the computer.  It was injection 43 during the run.

23 So there is other samples that were injected during this run.

24 And it would be a COfiler injection of lab case number WO8-927-2.

25 2 is the exhibit number of the standard of John Ford.

Aper - cross

1  Q.  That's the COfiler run.  That would be consistent with this

2  run right here, going back to page, I believe it's 33.

3  A.  Okay.

4  Q.  If you notice right here on the top, I don't know if you can

5  see that, sir?

6  A.  Yeah, yep.

7  Q.  W08927-2, 1/29/10, 8:01 a.m., is that correct?

8  A.  Yes.

9  Q.  That's exactly what it says right here, 1/29/10, 8:01 a.m.,

10  is that correct?

11  A.  Yes.

12  Q.  And you put that date and time stamp on this particular

13  report here.  Do you put that on this time stamp here?

14  A.  It's automatically built in to the software.

15  Q.  And then I notice up here generally there is little boxes

16  that show you where the particular loci are located.  Did you

17  have any ability to control that particular aspect of it, sir?

18  A.  You can print out basically kind of brackets that tells you

19  this is the range that this location can be found at.  But that

20  wasn't selected for printing off in this instance.

21  Q.  Well, if you did a run, if, for instance, you got done with a

22  run, and you didn't find this particular document here, would

23  that cause you to be suspicious in any way, shape, or form?

24  A.  If I couldn't find which document?

25  Q.  This injection log form.

368

Aper - cross

1  A.  I think it's created automatically whenever you start a run.

2  Q.  So whenever you start a run, for instance, you started this

3  run on 1/29, for instance, it would create a log like this, is

4  that correct?

5  A.  I believe, yeah, when you start a run, the log is created at

6  the moment that you get started.

7  Q.  And then you if you wanted to redo it or you wanted to do a

8  different sample, it would create automatically an additional log

9  for that particular sample, is that correct?

10  A.  I believe after the run is done, after the last sample has

11  run, that then you proceed to start a brand-new run, a new log

12  would be generated for that specific run.

13  Q.  A new log would be created.  So if you did two runs, you

14  would have two logs, is that correct?

15  A.  As long as we're talking about running the same way.  Usually

16  I consider a run if I put 40 samples on a tray and hit start, it

17  automatically runs all 40.  That's what I call one run.  So once

18  that's done, if I go on to my next tray of 40, that would be run

19  2.  A different instrument log would coincide with that.

20      MR. PETRO:  One second please, Judge.

21     (Discussion off the record.)

22  BY MR. PETRO:

23  Q.  At one point when you were testifying, you were causing

24  about -- you were talking about junk DNA, is that correct?

25  A.  Yes, I did mention that.

Aper - cross

1  Q.  And you mentioned at some point in time that this junk DNA,

2  now I want to make sure I get your testimony accurate, this was

3  junk DNA, and you said that hopefully the loci at one location is

4  independent of the loci at another particular location, is that

5  correct?

6  A.  When they selected the 13 locations that we look at, their

7  intent was to pick 13 locations that are inherited independently

8  from one another.  So what I'm saying is let's say at one

9  location I'm a type 7,8.  They want to make sure at location 2

10 that my types there don't correctly coincide with what I was at

11 location 1.

12       So, you know, they want them to be totally independent

13 where, you know, if I'm a 7,8 here, I'm more likely to be a 10,12

14 here.  They didn't want that to happen.  They wanted it to be

15 independently inherited location.

16 Q.  Well, your testimony, sir, was hopefully, hopefully they were

17 independent to each other.  Is that what your testimony was, sir?

18 A.  I don't recall.

19 Q.  You don't know if they're independent of each other, is that

20 correct?

21 A.  That was the goal when they selected them, yes.

22 Q.  And the reason why it's important that they're independent to

23 each other is because you get to use the product rule then, don't

24 you?

25 A.  That's correct.

370

Aper - cross

1  Q.  If they were dependent upon each other, if you had a 7,8 at

2  one location and a 10,12 at another location, and a lot of people

3  had a 7,8 here and a 10,12 here, you would be able to conclude

4  that they were dependent, is that correct?

5  A.  I don't know about that.

6  Q.  Well, that would substantially affect the statistics that

7  you're using though, isn't that correct, if they were dependent

8  upon each other?

9  A.  Right.  If the locations were dependent as he said on one

10  another, then statistics would not be useful in that situation.

11  Q.  What are the total number of loci available in a strand of

12  DNA, sir?

13  A.  I'm not sure.  It's got to be a very large number.

14  Q.  Well, is it over 50?

15  A.  I would easily say yes.

16  Q.  You don't know that basic piece of information?

17  A.  No.  It's a very large number.

18  Q.  It's in the billions, isn't it?

19  A.  It's probably somewhere in there, yes.

20  Q.  But the number of loci that are actually examined by you and

21  your folks over there at the DNA lab is only 13, is that correct?

22  A.  Yes.  These 13 were selected quite a while ago.  These same

23  13 are used at labs across the country.

24  Q.  Now, I wanted to ask you about one part of your testimony.

25  And I guess you kind of already answered it.  When you were

371

Aper - cross

1  testifying on direct examination for the government, you said

2  that if there was DNA in the negative control, that would tip you

3  off that there was some type of contamination.  Was that your

4  testimony?

5  A.  Yes.  That would be one flag to alert you that that might be

6  a contamination.

7  Q.  And the negative control, just to be absolutely 100 percent

8  clear, that's when you put the blank swab into the tube and

9  analyze it, is that correct?

10  A.  That's a little different.  What he's talking about is what I

11  refer to as the reagent blank.  That's started at the step of

12  extraction when you put that swab into the tube.

13        What I call the negative control is that control that I

14  introduce at the amplification step where I'm making all the

15  copies.  That's what I call the negative control there.  What he

16  just referred to is what we would call the reagent blank.

17  Q.  To make a long story short, if you found an allele where it

18  was supposed to be blank, what you are saying is that would be a

19  tip-off that there is some type of contamination, isn't that

20  correct?

21  A.  Yes, it's possible.

22  Q.  And that's when you, you actually know your DNA profile, it's

23  your job to search down the source of the contamination, is that

24  correct?

25  A.  If it's a legitimate allele call, yes, it's your job to try

Aper - cross

1   to hopefully identify the source where that contamination came

2   from.

3            MR. PETRO:  If I may have just one second, please?

4       (Discussion off the record.)

5   BY MR. PETRO:

6   Q.  Now, way at the beginning of your testimony, I kind of asked

7   you some questions, but it wasn't the proper time to ask you

8   those questions, about how many times you had extracted DNA for

9   some reason, is that correct?

10  A.  Yes.

11  Q.  Do you remember those questions?  You said it might have been

12  1,000 or 2,000, and then I think you said it might have been

13  3,000 or 4,000.  Do you remember that type of testimony?

14  A.  Yes.

15  Q.  You don't know how many times that you've actually done this

16  though, is that correct?

17  A.  Done what?

18  Q.  Extraction, for instance.

19  A.  Not the exact number.

20  Q.  Well, you don't keep records at all to determine how many

21  times that you've done that?

22  A.  No.  I don't get paid by the extraction.

23  Q.  Well, how do you know if a mistake was made?  For instance,

24  say someone had an alibi for the time of a particular offense,

25  but you said it was a match.  How would you account for that in

Aper - redirect

1    your statistics?

2         MR. YOUNG:  Objection, Your Honor, relevance.

3         THE COURT:  I think it assumes a fact as well.

4         MR. PETRO:  I'll withdraw it, Judge.

5         No other questions, sir.

6         THE COURT:  Thank you.  Any redirect?

7         MR. YOUNG:  Just a few, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MR. YOUNG:

10   Q.  Mr. Petro asked you a series of questions about the product

11   rule.  Has that been a rule that you've applied throughout your

12   career at the Illinois State Police?

13   A.  Yes.  This is one that not only do we use in our Illinois

14   State Police lab system, but it's used outside the Illinois State

15   Police lab system.

16   Q.  And there was also discussion of the databases that the FBI

17   compiles regarding sampling of the population.

18   A.  Correct.

19   Q.  Are those databases that have been in use for a number of

20   years as well?

21   A.  Yes.  They're published in scientific journals, and

22   population studies have been ongoing at these 13 locations ever

23   since that date.

24   Q.  There was also some discussion of an allelic ladder as well

25   by Mr. Petro.  That hasn't always been a requirement of the state

1  police to have it included in the reports, is that correct?

2  A.  Right.  We haven't always been included to print out that

3  allelic ladder.  But you always have to run an allelic ladder,

4  otherwise your sample run won't work at all.

5  Q.  If I could direct your attention back to page 33 of

6  Government's Exhibit 21, which was your report.  Mr. Petro asked

7  you about the bump that appears there and why this was called an

8  11,11.

9  A.  Yes.

10 Q.  He didn't give you an opportunity to explain.  Could you

11 please explain?

12 A.  Sure.  If you could keep it up there, it will probably be a

13 little easier.

14 Q.  Thank you.

15 A.  So we already discussed the most types that you can have at

16 one location is two, one from each parent.  So to the left of

17 this, we saw the location that had a type 14 and a 15.  So at

18 that location, that person inherited two different types from

19 their parents at that location.  The fancy term for that is that

20 person's heterozygous at that location.

21       Whenever we see a location when there is just one peak,

22 there is the possibility that they inherited that same exact type

23 from each parent.  So that's what happened in this situation.

24 Mr. Ford inherited a type 11 from each of his parents.  That's

25 why you only see one spike there.

Aper - redirect

375

        The way that I know that he can't be an 11,10 or an 11,9
all has to do with how tall that peak is.  So if you see that
number below the 11, 1453, that's pretty much a unit of measure
of how high that peak is.

        Now, during our validation studies conducted at the
state police, they found that, let's say that other location, the
14,15, if you have two different peaks from each parent, those
peaks should be within 70 percent height of one another to say
that they originated from that one person.

        So if I look at this profile, I have a peak height of
1453.  So if I took 70 percent of that, you would see probably
about 1,000.  So if this person actually was heterozygous there
and did inherited two different types from his parents, you would
see an 11 at 1453 and another peak of whatever number you want to
use, about 1,000.

        But since I didn't see that, then I have full confidence
that he, in fact, is a type 11,11 there, because if he was
heterozygous and did, in fact, two types at that location, I
definitely would have seen it, because our threshold for these
peaks to get labeled with a type is 150.  So if I'm not seeing a
peak at 1,000, I know for sure he's a type 11,11 there.

        MR. YOUNG:  No further questions, Your Honor.

        THE COURT:  Any recross based on that?

                    RECROSS-EXAMINATION

BY MR. PETRO:

Aper - recross

1   Q.  Sir, with respect to the little boxes that are underneath

2   there, you have the discretion and the control to eliminate boxes

3   if you don't feel that it's sufficient for whatever reason, is

4   that correct?

5   A.  At minimum we're required to print the allele call, the box

6   that has the number, the number below it, which is the peak

7   height, and then the third box is basically how large that

8   fragment DNA is.  All three of those are required when we print

9   off our data.

10  Q.  That third number, would it be your assumption that all

11  forensic scientists working in DNA day to day should know what

12  that third number is in the box?

13  A.  The size of the fragment?

14  Q.  Yes, correct.

15  A.  Yes, we are trained that that is what that represents.

16          MR. PETRO:  Thank you.  Nothing further, Judge.

17          THE COURT:  All right.  Thank you.  You're excused, sir.

18  Thank you.

19          THE WITNESS:  Thank you.

20      (Witness excused.)

21          MR. YOUNG:  May we have a moment, Your Honor?

22          THE COURT:  Sure.  Do you want to take a little break?

23  Is this a good time for a break?

24          MR. YOUNG:  We just have a stipulation to read in, Your

25  Honor.  We can do it after the break as well.

377

1          THE COURT:  Is that it for you as far as witnesses?

2          MR. YOUNG:  We don't anticipate calling any further

3   witnesses, Your Honor.

4          THE COURT:  You don't anticipate.  So why don't you read

5   the stipulation, and we'll take a break.

6          MR. YOUNG:  It is hereby stipulated and agreed between

7   the United States of America, by Patrick J. Fitzgerald, United

8   States Attorney for the Northern District of Illinois, through

9   Assistant United States Attorneys Carol A. Bell and Rick D.

10  Young, and defendant John A. Ford, individually and through his

11  attorney, Michael J. Petro as follows:

12          The deposits of the U.S. Bank including the branch

13  located at 1586 North Rand Road, Palatine, Illinois were insured

14  by the Federal Deposit Insurance Corporation on November 20th,

15  2007.

16          So stipulated?

17          MR. PETRO:  Yes, sir.

18          MR. YOUNG:  And, Your Honor, the government would move

19  into evidence Government Exhibit 7, which is a certified copy of

20  the FDIC certificate for the bank.

21          MR. PETRO:  No objection, Judge.

22       (Government Exhibit 7 was received in evidence.)

23          THE COURT:  Okay.  Does the government rest then?

24          MS. BELL:  Yes, Your Honor.

25          THE COURT:  Very well.  All right.  Ladies and

1  gentlemen, we're going to take a quick break, and at that point

2  the defense would be entitled to put on its case if it chooses

3  to.

4       (Jury out.)

5       MR. YOUNG:  Your Honor, there is a matter we need to

6  raise.

7       THE COURT:  Okay.

8       MS. BELL:  Your Honor, during the last break, Mr. Petro

9  gave us some documents, an e-mail, a testimonial by a former

10 client of Mr. Ford's vouching for Mr. Ford's abilities as a

11 personal trainer, as well as a page of a photocopy of a calendar

12 from November 20th, including November 20th, 2007, and expressed

13 his intention to call a witness to testify that he was with

14 Mr. Ford on November 20th, 2007, I'm not certain where other than

15 somewhere at 7:30 with him.

16      When I asked him:  What would be the purpose of the

17 testimony of the testimonial?  Was this a character witness?

18      Mr. Petro said:  No.

19      I said:  Is this an alibi witness?

20      Mr. Petro said:  No.

21      The government has not received any notice of this.  The

22 Court's procedures were not complied with.  The government has

23 made two written requests to Mr. Petro beginning back in December

24 2009 for notice of alibi.  That request was renewed again by

25 letter this month.  We've discussed that with Your Honor in

379

1  court.  So the government has issues with the planned testimony

2  presentation of this witness.

3          MR. PETRO:  Judge, they have known about this witness

4  since October of 2009.  They had an opportunity to interview him.

5  In fact, with respect to the testimonial on this particular

6  person, the testimonial that this particular person made on

7  behalf of John Ford, I provided that, because the government

8  provided it to me.  They knew who this person was.  They had

9  every opportunity and it was my belief that they --

10          THE COURT:  Is this a character witness?

11          MR. PETRO:  No.  He's going to testify that John Ford

12  was his personal trainer.  I asked him if he could check his

13  records for the date of November 20th, 2007.  He then got back to

14  me and said that he, in fact, checked his records for November

15  20th, 2007, and his records indicate that he did have a personal

16  training session with John Ford.

17          Mr. Martin was kind enough to respond today and come

18  down to the cafeteria over the lunch hour.  He has the actual

19  notebook with him that would substantiate that at 7:30 p.m. on

20  that particular day, that he was, in fact, training with John

21  Ford.  He has the actual -- I just made a copy for the purposes

22  of allowing the government to see the actual, a copy of what was

23  in the particular book.

24          But it's not technically an alibi, Judge.  What it is,

25  it's testimony that at 7:30 on that particular day, he was, in

380

1  fact, at a gym and training with John Ford, his personal trainer.

2       MS. BELL:  Your Honor, I don't see how that testimony is

3  relevant unless it is to alibi Mr. Ford.  Indeed on cross with

4  Blake Aper, Mr. Petro brought up the issue of, you know, if this

5  guy, if he had an alibi.  So he's raised that with the jury.

6  That seems to be the clear intention here.

7       The records, the e-mail correspondence that Mr. Petro

8  just provided us show that Mr. Petro had corresponded with Russ

9  Martin and that he knew Russ Martin was going to testify about

10 this issue before this trial began.  He did not notify the

11 government.  He did not comply with the Court's procedures or the

12 rule.

13      THE COURT:  Well, it's not an alibi, because the robbery

14 was at 5:25, right?

15      MR. PETRO:  No, it's not.

16      MS. BELL:  The argument will be that because of the

17 training, what's in this correspondence is that the training was

18 held at gyms not at Palatine, but either Chicago or Evanston,

19 outside or far away from the location of the bank robbery.

20      MR. PETRO:  Judge, I just want to make it clear that the

21 identity of this particular person was provided to me by the

22 government when they tendered their Jencks material to me on

23 Thursday or shortly before.  I mean, my first conversation was on

24 Tuesday, October 5th, after I received the --

25      THE COURT:  What's the relevance of the testimony if not

381

1  an alibi?

2         MR. PETRO:  The relevance of the testimony, Judge, is

3  based on their submission to me, I went and sought out this

4  person named Russ Martin.  I asked him if he had any records as

5  to whether he had been training with John Ford.  And it's to show

6  that at 7:30 on that particular evening, that John Ford, in fact,

7  had a training session with Russ Martin.

8         THE COURT:  Assume that that's the fact.  What is the

9  relevance of that fact?

10        MR. PETRO:  The relevance is obviously to show that if a

11 person were to rob a bank in one particular location at this

12 time, and John was at this particular location at this time, it's

13 not technically an alibi.

14        And the bottom line is, if they were to cross-examine,

15 their first question would always be, "But you can't tell me

16 where Johnny Ford was at 5:30 that particular evening."  I've

17 done this a little bit of time, Judge.  That's always their first

18 question.  It's not an alibi.  I discovered this --

19        THE COURT:  But you haven't answered my question.  What

20 is the relevance?  If it's not an alibi, what is the purpose of

21 the testimony?

22        MR. PETRO:  The purpose of the testimony is to show that

23 on that date, time, and location, that John Ford was somewhere in

24 the Chicago area at 7:30 that night.

25        MS. BELL:  That's an alibi, Your Honor.

1          MR. PETRO:  The jury can draw any type of conclusion
2  that they want with respect to that particular testimony, Judge.
3          And if they had given me this Jencks material earlier, I
4  would have responded earlier.  I didn't even find out about the
5  darn -- I mean, I had heard about it, but I just found out about
6  it.
7          THE COURT:  You said they knew about it, and you knew
8  about it last year.
9          MR. PETRO:  They knew about it.  How can they say that
10 they're prejudiced by this testimony, Judge?  How can they say
11 they're possibly prejudiced?
12         THE COURT:  Putting aside the element of surprise about
13 the witness, I'm still unclear about, if it's an alibi witness,
14 you know you have to give them advance notice.
15         MR. PETRO:  It's not technically an alibi.
16         THE COURT:  Okay.  Then what is it then?  The fact that
17 he, you know, several hours later or an hour and a half later
18 was, you know, somewhere else?  Then it's nothing.  Now, if you
19 could say, you know, he was acting inconsistent with the demeanor
20 of someone who just robbed a bank at gunpoint -- but there is,
21 you know, there is a big disconnect here.
22         MR. PETRO:  Judge, a personal trainer two hours after a
23 bank robbery, his demeanor by default, default setting is that
24 it's inconsistent with someone that robbed a bank.  And they had
25 this information, and the jury should be -- it's not a question

1    of admissibility, Judge.  It's a question for the weight of this

2    particular testimony.  And they have an opportunity, two fine

3    attorneys over here, to cross-examine and excoriate Mr. Martin

4    like I've been doing to their witnesses, they can excoriate him.

5    It's not about -- it's about admissibility.  This is about the

6    weight that's to be given to it.  And it's not their job to

7    assign weight to it.  It's not the Court's job.  The finder of

8    fact assigns this weight, Judge.

9         MS. BELL:  Your Honor, the evidence to be admissible, it

10   has to be relevant.  And if Mr. Petro is saying it's not for an

11   alibi, then it's not relevant.  The only thing that would come in

12   then is to look at it as a character witness.  But that's not

13   what Mr. Petro is using it for.  He already started heading that

14   way with the cross of the last witness when he brought up alibi.

15   He gave the government no notice of any alibi witness.  It's

16   clear in his correspondence that he knew about this witness

17   coming to testify about this issue before this trial started.

18        The government has big problems with him being allowed

19   to put on a witness without our ability to have time to

20   investigate someone who is going to suddenly come up with an

21   alibi this late in the trial.

22        MR. PETRO:  That's what cross-examination is for.

23        THE COURT:  I'm not sure it's a question of notice since

24   you all, since both sides knew about him.  It's a question of

25   relevance.  I'll think about it over the break.

384

1        MR. PETRO:  Well, Judge, relevance, I would just say one

2   last thing, relevance is easy, because if the other side

3   complains, you know it's relevant.

4        MS. BELL:  The other side is complaining, Your Honor,

5   because of the use.

6        THE COURT:  If that were the test, we'd really be in

7   trouble.

8        MR. PETRO:  It always is.

9        THE COURT:  It might actually cut against your client,

10  you know, Mr. Petro, because it shows that he was in town at that

11  point.

12       MR. PETRO:  Well, I'm willing to take that chance.  I'm

13  willing to take it.

14       THE COURT:  I understand you must be.  Okay.  I'll think

15  about it.

16       Do you have any other witnesses besides that, Mr. Petro?

17       MR. PETRO:  I'm trying to straighten out one issue with

18  respect to -- we have a stipulation obviously that we're going to

19  be entering.

20       THE COURT:  Are you calling Officer Martino?

21       MR. PETRO:  We're going through right now with respect

22  to Officer Martino, there is some confusion about one particular

23  aspect of this.

24       THE COURT:  Okay.  Well, let me know when we come back.

25  I'll come back in before.

385

1    (Recess.  Jury out.)

2         MR. YOUNG:  I'm sorry, Your Honor.

3         MS. BELL:  I apologize, Your Honor.

4         THE COURT:  That's okay.  No problem.

5         All right.  I've taken another look at Rule 12, not that

6    I had to be reminded.  The government requested the alibi

7    witness, if there is going to be one, and notice wasn't given.

8    The rule favors not permitting an alibi witness.

9         Even though you say it's not an alibi witness, I don't

10   see any other purpose for it, for the testimony of that witness.

11   So I'm going to exclude evidence based on the proffer that I've

12   heard.

13        I also want to ask you since we're here without the

14   jury, does the defendant wish to testify or not?

15        MR. PETRO:  No.

16        THE COURT:  All right.

17        MR. PETRO:  Do you want to testify, John?

18        THE DEFENDANT:  No.

19        THE COURT:  All right.  Mr. Ford, you do have a right to

20   testify if you choose to.  You've been advised of that right, I

21   assume, is that correct, sir?

22        THE DEFENDANT:  Yes.

23        THE COURT:  Do you know that you have a right to

24   testify?

25        THE DEFENDANT:  Yes, I do.

 1          THE COURT:  Okay.  If you choose not to testify, no

 2   suggestion or inference of guilt will be drawn from that.  That

 3   is your right.  And if you chose to testify, the jury would be

 4   instructed that they should treat your testimony like the

 5   testimony of any other witness.  Do you understand that, sir?

 6          THE DEFENDANT:  Yes, I do.

 7          THE COURT:  Okay.  And is it your choice then not to

 8   testify?

 9          THE DEFENDANT:  Not to testify.

10          THE COURT:  Okay.  Thank you, sir.

11          Are you going to call Officer Martino?

12          MR. PETRO:  Yes, sir.

13          THE COURT:  Okay.  Just so you know, Ms. Herring has,

14   it's an administrative proceeding tomorrow morning.  I've written

15   a letter for her to the hearing officer.  It involves her child.

16   It's not a custody thing.  It's a child support issue.  I've

17   written a letter to the hearing officer.  And hopefully we can

18   get her here as soon as possible, but no later than 10:00

19   o'clock.

20          I'm going to tell the jury to come back at 9:45

21   tomorrow.  Hopefully we can jump right into it.  We can talk

22   about the instructions again when we let them go today.

23          Is that your only witness then?

24          MR. PETRO:  Well, Russ, I would like to call Russ

25   Martin, but you've just excluded him over my objection, Judge.

1          THE COURT:  That's fine.  Your objection is noted.  So

2   Martino is your only witness?

3          MR. PETRO:  Martino is my only witness.  And we have two

4   stipulations, sir.

5          THE COURT:  All right.  Fine.  Let's bring the jury in.

6          MS. BELL:  Thank you, Your Honor.

7      (Jury in.)

8          THE COURT:  Good afternoon, folks, again.  Please be

9   seated.

10          The defense wishes to call a witness?

11          MR. PETRO:  Yes, Judge.  The defense would call Officer

12   Martino from the Palatine Police Department, please.

13          THE COURT:  Raise your right hand, please.

14      (Witness duly sworn.)

15          THE COURT:  Have a seat, please.

16              GARTH MARTINO, DEFENDANT'S WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MR. PETRO:

19   Q.  Sir, do you have your police reports available?

20   A.  I handed them to the FBI agent to hold on to them for me.

21   Q.  Could you state your name please and spell your last name for

22   the Court record?

23   A.  Officer Garth Martino, M-a-r-t-i-n-o.

24   Q.  And where do you work, sir?

25   A.  I'm employed by the Palatine Police Department.

388

Martino - direct

1  Q.  And calling your attention to November 21st of 2007, were you

2  working for the Palatine Police Department?

3  A.  Yes, I was.

4  Q.  And with respect to your employment at the Palatine Police

5  Department, what was your exact assignment on that particular

6  day?

7  A.  I was assigned to patrol.

8  Q.  At any point during that day did you receive a call to

9  respond to 1586 North Rand Road, the U.S. Bank, to speak with

10  Daniel Thomas?

11  A.  Yes, sir.

12  Q.  A person named Daniel Thomas?

13  A.  Yes, I did.

14  Q.  Could you tell us what happened when you arrived at that

15  particular location?

16  A.  He gave me further information from the incident that

17  happened the day before.

18  Q.  Well, what information did he give you specifically on that

19  date?

20  A.  He informed me that a subject had come into the bank on that

21  day, and he felt that he resembled the offender from the day

22  earlier.

23  Q.  And with respect to that particular conversation, did he also

24  provide you some type of evidence, evidence specifically in the

25  form of a check that was cashed that day?

Martino - direct

1  A.  Yes, he did.

2  Q.  Do you have a copy of that check here with you today, sir?

3  A.  Yes, I do.

4  Q.  Could I see a copy of it, please?

5  A.  Sure.  It's a photocopy.

6  Q.  Thank you, sir.

7          MR. PETRO:  I'm going to mark this Defendant's Exhibit,

8  am I up to No. 8, sir?

9          THE COURT:  I think that's a safe number.

10          MR. PETRO:  Defendant's No. 8.

11  BY MR. PETRO:

12  Q.  With respect to this check here --

13          MR. YOUNG:  Is Mr. Petro moving to admit the exhibit,

14  Your Honor?

15          MR. PETRO:  I just wanted to show it.  He gave it to me.

16          THE COURT:  Well, hold on.  You don't publish it until

17  it is admitted.

18          MR. PETRO:  Okay.

19          THE COURT:  Is there any objection to its admission?

20          MR. YOUNG:  No, Judge.

21          THE COURT:  All right.

22          MR. PETRO:  All right.

23          THE COURT:  It will be admitted.

24      (Defendant's Exhibit 8 was received in evidence.)

25  BY MR. PETRO:

Martino - direct

390

1  Q.  Would you take a look at that.  Tell me if you recognize what
2  that is, sir?
3  A.  I recognize that as a copy of the check that was given to me.
4  Q.  And on the bottom of that check, that appears to be a smudge.
5  What do you think that is, sir?
6  A.  He told me on that day that was a thumb print.
7  Q.  And with respect to the name on that particular check, the
8  name paid to the order of, could you please tell us the name on
9  the pay to the order of?
10 A.  John Theiler.
11 Q.  That will be T-h-e-i-l-e-r in the surname, is that correct?
12 A.  Yes, sir.
13 Q.  After you had this conversation and took the check --
14      MR. PETRO:  I have no other questions, Judge.  I'll
15 strike the last question.
16      THE COURT:  You have no other questions of the witness?
17      MR. PETRO:  No other questions, sir.
18      THE COURT:  Okay.
19      MR. YOUNG:  May we have a moment, Your Honor?
20    (Discussion off the record.)
21      MR. YOUNG:  No questions, Your Honor.
22      THE COURT:  All right.  You're excused.  Thank you.
23    (Witness excused.)
24      THE COURT:  Do you have a stipulation, Mr. Petro?
25      MR. PETRO:  I do have a stipulation.

1         Judge, the government and John Ford agree and stipulate

2    that the photo depicted in Defendant's Exhibit No. 1 represents

3    the photo of John Theiler obtained from the Illinois Secretary of

4    State records.

5         I'd ask leave to publish the photo if I could at this

6    time, Judge?

7              THE COURT:  You may.

8         (Said photo was viewed in open court.)

9              THE COURT:  Was that photograph admitted into evidence?

10             MR. PETRO:  I'm asking it be admitted in evidence at

11   this point, Judge.

12             MR. YOUNG:  No objection.

13             THE COURT:  That's DX or Defendant's Exhibit 9 we'll

14   call it.

15        (Defendant's Exhibit No. 9 was received in evidence.)

16             MR. PETRO:  I'm sorry, I apologize to the Court, sir.

17   Sometimes what happens, Judge, I think Ms. Michaelis is doing

18   something, and she thinks I'm doing something, and we have some

19   technical difficulties, and so I apologize.

20             THE COURT:  I know the feeling.  I'm sure we all do.

21   We're ahead of schedule, so take your time.

22             MS. MICHAELIS:  I apologize for the form of the

23   stipulation.  It is stipulated between the parties that on

24   November 20th, 2007, the Palatine Police Department investigated

25   a crime scene at the U.S. Bank at 1586 North Rand Road in

1    Palatine, Illinois.  At that date, time, and location, they found

2    a palm print on the glass of the rear door where the bank robbery

3    suspect exited the bank.  The palm print was preserved and sent

4    to the FBI laboratory for examination and analysis.

5            On February 1st, 2010, a latent print examiner for the

6    FBI examined this palm print.  The palm print was then compared

7    to a known palm print of the defendant John A. Ford.  The palm

8    print from the U.S. Bank was not the palm print of John A. Ford.

9            So stipulated?

10           MR. YOUNG:  So stipulated.

11           MS. MICHAELIS:  Thank you.

12       (Discussion off the record between the defendant and

13        Mr. Petro.)

14           MR. PETRO:  Judge, we rest.

15           THE COURT:  Thank you, sir.

16           Any rebuttal?

17           MR. YOUNG:  No, Your Honor.

18           THE COURT:  All right.  Ladies and gentlemen, that

19   concludes the evidence in the case.  The hour is late and the

20   parties, the lawyers and the parties want to prepare their

21   closing arguments, which we will do first thing tomorrow morning,

22   giving them that time to prepare, of course, will mean that it

23   will be concise and brief and easily understood by everybody.

24           The way this works is that the government has the burden

25   of proof, as I've said before, of course, and so they go first.

393

1  It's sort of like a debate for those of you who debated in high

2  school or college, it's the same format.  The government goes

3  first, the defense then gets a chance to make its closing

4  argument or his closing argument, and then the government gets a

5  brief rebuttal after that.

6          And so we will hear from them tomorrow.  And then I will

7  give you your final instructions on the law, and you'll begin

8  your deliberations no doubt before lunch.  If you do work over

9  lunch, which is likely, there is a free lunch every once in a

10 while in this world, and tomorrow is one of those days.

11         Because of a conflict, I'd like to begin earlier, but

12 I'm going to ask you all to be here at 9:45 in the hope that we

13 can start as close to that hour as possible, hopefully no later

14 than 10:00.  And we'll go right into closing arguments tomorrow.

15         Thank you so much for your attention.  You've been a

16 great group of people.  But remember what I always tell you,

17 don't talk about the case among yourselves or with anybody else.

18 Should there be any publicity, please don't expose yourself to

19 it.  Have a good evening, and I'll see you tomorrow.

20      (Jury out.)

21      THE COURT:  So please conform the jury instructions,

22 make sure there is a note-taking instruction in there.  Make sure

23 that you conform them to the fact that the defendant did not

24 testify.  There is about four or five instructions that mention

25 that.

 1          And then the other thing that we noticed was we did play

 2   a recording, and we did admit the CD into evidence.  So if you

 3   are going to send that back to the jury room with a recorder of

 4   some sort, we should give them an instruction I think on the

 5   recording, unless you don't care.  That's fine with me if you

 6   don't.  If neither side wants it, I don't really care.  This

 7   isn't like we've had, you know, recorded conversations and that

 8   sort of thing with undercover --

 9          MR. PETRO:  No transcript was admitted either, Judge.

10          THE COURT:  No.  But the CD was admitted.

11          MS. BELL:  Yes, Your Honor.

12          THE COURT:  It was very brief.  It was the 911 call.

13          MS. BELL:  Yes.

14          MR. PETRO:  911, yes.

15          THE COURT:  If you don't want it, that's fine with me,

16   too.  I don't think that's necessary.  If you do want it, talk to

17   each other, and just include that.

18          Get me a complete set, pages numbered, if you could do

19   that either later today, Emma will be here.  She's here much

20   later than I am.

21          MR. PETRO:  Emily, did you say?

22          THE COURT:  Emma, Emma.

23          MR. PETRO:  Emma.

24          THE COURT:  My law clerk.  If she's not here, just slip

25   it in the mail slot.  I'm here very early, so I'll take a look at

395

1    it first thing in the morning.  If there is any problems, we'll

2    talk about it.

3         I appreciate the work that's gone into this case.  I

4    know this DNA stuff is really tough.  I know it was a long

5    examination there of Ms. Brown, but it was challenging, I'm sure.

6    But I appreciate the work that went into it.  And I'll see you

7    all tomorrow morning.

8         MS. BELL:  Thank you, Your Honor.

9         MR. PETRO:  Thank you, Judge.

10    (Adjournment 3:20 p.m. until 9:45 a.m., October 15, 2010.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25